**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KIMBERLY SUTTON, ZAINAB SALMAN, DAVID RAMIREZ, and TYLER BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br> -against-<br><br>TED FOUNDATION INC.,<br><br>Defendant. | INDEX NO. 1:23-cv-09219-DEH-RWL<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6) AND THE FIRST AMENDMENT** |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

LEGAL STANDARD.............................................................................................................. 4

THE VIDEO PRIVACY PROTECTION ACT.......................................................................... 5

ARGUMENT .......................................................................................................................... 6

I.      PLAINTIFFS LACK ARTICLE III STANDING TO BRING THEIR VPPA
CLAIMS. ..................................................................................................................... 6

      a.      Plaintiffs Fail To Allege Facts Supporting Their Account Status Or That
They "Requested Or Obtained Specific Video Materials" Using TED
Accounts. ........................................................................................................ 6

      b.      Plaintiffs Fail To Allege Facts That Support A Finding That Either Of The
Traditionally Recognized Privacy Torts Applies To This Case. .......................... 8

II.     PLAINTIFFS HAVE NOT STATED A CLAIM UNDER THE VPPA. ....................... 10

      a.      Plaintiffs Fail To Allege A Subscriber Relationship With TED Sufficient
To Render Them "Consumers" Under The VPPA. ............................................. 11

      b.      Plaintiffs Fail To Allege That TED's Disclosures To Its Third-Party
Service Providers Were Not Made In The Ordinary Course Of Business........... 15

III.    THE VPPA VIOLATES THE FIRST AMENDMENT AS APPLIED TO THIS
CASE. ....................................................................................................................... 19

      a.      The First Amendment Imposes Heightened Scrutiny On Content-Based
Restrictions Of Non-Commercial Speech Like The VPPA................................ 19

      b.      Application Of The VPPA Here Is Unconstitutional Because It Expands
The VPPA Beyond What Is Necessary To Further Any Underlying
Government Interest And Renders It Unduly Overbroad. .................................. 22

      c.      The Canon Of Constitutional Avoidance Requires The Court To Construe
The VPPA In A Manner That Avoids These First Amendment Concerns........... 24

CONCLUSION..................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*330 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................................................................21

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
    671 F.3d 140 (2d Cir. 2011) ..............................................................................7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................5, 18

*Aurecchione v. Schoolman Transp. Sys.,*
    426 F.3d 635 (2d Cir. 2005) ..............................................................................5

*Austin-Spearman v. AMC Network Ent. LLC,*
    98 F. Supp. 3d 662 (S.D.N.Y. 2015) ...............................................................14

*Baker v. Bloomberg L.P.,*
    No. 22-cv-04988 (S.D.N.Y.) .............................................................................10

*Boelter v. Hearst Comm'ns, Inc.,*
    192 F. Supp. 3d 427 (S.D.N.Y. 2016) .............................................................21

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ............................................................................21, 24, 25

*Carroll v. Chick-fil-a,*
    No. 23-cv-314 (N.D. Cal.) ..........................................................................23, 24

*Carter v. Scripps Networks,*
    No. 22-cv-2031, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ............9, 10, 13, 25

*Cavazzini v. MRS Assocs.,*
    574 F. Supp. 3d 134 (E.D.N.Y. 2021) ...............................................................9

*Central Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ..........................................................................................21

*Conn. Bar Ass'n v. United States,*
    620 F.3d 81 (2d Cir. 2010) ..........................................................................20, 21

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988) ..........................................................................................25

*Ellis v. Cartoon Network, Inc.,*
    803 F.3d 1251 (11th Cir. 2015) ...........................................................11, 12, 14

*Farrell v. Burke,*
    449 F.3d 470 (2d Cir. 2006) ..............................................................................21

*Field Day, LLC v. Cty. of Suffolk*,
    463 F.3d 167 (2d Cir. 2006)...........................................................................20

*Gardener v. MeTV*,
    No. 22-cv-5963, 2023 WL 4365901 (N.D. Ill. July 6, 2023) ......................13, 14, 15

*Golden v. NBCUniversal Media*,
    No. 22-cv-9858, 2023 WL 5434378 (S.D.N.Y. August 23, 2023)....................11, 13

*Gorran v. Atkins Nutritionals*,
    279 F. App'x 40 (2d Cir. 2008) ....................................................................21

*IMDB.com v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020) ..................................................................20, 23

*IMS Health, Inc. v. Sorrell*,
    620 F.3d 263 (2d Cir. 2010)..........................................................................19

*Jusino v. Fed. Of Catholic Teachers*,
    54 F.4th 95 (2d Cir. 2022) ............................................................................25

*Kane v. DeBlasio*,
    19 F.4th 152 (2d Cir. 2021) ..........................................................................20

*Kuzenski v. Uproxx LLC*,
    No. 23-cv-945, 2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) ......................14, 15

*Lamb v. Forbes Media LLC*,
    No. 22-cv-06319, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) ..........7, 13, 14, 15

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007).............................................................................5

*Mendez v. Apple, Inc.*,
    No. 18-cv-7550, 2019 WL 2611169 (S.D.N.Y. Mar. 28, 2019).............................10

*Morrison v. Nat'l Australia Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008)..............................................................................4

*J.S. ex rel. N.S. v. Attica Cent. Schs.*,
    386 F.3d 107 (2d Cir. 2004)..............................................................................5

*Norkunas v. Wynn Resorts Hldgs.*,
    No. 11-cv-1499, 2007 WL 2949569 (D. Nev. Oct. 10, 2007)..............................10

*Perry v. Cable News Network*,
    854 F.3d 1336 (11th Cir. 2017) ......................................................................12

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015)......................................................................................................20

*Rodriguez v. Sony Computer Entm't Am.*,
  801 F.3d 1045 (9th Cir. 2015) .................................................................................16, 17

*Salazar v. Nat'l Basketball Ass'n*,
  No. 22-cv-7935, 2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023)................................8, 9, 11, 13

*Snyder v. Phelps*,
  562 U.S. 443 (2011)......................................................................................................24

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017).............................................................................6

*Sorrell v. IMS Health, Inc.*,
  564 U.S. 552 (2011).................................................................................................19, 20

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)......................................................................................................6

*Sputz v. Alltran Fin., LP*,
  No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) .................................................9

*Stark et al. v. Patreon, Inc.*,
  656 F. Supp. 3d 1018 (N.D. Cal. 2023) .........................................................20, 21, 22, 23

*Stark et al. v. Patreon, Inc.*,
  No. 22-cv-3131 (N.D. Cal.), ECF No. 49-1....................................................................16, 23

*Sterk v. Redbox Automated Retail*,
  770 F.3d 618 (7th Cir. 2014) .................................................................................16, 17, 26

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021)...................................................................................................2, 8

*Yershov v. Gannett Satellite Info. Network*,
  820 F.3d 482 (1st Cir. 2016)...........................................................................................11

**Statutes & Other Authorities**

Deloitte Global Outsourcing Survey 2022.....................................................................22

Federal Rule of Civil Procedure 12(b)............................................................... *passim*

Restatement (Second) of Torts § 652B (1977) ............................................................9

S. Rep. No. 100-599 at 14 (1988) ..............................................................................16, 25

Video Privacy Protection Act, 18 U.S.C. § 2710.................................................. *passim*

## PRELIMINARY STATEMENT

This is the latest of almost 200 recent cases filed across the country alleging that various streaming services and websites violate the Video Privacy Protection Act ("VPPA"). Indeed, over the past few years, VPPA litigation has become big business for the class action bar and, at this point, very few viable corporate targets remain. The vast majority of these cases target companies' practices of sharing data with Meta and Google in order to increase advertising revenues and monetize such data for profit. But, with most of that well having run dry, putative classes now turn to targeting non-profit organizations, cutting and pasting the same allegations yet again without recognizing critical differences between non-profit cases and those that came before them.

Defendant TED Foundation Inc. ("TED") is a New York-based 501(c)(3) organization that aims to discover, foster, and share "ideas worth spreading" in order to spark imagination, spur local and global community building, and catalyze impact. It is the curator and host of "TED Talks" and related online and in-person programming that allows leading visionaries and innovators to share their scientific, cultural, humanitarian, and academic endeavors with a global audience. Like many organizations of its size, TED relies on third-party service providers to help provide its online programming. These service providers—including Leanplum, Mixpanel, and OpenWeb—provide data management and website support to help TED fulfill its mission. And they are a *cost* to TED, not a means of financial gain. Indeed, TED's only goal is to provide videos and other content as a means of inspiration. The payoff is world-changing ideas, not profit.

This case thus marks a dramatic shift from traditional VPPA legal theory because it targets the outsourcing of information technology services, *not* advertising or data monetization. As a result, Plaintiffs' effort to apply the VPPA here is an exercise in conjecture and overreach. Not only does the Complaint fall short of establishing Article III standing or articulating a viable claim under the VPPA, but the VPPA's application as alleged also would violate the First Amendment.

More importantly, if Plaintiffs' theory were accepted, it would be disastrous for small businesses and non-profits that necessarily depend on outsourced IT support to survive and compete in the digital age. Congress never intended for the VPPA to be abused in this way.

First, Plaintiffs do not allege facts sufficient to establish Article III standing. As an initial matter, the Complaint's allegations bearing on standing are riddled with demonstrably false assertions. The e-mail addresses provided by Plaintiffs' counsel reveal that Plaintiffs did not create accounts as alleged, and Plaintiff Salman is not associated with *any* TED account. Similarly, and incredibly, Plaintiff Sutton alleges to have downloaded the TED mobile app years before it was even launched. But, even putting the falsities aside, Plaintiffs also fail to allege a concrete injury under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205-06 (2021).

Second, Plaintiffs do not allege a cognizable VPPA claim. Plaintiffs have not shown that signing up for a TED account renders them "consumers" under the VPPA because they do not allege an "ongoing commitment or relationship" with TED or any connection between account-holder status and the video content at issue. Plaintiffs also do not plausibly allege that the VPPA's exclusion for disclosures in the "ordinary course of business" does not apply. To the contrary, the Complaint's *substantive* allegations make clear that TED uses these service providers to improve website functionality, video delivery, and the customer experience—paragons of how "ordinary course of business" is defined in the VPPA and its legislative history and interpreted by courts. Plaintiffs' speculation otherwise should not be credited and is belied by their own statements.

Finally, the VPPA is a content-based restriction on speech that, as applied to the non-commercial speech here, is subject to strict scrutiny and cannot pass muster under the First Amendment. Even if intermediate scrutiny applies, Plaintiffs are asking that the Court apply the VPPA in a manner that is far broader than necessary to further any substantial interest. Extension of the VPPA to the facts here would significantly overreach and have a chilling effect on lawful

speech in violation of the First Amendment. But the Court need not reach this question, because the canon of constitutional avoidance requires that the VPPA's provisions be construed—for purposes of the Rule 12(b) analyses—in a manner that avoids such a result. For these reasons, and as set forth below, TED respectfully requests that the Complaint be dismissed.

## **BACKGROUND**

TED is dedicated to researching and championing "ideas worth spreading" through short talks and presentations that inform and educate global audiences in an accessible way. Among these are over 3,500 curated TED Talks, which have been translated into over 100 languages and viewed over 30 billion times since TED launched online in 2006. TED expanded these efforts in 2009 by creating TEDx, a licensure of TED's format to local communities around the world, and again in 2012 by creating TED-Ed animated lessons and clubs that celebrate the ideas of teachers and students. TED's work also extends beyond conferences and video series, encompassing a variety of global initiatives like the Audacious Project, which has catalyzed more than $3 billion for charities and projects that seek to make the world more beautiful, sustainable, and just.[1]

Consistent with its mission, TED makes its videos available to the public for free via browser at TED.com ("Website") and on its Android and iOS mobile applications ("Apps"). ECF No. 1 ("Compl."), ¶ 4. This case involves claims that TED "knowingly and intentionally discloses its users' personally identifiable information . . . to unrelated third parties" on its Website and Apps in violation of the VPPA. *Id.* ¶ 5. Plaintiffs' claims stem from the fact that users of TED's Website and Apps have the option to create an account. *Id.* ¶ 12. TED account holders are not alleged to (and do not) gain access to different or altered video content, but they can create a "watch later" list, sync their account across devices, watch videos offline, receive tailored TED Talks

---

[1] *See generally* "About" and "Programs & Initiatives," Ted.com, www.ted.com/about/our-organization and www.ted.com/about/programs-initiatives (last visited Dec. 12, 2023).

suggestions, and engage with "comments" on the Website. *Id.* ¶¶ 13, 94. There are no fees or activity/usage obligations associated with a TED account, and all videos available to account holders "are free to watch on the browser and app regardless of whether a user signs up to create a free account." *Id.* ¶ 11. To create an account, a user provides their name and email address, *id.* ¶ 12, and acknowledges acceptance of TED's Privacy Policy, *see id.* ¶¶ 79 n.54, 92-93 nn.69-71.

Plaintiffs allege that the Website and Apps integrate software from three third-party service providers—Leanplum, Mixpanel, and OpenWeb—who offer "built-in tools and analytics [that] allow it to collect and analyze user data." *See id.* ¶¶ 22-23, 25-30, 82-83. Using images captured from a dynamic analysis, Plaintiffs allege that TED disclosed their names, email addresses, video views, and at times a user ID to these service providers. *Id.* ¶¶ 107-110, 113-117, 120-125.

Invoking TED and third-party press materials, Plaintiffs allege that TED uses the data compiled by Leanplum and Mixpanel to "understand[] how different mobile app users engage with different content," tailor "messaging campaigns to more effectively drive an increase in views," "monitor growth, engagement, and retention," "personaliz[e] talk recommendations for any user," and "safeguard[] customer data." *Id.* ¶¶ 75-76, 78, 90-93. Quoting TED's Privacy Policy, Plaintiffs further allege that these services providers "help manage TED offerings, track the use of the content we provide, understand how our audiences are using our TED offerings, and to better personalize them," and "to help us update and maintain our website." *Id.* ¶ 92. Plaintiffs allege that TED incorporates Opentext to host and moderate the "comments" feature. *Id.* ¶ 94.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citation omitted). Rather, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by

a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys.*, 426 F.3d 635, 638 (2d Cir. 2005). Courts deciding a fact-based 12(b)(1) challenge "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [] may not rely on conclusory or hearsay statements[.]" *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

A court considering a motion under Rule 12(b)(6) must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007)). Claims should be dismissed when the allegations do not "plausibly give rise to an entitlement for relief." *Id.* at 679. While not akin to a "probability requirement," a plaintiff must allege facts that show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. A claim that alleges facts "'merely consistent with' a defendant's liability, [] 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.*

## THE VIDEO PRIVACY PROTECTION ACT

Passed in 1988 after a newspaper obtained and published a list of Supreme Court nominee Robert Bork's video rental history, the VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b). The VPPA then lists several exclusions, including for disclosures "incident to the ordinary course of business of the video tape service provider." *Id.* § 2710(b)(2)(E). The statute defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider," *id.* § 2710(a)(1), and defines "ordinary course of business" as including "debt collection activities, order fulfillment, request processing, and the transfer of ownership," *id.* § 2710(a)(2).

## ARGUMENT

### I.   PLAINTIFFS LACK ARTICLE III STANDING TO BRING THEIR VPPA CLAIMS.

Article III of the U.S. Constitution provides that federal courts only have jurisdiction over "cases" and "controversies." This requirement is satisfied only when a plaintiff alleges "an injury-in-fact [] that is fairly traceable to the challenged conduct of the defendant, and [] that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotations omitted). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (internal citation omitted).

An injury-in-fact under the VPPA requires that the disclosure involve "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Plaintiffs must therefore allege not only the facts underlying TED's alleged disclosures generally, but also those underlying TED's alleged collection and disclosure of Plaintiffs' own data, to allege standing. Plaintiffs fail to do so and, accordingly, the Complaint should be dismissed pursuant to Rule 12(b)(1).

### a.   Plaintiffs Fail To Allege Facts Supporting Their Account Status Or That They "Requested Or Obtained Specific Video Materials" Using TED Accounts.

In *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 570 (S.D.N.Y. 2017), the Court dismissed the named plaintiff's Commodities Exchange Act claim for lack of Article III standing because the complaint failed to provide the specific dates, transactions, or direction in which he was allegedly harmed. Likewise, the Complaint here merely alleges an estimated date when the Plaintiffs created a TED account and downloaded the TED App, and general windows of up to fifteen years in which they watched "various" videos from their TED accounts. *See generally* Compl. ¶¶ 103, 109, 115-16, 121. The Complaint does not identify any

specific video that any Plaintiff viewed on the Website or Apps. And although the Complaint estimates the last time each named Plaintiff viewed a TED video, it fails to specify whether any of them used their account to watch said video. *See id.* Finally, the Complaint does not even allege that Plaintiffs provided their real names or e-mail addresses to TED during account enrollment. *See id.* In other words, the Complaint simply proffers images from "tester" TED accounts created by a private research company, and asks the Court to assume that the Plaintiffs engaged with the Website and the Apps in the same manner and experienced the same disclosures.

In fact, a diligent investigation by TED to locate records relating to each Plaintiff revealed information materially contrary to the allegations in the Complaint.[2] First, the Complaint alleges that "[i]n or about January 2008, Plaintiff Sutton created a TED account and downloaded the TED App on her Android phone." Compl. ¶ 103. TED cannot locate any account for Ms. Sutton created prior to 2017, and the Android App was not available until 2010. *See* Merryman Decl. ¶¶ 8-9. Regarding Plaintiff Salman, who is alleged to have created a TED account in or about June 2013 and used that account to watch videos until May 2022, TED has no record of any account associated with Ms. Salman's e-mail. *See id.* ¶ 11. With respect to Plaintiff David Ramirez, the Complaint alleges that he created a TED account "[i]n or about January 2016 . . . [and] used the TED App to watch various videos between January 2016 and October 2023." Compl. ¶¶ 115-16. TED cannot locate any account for Mr. Ramirez created prior to 2019, and the account associated with his e-mail shows that he has not viewed a video using his account since 2021. *See* Merryman

---

[2] In support of its Rule 12(b)(1) arguments, TED submits the attached Declaration of Andrew Merryman ("Merryman Decl."). On a fact-based Rule 12(b)(1) motion, a court can consider "evidence outside the pleadings" if such evidence places "jurisdictional facts in dispute." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011); *see also Lamb v. Forbes Media LLC*, No. 22-cv-06319, 2023 WL 6318033, at *7 (S.D.N.Y. Sept. 28, 2023) (permitting defendant to proffer extrinsic evidence rebutting allegation that plaintiff "requested or obtained specific video materials" from defendant's website). As set forth herein, Mr. Merryman's declaration flatly contradicts many allegations upon which Plaintiffs rely to establish standing.

Decl. ¶¶ 13-14. Finally, the Complaint alleges that Plaintiff Baker accessed and created a TED account "[i]n or about January 2022." Compl. ¶ 121. TED's records show that the e-mail associated with Mr. Baker did not register for a Website account until July 31, 2023. Merryman Decl. ¶ 16. These inconsistencies call into question each Plaintiff's allegations regarding their account histories and Website and App interactions. *See Forbes*, 2023 WL 6318033, at \*8. Together with Plaintiffs' insufficient allegations, TED's concrete evidence of the falsity of many of Plaintiffs' allegations should be grounds for dismissal for lack of standing.

### b. Plaintiffs Fail To Allege Facts That Support A Finding That Either Of The Traditionally Recognized Privacy Torts Applies To This Case.

Even if the Complaint *had* set forth credible facts required for each Plaintiff, it nevertheless fails to establish concrete injury under the *TransUnion* standard. The Supreme Court held in *TransUnion* that "Article III standing requires a concrete injury even in the context of a statutory violation," and an injury is "concrete" only when it is a "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." 141 S. Ct. at 2205-06. Courts in this District have recognized *TransUnion*'s impact on the VPPA standing analysis: where previously plaintiffs needed only "allege a deprivation of their privacy rights under the VPPA," now courts "must ask whether Plaintiff[s] suffered a concrete harm by looking to traditionally recognized injuries." *Salazar v. Nat'l Basketball Ass'n*, No. 22-cv-7935, 2023 WL 5016968, at \*5 (S.D.N.Y. Aug. 7, 2023); *see also Forbes*, 2023 WL 6318033, at \*6. Courts have found that VPPA claims can derive from two traditionally recognized privacy torts: (1) "public disclosure of private information" or (2) "intrusion upon seclusion." *Salazar*, 2023 WL 5016968, at \*6-7; *see also Carter v. Scripps Networks*, No. 22-cv-2031, 2023 WL 3061858, at \*3 (S.D.N.Y. Apr. 24, 2023). Neither of these privacy torts applies here.

For one, public disclosure of private information is inapposite because Plaintiffs do not

allege that any actual person, let alone the public at large, ever saw or read the information that TED allegedly disclosed to Leanplum, Mixpanel, or OpenWeb. *See, e.g.*, *Sputz v. Alltran Fin., LP*, No. 21-cv-4663, 2021 WL 5772033, at *3 (S.D.N.Y. Dec. 5, 2021) (finding a lack of standing where disclosure of plaintiff's personally identifying information to mail vendor to process letters did "not remotely rise to the level of 'publicizing' private information to the public at large"). As with the mail vendor in *Sputz*, TED's third-party service providers operate in a closed system. *See* Merryman Decl. ¶ 5. TED also retains separate exclusivity and confidentiality agreements with Leanplum, Mixpanel, and OpenWeb to ensure that data exchanged between TED and its vendors are not sold, marketed, or otherwise used for any purpose outside of TED's services to its users. *See id.* In other words, TED account users' data is *never* publicly disclosed.

Intrusion upon seclusion also does not apply. First, "intrusion upon seclusion requires the *intrusion* to have caused an injury, *not a subsequent disclosure* of the information gained from the intrusion." *Cavazzini v. MRS Assocs.*, 574 F. Supp. 3d 134, 141 (E.D.N.Y. 2021) (emphasis added). Plaintiffs allege the complete opposite of intrusion upon seclusion, claiming injury from the *disclosure* of information, not from an intrusion. *See* Compl. ¶¶ 107−08, 113−14, 120, 125. Second, the intrusion must be "of a kind that would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977). TED is not alleged to collect or use account data for targeted advertising or to otherwise monetize the data in any way. This makes TED's case critically distinguishable from all other post-*TransUnion* VPPA cases, which involve monetizable Meta tracking pixels. *See, e.g.*, *Salazar*, 2023 WL 5016968, at *6 ("A reasonable person could find it offensive that private and personal details of their viewing preferences were shared . . . so that commercial parties could profit from targeted advertisements that were then sent to them."); *Carter*, 2023 WL 3061858, at *3 (noting that standing findings turned on "intentional[] disclos[ure] . . . to Facebook"). Here, by contrast, the alleged disclosures are not alleged to have

been offensive to Plaintiffs *or* to a reasonable person; in fact, the Website and App functions that TED's data analytics enable, such as "watch later" lists and targeted video suggestions, are some of the exact reasons why users might create an account in the first place. Further, TED's Privacy Policy clearly gives notice of and explains the scope of and reasons for the disclosures. Compl. ¶¶ 79, 92-93. Thus, because Plaintiffs do not allege harm by intrusion and TED's conduct cannot be described as highly offensive, intrusion upon seclusion is inappropriate to establish injury.

As a final matter, Plaintiffs' claim of concrete injury is also undermined by the fact that theirs is one of dozens of copycat suits brought in recent years by Plaintiffs' counsel, some of which include Plaintiff Baker. *E.g.*, *Baker v. Bloomberg L.P.*, No. 22-cv-04988 (S.D.N.Y.).[3] A plaintiff's litigation history "can undercut the sincerity of his or her expressed [injury]." *Norkunas v. Wynn Resorts Hldgs.*, No. 07-cv-096, 2007 WL 2949569, at *4 (D. Nev. Oct. 10, 2007). Together with the factual inaccuracies above, such "cut-and-paste complaints [] undermine the persuasiveness of Plaintiffs' claim to have suffered a particularized and concrete injury." *Mendez v. Apple, Inc.*, No. 18-cv-7550, 2019 WL 2611168, at *4 (S.D.N.Y. Mar. 28, 2019) ("Those who live by the photocopier shall die by the photocopier" if they "fail[] specifically to assert any concrete injury."). Absent a traditionally recognized injury, Plaintiffs' VPPA claims should be dismissed because Plaintiffs have not alleged the concrete harm necessary for Article III standing.

## II.   PLAINTIFFS HAVE NOT STATED A CLAIM UNDER THE VPPA.

Turning to the substantive elements of Plaintiffs' claims, this District has held that to state a claim under the VPPA, a plaintiff "must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any consumer' . . . (3) the disclosure was made knowingly, and (4) the disclosure was not authorized

---

[3] In addition to his VPPA cases, Plaintiff Baker has brought over a dozen cases in recent years under other federal and state privacy laws, often under the Telephone Consumer Protection Act.

by another part of the statute." *Salazar*, 2023 WL 5016968, at *4 (internal quotation omitted). As set forth below, Plaintiffs have not adequately alleged that they are "consumers" or that the VPPA's exception for disclosures "incident to the ordinary course of business" does not apply.

> **a.  Plaintiffs Fail To Allege A Subscriber Relationship With TED Sufficient To Render Them "Consumers" Under The VPPA.**

Because Plaintiffs do not allege to have rented or purchased goods or services from TED, their status as "consumers" under the VPPA hinges on whether they have adequately alleged that they are a "subscriber of goods or services from [TED]." 18 U.S.C. § 2710(a)(1). As set forth below, enrolling in a free TED account on the Website or Apps is insufficient to qualify Plaintiffs as "subscribers" under the VPPA.

The VPPA does not define "subscriber," nor has the Second Circuit addressed the issue.[4] Most courts in the Second Circuit look to *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015), as the seminal case examining what facts render a plaintiff a subscriber under the VPPA. In *Ellis*, the court held that the "common thread" of subscriber status "is that 'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." 803 F.3d at 1256. The court specifically focused on whether an "ongoing commitment or relationship" existed between the user and the site or app host, and the difference between having access to video content (like any other free user) and subscribing to it. *See id.* at 1257 ("Importantly, [a non-subscriber] is free to delete the app without consequences whenever he likes, and never access its content again.").[5] The Eleventh Circuit then enumerated six factors

---

[4] This may soon change, as an appeal of the *Salazar* decision is currently pending before the Second Circuit. *See generally* No. 23-1147 (2d Cir.).

[5] *See, e.g.*, *Golden v. NBCUniversal Media*, No. 22-cv-9858, 2023 WL 5434378, at *9 (S.D.N.Y. August 23, 2023) (collecting cases in which courts "have agreed that 'subscriber' . . . requires an 'ongoing commitment or relationship'"); *Forbes*, 2023 WL 6318033, at *13 (same). The First Circuit took a different approach to the subscriber issue in *Yershov v. Gannett Satellite Info. Network*, but still anchored its test to an identified connection between the plaintiff and the defendant's delivery of video material. *See* 820 F.3d 482, 489 (1st Cir. 2016).

indicative of a "subscriber" relationship: "payment, registration, commitment, delivery, [expressed association,] and/or access to restricted content. *Id.* at 1256 (noting that "[s]ubscriptions involve some or [most]" of these factors); *see also Forbes*, 2023 WL 6318033, at *12 (quoting *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015)) ("sign[ing] up, register[ing] for an account, establish[ing] a user ID or profile, download[ing] an app or program, or tak[ing] any action to associate herself with [the provider]").

Two years after *Ellis*, in *Perry v. Cable News Network*, 854 F.3d 1336, 1339 (11th Cir. 2017), a plaintiff alleged that CNN's app tracked user activity and sent "the collected record of viewing activity to a company called Bango, a third party company that conducts data analytics." Following *Ellis*, the court found that the plaintiff was "not a subscriber of CNN because he [had] not demonstrated an ongoing commitment or relationship with CNN." *Id.* at 1342 (alteration in original). Undeterred, the plaintiff attempted to amend his complaint to allege an ongoing relationship with CNN "by claiming that he received some exclusive or restricted content on the CNN App based on his relationship with his cable television provider and that he made payments to CNN." *Id.* at 1342. But the Court rejected this argument too, finding that it showed "a commitment to only [plaintiff's] cable television provider"—i.e., the entity that provided access to the subscribed-to video content—but *not* the app provider (CNN), with whom the plaintiff was not required to "engage [with] in any other way in order to gain access to [the video content]." *Id.*

Courts in this District likewise read *Ellis* and *Perry* to require that the alleged subscriber have an "ongoing commitment or relationship" with the defendant, as well as a connection between the subscription and the plaintiff's access to video content. *See Forbes*, 2023 WL 6318033, at *12 ("[T]o qualify as a consumer under the VPPA, a person must rent, purchase, or subscribe 'to audio visual materials, not just any products or services from a video tape service provider.'") (quoting *Salazar*, 2023 WL 5016968, at *8). At least three recent opinions have made clear that "to qualify

as a subscriber under the VPPA," a plaintiff cannot have "merely downloaded a free mobile app," or signed up for a free account "unrelated to her video viewing." *Golden*, 2023 WL 5434378, at *4; *see also Salazar*, 2023 WL 5016968, at *4 (no VPPA subscriber status where plaintiff alleged a subscription to email newsletters); *Carter*, 2023 WL 3061858, at *6 (same). And just two months ago, this Court reasoned that this line of cases "may logically extend to instances where plaintiffs allege that they created an account directly on the website." *Forbes*, 2023 WL 6318033, at *13 (citing *Gardener v. MeTV*, No. 22-cv-5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023)). In *Forbes*, one of the plaintiffs alleged subscriber status based on his account on the Forbes website. *See id.* Observing that the account was optional and "not connected to [his] ability to access video content," the Court ruled that the plaintiff was a subscriber "to the website, not [a] subscriber[] to audio visual materials" as required by the VPPA." *Id.* at *13 (internal citation omitted).

Two other courts have joined *Forbes* in declining to find "subscriber" status by virtue of an account on a video service provider's website. In *Gardener*, the court held that MeTV website account holders were not subscribers and, in so doing, stressed the fact that "anyone can view videos on [defendant] MeTV's website, without the need for a login." 2023 WL 4365901, at *1, *3. The court ultimately held that plaintiffs in the aforementioned e-mail newsletter cases were indistinguishable from the plaintiffs before it because "both had subscriptions (newsletter or website) of a kind that were unconnected to their ability to *access* video content," and "[n]either set of plaintiffs paid for this privilege, made any commitment to do so, otherwise exchanged anything of value to do so, or received special access to certain content." *Id.* (emphasis added). Thus, the plaintiffs "were free to watch or not watch [MeTV's] videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site." *Id.* (quoting *Carter*, 2023 WL 3061858, at *6). A court reached a similar outcome in *Kuzenski v. Uproxx LLC*, No. 23-cv-945, 2023 WL 8251590, at *4-5 (C.D. Cal. Nov. 27, 2023), where the plaintiffs

allegedly subscribed "to Defendant's entire website, of which a large focus is audio visual materials," in exchange for receiving a custom avatar, the ability to interact and communicate with other subscribers, the ability to earn badges and rewards, and recurring emails with links to articles and videos. The Court found that such facts satisfied only two *Ellis* factors—registration and express association—and that "Plaintiff does not allege that any of the other *Ellis* factors are present such as paying for his subscription or receiving access to exclusive video content[.]" *Id.* at *5. With regard to the interactivity features enabled by account holder status, the court found "unavailing" the plaintiff's argument that such function "enhance[d] and affect[ed] his viewing of video materials," and that such features were more akin to "social media type benefits." *Id.*

This case law makes clear that allegations that Plaintiffs enrolled in a free TED account that provides access to the same video content as a non-account-holder are insufficient to establish subscriber status under the VPPA. Plaintiffs do not allege any facts supporting a finding of an "ongoing commitment or relationship" with TED—nor could they. Plaintiffs can opt out of their account "without consequences whenever [they] like[]," and either "never access its content again" or choose to continue accessing the same content without logging in. *Ellis*, 803 F.3d at 1257-58 (alteration in original); *see also Austin-Spearman*, 98 F. Supp. 3d at 669 (finding no subscriber status where plaintiff could "decide to never visit the AMC website ever again," and, as here, "that decision will have zero consequences, costs, or further obligations"). Here, Plaintiffs' allegations are strikingly similar to those in *Forbes*, *Gardener*, and *Kuzenski*, where the plaintiff's account did not provide access to video content "that any member of the public would not otherwise have." *Forbes*, 2023 WL 6318033, at *13 (internal citations and quotations omitted); *see also Gardener*, 2023 WL 4365901, at *3-4; *Kuzenski*, 2023 WL 8251590, at *4-5. Indeed, Plaintiffs here *acknowledge* that the content Plaintiffs allege to have viewed is freely accessible (at no cost and

requiring no registration, subscription, or account) to any user. *See* Compl. ¶ 11. This critical admission forecloses any argument that Plaintiffs are subscribers under the VPPA.

Finally, Plaintiffs emphasize that they are subscribers because TED account holders receive "benefits" that include "personalized recommendations" and the ability to sync videos across devices, watch videos offline, and create a "watch later" list. *See* Compl. ¶¶ 12-13. But no precedent indicates that such benefits are at all relevant to the subscriber relationship. In *Forbes*, this Court rejected the argument that a limit on article access for non-account-holders was relevant to the subscriber analysis. 2023 WL 6318033, at *13-14 ("Plaintiff fails to explain how an article limit is relevant to a claim under the VPPA. Plaintiff does not allege how such limitations of articles is related to the video content offered by Forbes."); *see also Kuzenski*, 2023 WL 8251590, at *5 (benefits that "enhance or affect his viewing" did not create subscriber status). Such a feature is strikingly similar to the alleged "benefits" to TED account holders: none impact the actual video content offered to Plaintiffs. Plaintiffs do not allege a connection between becoming an account holder and TED's video content, nor do they allege any payment, usage, or activity requirements, or other indicia of an ongoing commitment to or relationship with TED. As such, Plaintiffs have not properly pleaded that they are subscribers (and thus consumers) under the VPPA.

**b. Plaintiffs Fail To Allege That TED's Disclosures To Its Third-Party Service Providers Were Not Made In The Ordinary Course Of Business.**

Even if TED disclosed Plaintiffs' video viewing information as alleged, Plaintiffs fail to allege sufficient facts to show that any such disclosures were not made incident to TED's ordinary course of business. To the contrary, the VPPA's "ordinary course of business" exception applies on the face of the Complaint and provides an independent basis for dismissal.

Whether a disclosure is permissible under the VPPA "turns on the underlying purpose for which [the provider] provides the information to a third party." *Sterk v. Redbox Automated Retail*,

770 F.3d 618, 626 (7th Cir. 2014). The VPPA expressly permits disclosures "incident to the ordinary course of business," 18 U.S.C. § 2710(b)(2)(E), which it says includes "debt collection activities, order fulfillment, request processing, and the transfer of ownership," *id.* § 2710(a)(2). The Senate Judiciary Report explains that this exception "allows disclosure to permit video tape service providers to use mailing houses, warehouses, *computer services*, and similar companies for marketing to their customers. These practices are called 'order fulfillment' and 'request processing.'" S. Rep. No. 100-599 at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N 4342.

As the Seventh and Ninth Circuits have observed, the ordinary course of business exception "reflects Congress' awareness of the unremarkable fact that no business is an island, and that video tape service providers, like many other businesses, 'may use third parties in their business operations.'" *Rodriguez v. Sony Computer Entm't Am.*, 801 F.3d 1045, 1054 (9th Cir. 2015) (quoting *Sterk*, 770 F.3d at 624); *see also* DOJ Mem. In Supp. of the Constitutionality of the VPPA ("Stark DOJ Br."), *Stark et al. v. Patreon, Inc.*, No. 22-cv-3131 (N.D. Cal.), ECF No. 49-1, at 11 (the VPPA includes "reasonable, limited exceptions to account for . . . the practicalities of running a business"). In *Sterk*, the Seventh Circuit observed that the exception allows disclosures attendant to "out-sourc[ing] certain 'back office' functions to various service providers." 770 F.3d at 621. It found that although when Congress passed the VPPA in 1988 it had in mind the forms of outsourcing done by brick-and-mortar stores, the exception applied to electronic data disclosures that the defendant Sterk made to a third-party customer service provider. *Id.* at 624-26.

Similarly, for a company like TED that operates primarily online, "'back-office' functions" primarily involve maintaining and improving website functionality and the visitor experience. While there is no question that such functions fall within the Senate Report's enumerated exceptions for use of "computer services" and "similar companies for marketing to [] customers," they also align with the VPPA's statutory references to "order fulfillment" and "request

processing." That is because the "request" and "order" at issue—both under the VPPA and the facts alleged in the Complaint—is the "delivery of video content or services." *See Sterk*, 770 F.3d at 620 (customer service disclosures were incident to "request processing"); *Rodriguez*, 801 F.3d at 1054 ("The functions performed by these third parties fall within the definition of "order fulfillment" or "request processing."). Disclosures made to maintain, assess, and enhance the manner in which TED's "video content or services" are delivered to customers are precisely what Congress had in mind when including an "ordinary course of business" exception.

The applicability of this exception to TED's disclosures to Leanplum, Mixpanel, and OpenWeb is apparent from Plaintiffs' own allegations:

- **Leanplum.** According to Plaintiffs, TED integrates Leanplum into its app "to more effectively drive an increase in views of TED Talks[.]" Compl. ¶¶ 74-77, 90. TED utilizes Leanplum to "personaliz[e] talk recommendations for any user, based on the individual viewer's interest and motivations." ¶ 91. Plaintiffs quote TED's Director of Mobile and Platforms, Cody Winn, as saying that Leanplum is TED's "avenue for understanding how different mobile app users engage with different content," ¶ 75, and that it is used primarily by "our team focused on editorial and product engagement," ¶ 76, in order to "make decisions on messaging strategies and switch gears when needed," ¶ 77.

- **Mixpanel.** According to Plaintiffs, Mixpanel is a data analytics tool that TED uses to "analyze user metrics, view how users convert at each step, and monitor growth, engagement, and retention." *Id.* ¶ 78 (cleaned up). Plaintiffs also cite TED's Privacy Policy, which states that TED uses Mixpanel "to help manage TED offerings, track the use of the content we provide, understand how our audiences are using our TED offerings, and to better personalize them." *Id.* ¶¶ 78-81, 92-93. Plaintiffs further quote from TED's website that TED "may provide information to [such] partners to *help us update and maintain our website*." *Id.* Plaintiffs also allege that TED has "admitted" that it "leverages Mixpanel's ability to 'safeguard[] customer data.'" *Id.* ¶ 93.

- **OpenWeb.** According to Plaintiffs, OpenWeb is "an innovative social engagement platform" that TED integrates into its Website to host, moderate, and provide functionality for users to make and interact with public comments. *See id.* ¶¶ 82-86, 94.

The Complaint speaks for itself, alleging that the disclosures enabled TED to enhance the customer experience and stimulate engagement with its videos, provide customer service, and maintain and improve the functionality of the Website and Apps. Not only do Plaintiffs fail to adequately allege

that the disclosures do not fit within the "ordinary course of business" exception (as is required by Rule 12(b)(6)); they show that the exception *does* apply.

In contrast to their specificity about the foregoing IT uses, Plaintiffs do not plausibly allege that TED used Leanplum, Mixpanel, or OpenWeb to engage in targeted advertising or to monetize viewers' data. Rather, the allegations that TED had any underlying advertising or financial motivations are purely conclusory, untethered from supporting facts, and entirely contradicted by dozens of substantive allegations, quotes, and references concerning the purpose of TED's alleged disclosures. Tellingly, although Plaintiffs include numerous allegations concerning the theoretical uses to which companies *can* put Leanplum's and Mixpanel's data tracking technologies, *see id.* ¶¶ 46, 74, 81, and concerning OpenWeb's advertising offerings, *see id.* ¶¶ 59-65, 84-86, Plaintiffs do not allege that Leanplum, Mixpanel, or OpenWeb provided any such services *to TED*. In other words, Plaintiffs allege only that Leanplum, Mixpanel, and OpenWeb have the *capacity* to assist their clients with advertising and marketing goals. Such allegations "stop[] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.

Finally, forcing TED into discovery on the "ordinary course of business" exception based on pure speculation and conjecture---and given the uses *acknowledged* in the Complaint---would strike at the heart of IT and data services functions that are both ubiquitous and *necessary* for small businesses and non-profits to participate and compete in today's economy. Only the largest and most sophisticated companies can afford to develop and internalize technical functionality and data management functions; the rest must outsource. Third-party service providers like Leanplum, Mixpanel, and OpenWeb level the playing field by enabling companies—even a non-profit organization like TED—to hold their own in the digital age. Given this reality, as well as the hard facts alleged in the Complaint, Plaintiffs' claims should be dismissed for failure to plausibly allege that the disclosures did not occur in the "ordinary course of business."

## III.   THE VPPA VIOLATES THE FIRST AMENDMENT AS APPLIED TO THIS CASE.

Although the Court need not reach the issue, application of the VPPA to TED's alleged disclosures to third-party service providers also does not pass muster under the First Amendment. The Court should dismiss Plaintiffs' VPPA claim either as unconstitutional as applied to TED or because the canon of constitutional avoidance compels it to construe the VPPA's provisions in favor of TED to avoid the statute running afoul of weighty constitutional concerns.[6]

### a.   The First Amendment Imposes Heightened Scrutiny On Content-Based Restrictions Of Non-Commercial Speech Like The VPPA.

It is well settled that the disclosure prohibited by the VPPA—of information that "identifies a person as having requested or obtained specific video materials or services"—is speech entitled to First Amendment protection. Indeed, the Supreme Court made clear over a decade ago that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011) (restriction on pharmacies from selling data for marketing purposes violated First Amendment); *see also IMS Health, Inc. v. Sorrell*, 620 F.3d 263, 271-72 (2d Cir. 2010) ("The First Amendment protects even dry information[.]").

In evaluating whether a law violates the First Amendment, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Here, there is no question that the VPPA, which restricts the disclosure of specific information and only by specific speakers,

---

[6] As-applied challenges consider the parties and allegations of a particular case "to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006) (internal citations omitted). They are preferred over facial challenges so that courts can "decide constitutional attacks on the narrowest possible grounds[.]" *Kane v. DeBlasio*, 19 F.4th 152, 174 (2d Cir. 2021). This preference is especially strong "in cases involving 'clashes between the First Amendment and privacy rights' in light of the 'sensitivity and significance of the interests presented[.]'" *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1037 (N.D. Cal. 2023).

is content-based and subject to heightened scrutiny. *See Stark*, 656 F. Supp. 3d at 1031 ("[T]he VPPA's regulation of video service providers disclosing consumers' personal information—as opposed to any other information—is content-based[.]"); *see also Sorrell*, 564 U.S. at 566 (law governing "records containing prescriber-identifiable information" was content-based); *IMDB.com v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (statute targeting "one type of speech: 'date or first or age information' . . . [and] a single category of speakers" was content-based).

Courts also agree, however, that "commercial speech" receives reduced protection, even if content-based. The Supreme Court has articulated two definitions of commercial speech: first, that it "does no more than propose a commercial transaction," *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)), and second, that it "relate[s] solely to the economic interests of the speaker and its audience," *id.* at 94 (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)). Under *Central Hudson*, a regulation of commercial speech must "directly advance a substantial governmental interest and be no more extensive than is necessary to serve that interest." *Id.* at 92 n.14. The regulation also cannot be unconstitutionally vague or its prohibitions too broad in their sweep, failing to distinguish between conduct that may be proscribed and conduct that must be permitted." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973). This final analysis "prevent[s] the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that may fall within the scope of a prohibition, even if they are not entirely sure whether it does." *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006).

TED's speech does not fit either definition of commercial speech. To state the obvious, the alleged disclosures—and TED's interactions with users more broadly—do not involve commercial transactions. Nor do they "relate solely to the economic interest of the speaker and its audience." *Conn. Bar Ass'n*, 620 F.3d at 94; *see also Gorran v. Atkins Nutritionals*, 279 F. App'x 40, 41 (2d

Cir. 2008) (portion of website that sought "to communicate a particular view on health, diet, and nutrition," was noncommercial speech even though website also had commercial elements). The allegations here are a far cry from the two cases that have found speech regulated by the VPPA and a related state law commercial. *See Boelter v. Hearst Comm'ns*, 192 F. Supp. 3d 427, 445 (S.D.N.Y. 2016) (speech disclosed individuals "who purchase [certain] products"; "relays an individual's economic decisions, elucidates an individual's economic preferences, and facilitates the proposal of new commercial transactions"; and results in "profit from the collection and sale of data"); *Stark*, 656 F. Supp. 3d at 1033-34 ("There is no indication that either party to this transfer of information had an non-economic motivation," and disclosure was aimed "to more effectively sell or otherwise monetize their products[.]"). In fact, in *Stark*, the court stressed that applying the VPPA in a "non-economic motivation" context would implicate non-commercial speech, and would be subject to "the rigor of strict scrutiny." 656 F. Supp. 3d at 1036-37.

In this case, the free, publicly available videos available on TED's website are not alleged to be connected to any purchase or sale, nor are TED's alleged disclosures motivated by a desire for financial gain. Instead, the underlying disclosures wholly concern and are aimed at enabling TED's digital "marketplace of ideas" and proliferation of messages of the utmost public concern. *See 330 Creative LLC v. Elenis*, 600 U.S. 570, 584-85 (2023) ("[I]f there is any fixed star in the constitutional constellation of the United States, it is the principle that the government may not interfere with an uninhibited marketplace of ideas.") (internal citations omitted). As discussed in Part II.b, the Complaint and all materials cited therein make clear that the use of data was intended to improve the customer experience and website functionality and to assist in TED's promulgation of "ideas worth spreading." Strict scrutiny therefore applies to TED's as-applied challenge, but as set forth below the Complaint does not pass muster regardless of which level of scrutiny applies.

   **b.  Application Of The VPPA Here Is Unconstitutional Because It Expands The VPPA Beyond What Is Necessary To Further Any Underlying Government Interest And Renders It Unduly Overbroad.**

Although the almost 200 VPPA cases filed in recent years against every manner of website owner suggest that the statute may be facially overbroad, and litigants' and courts' diverging interpretations of its language suggest that it may be unduly vague, *no* reading of the VPPA can render it constitutional as applied to the case at hand. And while the VPPA should be reviewed under strict scrutiny, the VPPA does not survive even if intermediate scrutiny applies.

As an initial matter, the government does not have a substantial or compelling interest in preventing the confidential, non-public disclosures alleged here, which are not plausibly alleged to have been made for any reason other than assisting TED in managing and maintaining its website. In fact, as applied here, the VPPA's prohibitions do *not* align with Congress's overarching intent to prevent the public disclosure of consumers' viewing history. Consider, for example, that the most commonly outsourced corporate functions are IT, data management, and cybersecurity.[7] Rather than keeping customer data on internal systems with varying degrees of sophistication, companies regularly elect to contract with data managers and warehouses to ensure the security of customer data while remaining in compliance with various preservation and retention obligations. The VPPA's application here would prohibit companies like TED from "disclosing" certain customer data to outside service providers, meaning that such data would likely remain on company systems and arguably become *more* likely to be compromised or publicly disclosed.

Whatever the merit of Congress's interest in protecting privacy when enacting the VPPA, broadening its scope to reach TED's alleged disclosures is by no means "sufficiently narrowly drawn" to protect that interest. Of the recent onslaught of VPPA cases, the vast majority concern

---

[7] *See* Deloitte Global Outsourcing Survey 2022, at 7, 10, http://www.deloitte.com/content/dam /Deloitte/us/Documents/process-and-operations/us-global-outsourcing-survey-2022.pdf.

disclosures for advertising purposes, with over 90% involving data shared with Meta or Google. This is consistent with most conceptions of the VPPA's reach. *See, e.g.*, *Stark*, 656 F. Supp. 3d at 1036-37 ("Patreon's alleged speech at issue is commercial—as is most similar speech governed by the VPPA in the context of corporate data collection and analysis"); Stark DOJ Br. at 16 (noting that "the VPPA's disclosure prohibitions are targeted at the commercial entities"); DOJ Mem. in Supp. of the Constitutionality of the VPPA ("CFA DOJ Br."), *Carroll v. Chick-fil-a*, No. 23-cv-314 (N.D. Cal.), ECF No. 36-1 at 8 ("the VPPA regulates commercial speech"). Courts and the DOJ have also contrasted such commercial uses from noncommercial uses like those now before the Court, recognizing that restrictions on the latter are unlikely to pass muster. *See, e.g.*, *Stark*, 656 F. Supp. 3d at 1037 (commercial transaction like a video rental "does not remove [later] noncommercial speech from the rigor of strict scrutiny"); *IMDb.com*, 962 F.3d at 1122 (data restriction on "free, publicly available" website that "d[id] not propose a commercial transaction" violated First Amendment); Stark DOJ Br. at 8 ("any hypothetical non-commercial application of the statute is trivial in comparison to the statute's *legitimate* scope") (emphasis added).

Many VPPA plaintiffs share this view, arguing in response to overbreadth challenges that "website owners/operators with no commercial interest (such as a non-profit entity) are clearly beyond the scope of the VPPA."[8] Indeed, until now, the threat that a plaintiff would bring claims based on disclosures not motivated by financial gain was largely speculative. *See* Stark DOJ Br. at 11 (noting "the VPPA's restrictions have overwhelmingly been applied to disclosures of private information for financial gain"); CFA DOJ Br. at 12 (arguing that the defendant "fails to identify any hypothetical non-commercial application of the statute"). In response to constitutional

---

[8] *See Carroll v. Chick-Fil-A*, No. 23-cv-314 (N.D. Cal.), ECF No. 49 at 7. Plaintiffs have made identical arguments concerning the VPPA's inapplicability to non-profit entities in over a dozen cases this year, including against Ashley Global Retail, Buzzfeed, Denny's, Feld Entertainment, General Mills, Hershey, J.M. Smuckers, J.P. Boden, Jostens, Luxy, Tapestry, and Sound United.

overbreadth concerns, the DOJ has also pointed to the fact that the VPPA includes protections against such overbreadth in the form of its exclusions for "the practicalities of running a business" and for "entities whose mission is to publicize information of public import," *id.* at 11.[9]

Application of the VPPA here will contravene these principles and have repercussions and a chilling effect far beyond the pale of Congress's intent. First, it will open the floodgates of litigation against small and non-profit businesses who need to outsource various corporate functions. Only companies that achieve the scale and technical know-how required to internalize data-related functions will feel secure in their ability to fully utilize data analytics, and those that cannot will be unable to take refuge in the fact that their data analytics are used for website or customer experience improvements rather than for pecuniary gain. And second, the VPPA as applied here will "cause[s] others not before the court to refrain from constitutionally protected speech." *Broadrick*, 413 U.S. at 612. Online video content is a pervasive presence on the internet, and if the VPPA applies to the limited, non-pecuniary, confidential disclosures alleged here, it will have a substantial chilling effect on thousands of other organizations' operations online.

### c.   The Canon Of Constitutional Avoidance Requires The Court To Construe The VPPA In A Manner That Avoids These First Amendment Concerns.

It is a "cardinal principle . . . beyond debate" that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of

---

[9] Such pronouncements further support a finding of unconstitutional vagueness or overbreadth as applied. If found to support the VPPA's application here, terms like "subscriber" and "ordinary course of business" are fatally misleading and/or indistinct to put website owners on notice of who and what conduct the VPPA proscribes. *See Broadrick*, 413 U.S. at 612. Likewise, the notion that the VPPA does not apply to entities like TED whose "mission is to publicize information of public import" is grounded not in the VPPA's text but in jurisprudence placing such speech at "the heart . . . of First Amendment protection" and on the "highest ruing of the hierarchy of First Amendment values." *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988); *see also Jusino v. Fed. Of Catholic Teachers*, 54 F.4th 95, 101 (2d Cir. 2022) (recognizing "the longstanding principle that acts of Congress 'ought not be construed to violate the Constitution if any other possible construction remains available'") (citation omitted).

The VPPA's application to the facts alleged in the Complaint would be unprecedented and would expand the statute's reach further than ever before. In essence, Plaintiffs would have the Court not only disregard the canon of constitutional avoidance, but rather take the opposite approach and construe the VPPA in the manner *most* likely to cause First Amendment concerns. Indeed, courts in this District and across the country have toiled with several VPPA terms relevant here. *See, e.g.*, *Carter*, 2023 WL 3061858, at *4-5 (using dictionary definitions, statutory interpretation, and legislative history to interpret "consumer" and "subscriber," and noting differing views of First and Eleventh Circuits); *Sterk*, 2013 WL 4451223, at 5 (plaintiff argued that while the "lay meaning" of "ordinary course of business" encompassed the disclosure, the Senate Report "displaces that otherwise clear meaning"); CFA DOJ Br. at 1 (advocating for application of constitutional avoidance doctrine). Rather than confronting TED's as-applied First Amendment challenge, the court can avoid such complications altogether by construing certain of the VPPA's provisions in a way that obviates TED's constitutional concerns.

Because the VPPA cannot be applied as Plaintiffs urge without unduly restricting lawful speech, the Court should decline to give the VPPA an overbroad reading and choose instead to preserve its proper scope. Otherwise the Court must decline to apply the statute at all.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss Plaintiffs' claims with prejudice and, further, that Defendant be granted leave under Federal Rule of Civil Procedure 54 to move for fees and costs associated with defending this action.

Dated: December 13, 2023     Respectfully submitted,

By: _/s/ Ryan P. Phair_____
   Ryan P. Phair (*pro hac vice*)
   Carter C. Simpson (*pro hac vice forthcoming*)
   Emma L. Hutchison (*pro hac vice*)
   **PAUL HASTINGS LLP**
   2050 M Street, N.W.
   Washington, DC 20036
   ryanphair@paulhastings.com
   cartersimpson@paulhastings.com
   emmahutchison@paulhastings.com
   Telephone:  1(202) 551-1753
   Facsimile:  1(202) 551-0253

   *Attorneys for Defendant TED Foundation Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Ryan P. Phair, hereby certify under penalty of law that on December 13, 2023, I caused a copy of the foregoing to be served electronically on all counsel of record via ECF.

                                          */s/ Ryan P.Phair*
                                          Ryan P. Phair