**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KIMBERLY SUTTON, ZAINAB SALMAN, DAVID RAMIREZ, and TYLER BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TED FOUNDATION INC.,<br><br>Defendant. | Case No. 1:23-cv-09219-NSR<br><br>Hon. Dale E. Ho |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Dated: January 10, 2024

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou (*Admission Forthcoming*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**PAGES**


INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................2

I. PLAINTIFFS SUFFICIENTLY ALLEGE ARTICLE III STANDING ..............................2

A. Plaintiffs Each Allege Their Specific PII Was Disclosed......................................2

B. Courts Have Repeatedly Held That Violations Of The VPPA Give Rise To Article III Standing .....................................................................................5

II. PLAINTIFFS SUFFICIENTLY ALLEGE VIOLATIONS OF THE VPPA .......................9

A. Plaintiffs' Allegations Sufficiently Show A Subscriber Relationship With TED ...9

1. Plaintiffs Are Subscribers Under The First Circuit's Standard .................10

2. Plaintiffs Are Subscribers Under The Eleventh Circuit's Standard...........10

B. Defendant's Disclosures Were Not Exempt From The VPPA ............................15

1. The Ordinary Course Of Business Exception Is An Affirmative Defense That Cannot Be Resolved At The Pleading Stage ....................................15

2. Plaintiffs Explicitly Allege That Defendant Disclosed Their Personal Information For Purposes Of Its "Marketing, Advertising, And Analytics" ..........................................................................................16

III. THE VPPA COMPORTS WITH THE FIRST AMENDMENT......................................19

A. At Most, Intermediate Scrutiny Should Apply .....................................................19

B. The VPPA Satisfies Intermediate Scrutiny..........................................................21

1. Congress's Asserted Interest is Substantial ..............................................21

2. The VPPA Directly Advances Privacy And Intellectual Freedom ............22

3. Congress Narrowly Tailored the VPPA to Protect Privacy and Intellectual Freedom ................................................................................23

C. The Canon Of Constitutional Avoidance Is Inapplicable .....................................24

## TABLE OF AUTHORITIES

**Page**(s)

**Cases**

*ACA Connects – Am.'s Communications Ass'n v. Frey*,
471 F. Supp. 3d 318 (D. Me. 2020) ........ 19

*Acquisition XC, Inc. v. Kings Harbor Care Center*,
1999 WL 223152 (S.D.N.Y. Apr. 16, 1999) ........ 23

*Adams v. America's Test Kitchen, LP*,
2023 WL 4304675 (D. Mass. June 30, 2023) ........ 16

*Aitkin v. Communications Workers of America*,
496 F. Supp. 2d 653 (E.D. Va. 2007) ........ 21

*Austin-Spearman v. AMC Network Enter. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 20156) ........ 11, 13

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) ........ 22

*Boelter v. Advance Magazine Publishers Inc.*,
210 F. Supp. 3d 579 (S.D.N.Y. 2016) ........ 21, 24

*Boelter v. Hearst Communications, Inc.*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016) ........ 6, 19, 21

*Cain v. Redbox Automated Retail, LLC*,
981 F. Supp. 2d 674 (E.D. Mich. 2013) ........ 16

*Canadian St. Regis Band of Mohawk Indians v. New York*,
146 F. Supp. 2d 170 (N.D.N.Y. 2001) ........ 4, 5

*Cappello v. Walmart Inc.*,
2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) ........ 19

*Career Schools v. Healey*,
159 F. Supp. 3d 173 (D. Mass. 2016) ........ 20

*Carey v. Brown*,
447 U.S. 455 (1980) ........ 21

*Carter v. Scripps Networks, LLC*,
2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ........ 5, 14

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980) .......... 19, 20, 22, 23

*Clark v. Martinez*,
543 U.S. 371 (2005) .......... 24

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) .......... 20

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 6, 22

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) .......... 10, 11

*Feldman v. Star Trib. Media Co. LLC*,
2023 WL 2388381 (D. Minn. Mar. 7, 2023) .......... 16

*Frisby v. Schultz*,
487 U.S. 474 (1988) .......... 21

*Gardener v. MeTV*,
2023 WL 4365901 (N.D. Ill. July 6, 2023) .......... 14

*Golden v. NBCUniversal Media, LLC*,
2023 WL 5434378 (S.D.N.Y. Aug. 23, 2023) .......... 14

*Harris Pub. Broad. Serv.*,
662 F. Supp. 3d 1327 (N.D. Ga. 2023) .......... 15

*Homaidan v. Sallie Mae, Inc.*,
3 F.4th 595 (2d Cir. 2021) .......... 17

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 6, 9

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 3

*In re Hulu Priv. Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... 16

*In re Methyl Tertiary Butyl Ehter (MTBE) Prod. Liab. Litig.*,
674 F. Supp. 2d 494 (S.D.N.Y. 2009) .......... 25

*James v. Walt Disney Co.*,
2023 WL 7392285 (N.D. Cal. Nov. 8, 2023) .................. 3, 7

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .................. 24

*Katz v. Donna Karan Co.*,
872 F.3d 114 (2d Cir. 2017) .................. 3

*Kuzenski v. Uproxx LLC*,
2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) .................. 14

*Lamb v. Forbes Media LLC*,
2023 WL 6318033 (S.D.N.Y. Sep. 28, 2023) .................. 14

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022) .................. 15

*Leonard v. McMenamins, Inc.*,
2022 WL 4017674 (W.D. Wash. Sept. 2, 2022) .................. 6

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) .................. 16

*M.K. v Google LLC*,
2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) .................. 15

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023) .................. 5

*Mendez v. Apple Inc.*,
2019 WL 2611168 (S.D.N.Y. Mar. 28, 2019) .................. 9

*Mendoza v. Manymar Corp.*,
2023 WL 3043634 (S.D. Fla. Apr. 21, 2023) .................. 5

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010) .................. 25

*Morrison v. Amway Corp.*,
323 F.3d 920 (11th Cir. 2003) .................. 4

*National Artists Management Co., Inc. v. Weaving*,
769 F. Supp. 1224 (S.D.N.Y. 1991) .................. 21

*Nayab v. Cap. One Bank (USA), N.A.*,
942 F.3d 480 (9th Cir. 2019) .......... 15

*Norkunas v. Wynn Resorts Holdings, LLC*,
2007 WL 2949569 (D. Nev. Oct. 10, 2007) .......... 9

*Perry v. Cable News Network, Inc.*,
854 F.3d 1336 (11th Cir. 2017) .......... Passim

*Petty v. Goord*,
2007 WL 724648 (S.D.N.Y. Mar. 5, 2007) .......... 4

*Rodriguez v. Sony Computer Entm't Am.*,
801 F.3d 1045 (9th Cir. 2015) .......... 17

*Roman v. City of Mount Vernon*,
2023 WL 8719968 (S.D.N.Y. Dec. 18, 2023) .......... 25

*Salazar v. National Basketball Association*,
2023 WL 5016968 (S.D.N.Y. Aug. 7, 2023) .......... 5

*Satellite Information Network, Inc.*,
204 F. Supp. 3d 353 (D. Mass. 2016) .......... 6

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 20

*Stark v. Patreon, Inc.*,
656 F. Supp. 3d 1018 (N.D. Cal. 2023) .......... 20, 24

*Sterk v. Redbox Automated Retail*,
770 F.3d 618 (7th Cir. 2014) .......... 17

*Stover v. Fingerhut Direct Marketing, Inc.*,
709 F. Supp. 2d 473 (S.D.W. Va. 2009) .......... 20

*TransUnion Corp. v. FTC*,
245 F.3d 809 (D.C. Cir. 2001) .......... 21

*United States Dep't of Justice v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989) .......... 6

*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) .......... 24

*United States v. Hardin*,
2020 WL 1922594 (S.D.N.Y. Apr. 21, 2020) .......... 24

*United States v. Scott*,
919 F. Supp. 2d 423 (S.D.N.Y. 2013) .......... 24

*United States v. Security Indus. Bank*,
459 U.S. 70 (1982) .......... 25

*Volokh v. James*,
656 F. Supp. 3d 431 (S.D.N.Y. 2023) .......... 23

*Vugo, Inc. v. City of New York*,
931 F.3d 42 (2d Cir. 2019) .......... 21

*Yates v. U.S.*,
574 U.S. 528 (2015) .......... 17

*Yershov v. Gannett Satellite Information Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) .......... 1, 10

Statutes

18 U.S.C. 2710(b)(E) .......... 22
18 U.S.C. § 2710(b)(2)(B)(i) .......... 8, 19
18 U.S.C. § 2710 .......... 1
18 U.S.C. § 2710(a)(4) .......... 25
18 U.S.C. § 2710(b)(1) .......... 1
18 U.S.C. § 2710(b)(2)(D)(ii) .......... 17

Other Authorities

S. Rep. No. 100-599 .......... 1, 17, 21, 22

## INTRODUCTION

When first enacted, the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), was the latest in "a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599, at 2. Congress passed the VPPA with the goal of "preserv[ing] personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.* at 1. To that end, Congress "created a civil remedy against a 'video tape service provider' for 'knowingly disclosing, to any person, personally identifiable information concerning any consumer of such provider.'" *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016) (quoting 18 U.S.C. § 2710(b)(1)). Defendant is one such "video tape service provider."

Defendant "produces a wide variety of pre-recorded videos that are watched by millions of consumers nationwide. These platforms are accessible via browser on Defendant's website, as well as on mobile via the TED App on Android and Apple devices." Complaint ¶ 4 (ECF No. 1) ("Compl."). Plaintiffs' testing shows that, on both its website and mobile applications ("Website" and "App"), Defendant "knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties … [without] any form of consent." *Id.* ¶¶ 5, 153, 165.

Defendant spends its brief complaining about the number of other pending VPPA cases and suggesting that its widespread privacy violations should be excused because it is a nonprofit entity. None of that is relevant to the Court's determination of the issues in this case or its duty to apply federal law, which does not permit nonprofit entities to violate the VPPA. When stripped of its *ad hominem* attacks on Plaintiffs and their counsel and other rhetoric, Defendant's motion boils down to a few weak arguments that have been repeatedly rejected by other courts.

Accordingly, Defendant's Motion to Dismiss (the "MTD" or "Motion") should be denied.

# ARGUMENT

## I. PLAINTIFFS SUFFICIENTLY ALLEGE ARTICLE III STANDING

### A. Plaintiffs Each Allege Their Specific PII Was Disclosed

Defendant contends Plaintiffs have not alleged Article III standing because Plaintiffs do not allege facts "underlying TED's alleged collection and disclosure of Plaintiffs' own data, to allege standing." MTD at 6. This is wrong. Plaintiffs allege—indeed, demonstrate via testing—that Defendant discloses its users' full names, e-mail addresses, user IDs, and the name or identifier of watched videos to the various third parties. Compl. ¶¶ 35-36, 38-39, 41-42, 44, 48, 52, 54, 66, 68, 69. And, depending on whether Plaintiffs used the TED App or website, they allege their specific and aforementioned information was disclosed to the third parties. *Id.* ¶¶ 107-108, 113-114, 120, 125. This is sufficient to allege Plaintiffs' specific PII was disclosed to the third parties.

Defendant's counter-arguments are unavailing. *First*, Defendant contends "the Complaint does not even allege that Plaintiffs provided their real names or e-mail addresses to TED during account enrollment." MTD at 7. As an initial matter, the plausible inference from Plaintiffs' allegations is that their actual names and e-mail addresses were disclosed. Compl. ¶¶ 107-108, 113-114, 120, 125. Moreover, this argument rings hollow because Plaintiffs' counsel provided Defendant's counsel with the e-mails associated with Plaintiffs' TED accounts, and Defendant located at least three accounts associated with those e-mails that matched Plaintiffs' names. Merryman Decl. ¶¶ 6, 8, 13, 16. Accordingly, Defendant's own declaration rebuts its argument.

*Second*, Defendant contends "although the Complaint estimates the last time each named Plaintiff viewed a TED video, it fails to specify whether any of them used their account to watch said video." MTD at 7. This ignores the pleadings, which allege each Plaintiff "used his [or her] TED account to watch prerecorded TED videos on Defendant's Website" or mobile application. Compl. ¶¶ 103, 109, 116, 121. Further, the Merryman Declaration confirms Defendant has records

of several Plaintiffs watching videos using their TED accounts during the class period. Merryman Decl. ¶¶ 14, 16. Again, Defendant's own declaration undermines its arguments.[1]

*Third*, Defendant argues that Plaintiffs' memories are not perfect and they may have misremembered the date they created their TED account or watched videos. Even assuming Defendant's declaration is accurate (which would be improper at this stage), Defendant does not actually dispute most Plaintiffs watched videos during the class period. So, with Plaintiff Sutton, she would have watched TED videos with her account since "2017," rather than 2008. Merryman Decl. ¶ 8. With Plaintiff Ramirez, he would have watched videos with his account between September 2019 and August 2019, instead of January 2016 through October 2023. *Id.* ¶¶ 13-14. And with Plaintiff Baker, he would have watched videos with his account in July 2023, rather than "prior to 2023." *Id.* ¶ 16. None of this undermines that these Plaintiffs suffered an injury. In fact, it confirms Plaintiffs' standing, as Defendant's investigation confirms each of these Plaintiffs in fact had TED accounts attached to their actual names and e-mails and used those accounts to watch pre-recorded videos (which necessarily resulted in the disclosure of their PII). That Plaintiffs did not recall the exact dates of viewing and account creation does not undermine their standing.[2] *Katz*

[1] Plaintiffs are not required to allege the specific videos they watched. This is a privacy case, and it would not make sense for Plaintiffs to allege violations of the VPPA but then disclose their video-viewing history on a public docket. *See, e.g.*, *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *11 (N.D. Cal. Nov. 8, 2023) ("[T]o the extent Disney suggests Plaintiffs must plead the exact communications they had with the ESPN.com website, other courts have rejected that position."); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 816 (N.D. Cal. 2020) ("[T]he Court rejects Defendants' suggestion that Plaintiffs must identify specific communications that Plaintiffs reasonably believed to be private and that were wrongly recorded. The Court is not convinced that Plaintiffs are required to produce such details at the pleading stage, prior to discovery.")

[2] To the extent Defendant's investigation is correct, Plaintiffs can amend their Complaint to reflect this information. As Defendant explained, Plaintiffs voluntarily provided their information to Defendant after filing this action so it could retrieve records with the expectation that Defendant would report back in the event that the records revealed inconsistencies with their recollections. Had Defendant done so, Plaintiffs would have amended their complaint prior to Defendant's

*v. Donna Karan Co.*, 872 F.3d 114, 119 (2d Cir. 2017) (plaintiffs may "rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing") (cleaned up).

The one exception is Plaintiff Salman, who Defendant claims "it has no records that indicate that the e-mail address provided has interacted with the TED website or apps." Merryman Decl. ¶ 11. Without knowing how Defendant conducted its search—such as through a deposition of Mr. Merryman—it is impossible to verify the veracity of Defendant's declaration. But if the Court chooses to consider this declaration, then this would amount to a "factual attack" on standing, which would necessitate converting the Motion into one for summary judgment or a Rule 12(b)(6) motion. *Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F. Supp. 2d 170, 183 n.12 (N.D.N.Y. 2001) (where "[t]he standing question presented in this case … is clearly intertwined with the merits," a "Rule 12(b)(1) motion to dismiss would have to be converted into a Rule 12(b)(6) or Rule 56 summary judgment motion"); *see also Petty v. Goord*, 2007 WL 724648, at *5 (S.D.N.Y. Mar. 5, 2007) (converting Rule 12(b)(1) motion into a summary judgment motion where "both Petty and the defendants have submitted materials outside of the pleadings to the Court"); *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (holding "[i]f a jurisdictional challenge does implicate the merits of the underlying claim then[] … the defendant is forced to proceed under Rule 12(b)(6) [] or Rule 56 [] both of which place great restrictions on the district court's discretion") (cleaned up). Under this caselaw, the Court could convert Defendant's standing challenge into a Rule 12(b)(6) motion, which would require the Court to take Plaintiff Salman's allegations as true and leave Defendant's declaration for another day. Or, the

motion and the Court and parties would not now be burdened with addressing these issues that could have been handled collaboratively by the parties. It is entirely unremarkable that Plaintiffs did not recall exact dates they watched videos or downloaded mobile applications.

Court could convert the Motion to one for summary judgment, but that would be premature given "sufficient affidavit and other necessary documentary evidence necessary to decide such a [] factual issue is not before [the Court] at this time." *Mohawk Indians*, 146 F. Supp. 2d at 183 n.12; *see also Mendoza v. Manymar Corp.*, 2023 WL 3043634, at *1 (S.D. Fla. Apr. 21, 2023) ("The Court will not decide a motion for summary judgment on such an undeveloped record—especially where the record already contains competing facts—and sees no benefit in converting this motion to one for summary judgment at such an early stage in the case."). In either case, Defendant's declaration should not serve as a basis to dismiss Plaintiff Salman's claim.[3]

### B. Courts Have Repeatedly Held That Violations Of The VPPA Give Rise To Article III Standing

Defendant contends "[e]ven if the Complaint had set forth credible facts required for each Plaintiff [and it does], it nevertheless fails to establish concrete injury under the *TransUnion* standard." MTD at 8 (cleaned up). What Defendant attempts to gloss over is that—before or after *TransUnion*—"courts have consistently found that plaintiffs satisfy the concreteness requirement of Article III standing where they allege[d] a deprivation of their privacy rights under the VPPA." *Salazar v. National Basketball Association*, --- F. Supp. 3d ---, 2023 WL 5016968, at *5 (S.D.N.Y. Aug. 7, 2023) (standing alleged where "Plaintiff alleges that NBA.com shared private information about, among other things, his video viewership to a third party without his consent or knowledge, resulting in targeted advertisements being sent to him"); *see also*, *e.g.*, *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 283 (S.D.N.Y. 2023) ("The plaintiff has sufficiently alleged standing. Martin was allegedly harmed when his information was disclosed to a third party."); *Carter v. Scripps*

[3] If the Court dismisses Plaintiff Salman's claim based on Defendant's declaration, then Plaintiff Salman should be provided leave to amend to come forth with evidence that she was a TED account holder.

*Networks, LLC*, --- F. Supp. 3d ---, 2023 WL 3061858, at *3 (S.D.N.Y. Apr. 24, 2023) ("[D]efendants' alleged disclosure of plaintiffs' personal information and viewing activities describes traditionally recognized harm."); *Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427, 438 (S.D.N.Y. 2016) ("Plaintiffs suffered a particularized, concrete injury-in-fact—the violation of their rights under the VRPA, along with economic harm—that was caused by Defendant and that can be remedied by court action."); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1340-41 (11th Cir. 2017) ("[T]he VPPA's creation of a cause of action for this type of invasion of privacy has a close relationship to a harm that has been regarded as providing a basis for a lawsuit in English or American courts.") (cleaned up); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017) ("We therefore join the two other circuits that … have found Article III standing in similar cases arising under the VPPA.").

Defendant attempts to categorize Plaintiffs' injury as either "(1) public disclosure of private information or (2) intrusion upon seclusion." MTD at 8 (cleaned up). But the VPPA protects against a different privacy harm: the right of the individual to "control of information concerning his or her person," which is encompassed by "[b]oth the common law and the literal understandings of privacy." *Yershov v. Gannet v. Satellite Information Network, Inc.*, 204 F. Supp. 3d 353, 362 (D. Mass. 2016) (quoting *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989)); *see also see also In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) (same); *Perry*, 854 F.3d at 1341 ("Supreme Court precedent has recognized in the privacy context that an individual has an interest in preventing *disclosure* of personal information.") (emphasis added). And "[n]umerous courts … have found allegations concerning the interference with plaintiffs' control over their personal data to be sufficient for standing." *Leonard v. McMenamins, Inc.*, 2022 WL 4017674, at *5 (W.D. Wash. Sept. 2, 2022).

"That is the privacy right being claimed by Plaintiffs here": that Plaintiffs' personally identifying information—their names and e-mail address—and the videos they watched were disclosed without consent to Leanplum, Mixpanel, and OpenWeb, which caused Plaintiffs to lose the right to control information concerning their persons. *James*, 2023 WL 7392285, at *5; *see also* Compl. ¶¶ 35-36, 38-39, 41-42, 44, 48, 52, 54, 66, 68, 69, 107-108, 113-114, 120, 125. And Plaintiffs allege those disclosures were specifically made "to identify Plaintiff[s]," to "attribute [Plaintiffs'] video viewing records to an individualized profile of Plaintiff[s] in [Leanplum, Mixpanel, or OpenWeb's] databases," and that this PII was used by Defendant "for marketing, advertising, and analytics purposes." Compl. ¶¶ 107-108, 113-114, 120, 125; *see also id.* ¶¶ 20-31, 59-65, 74-95. Because Plaintiffs allege "a violation of the VPPA for a wrongful disclosure," they have "satisfied the concreteness requirement of Article III standing." *Perry*, 854 F.3d at 1341.

Defendant's assortment of further arguments is unavailing. *First*, Defendant tries to distinguish VPPA cases finding standing because "TED is not alleged to collect or use account data for targeted advertising or to otherwise monetize the data in any way." MTD at 9. That is the *literal opposite* of what the Complaint alleges. Plaintiffs exhaustively allege how TED uses the personal information it discloses to the third parties: full names, e-mail addresses, and video-viewing history, to conduct targeted marketing, advertising, and data analytics—all of which drive revenue. *See*, *e.g.*, Compl. ¶ 79 ("Defendant confirms this usage of the Mixpanel API for the purposes of analyzing user behavior, targeting marketing and advertising offerings, and ultimately retaining a larger user base."); *id.* ¶ 91 ("Leanplum boasts that its partnership with Defendant was so successful that Defendant was now turning towards loftier goals: to take the next step in offering relevant content, TED is personalizing talk recommendations for any user, based on the individual viewer's interests and motivations.") (cleaned up); *id.* ¶ 93 ("Defendant has admitted that it

leverages Mixpanel's ability to safeguard customer data and logically separate user data to knowingly and intentionally drive revenue on the TED App through marketing, advertising, and analytics.") (cleaned up); *see also id.* ¶¶ 20-31, 59-65, 74-95.[4]

*Second*, Defendant contends, without citation to its declaration or the Complaint, that "the Website and App functions that TED's data analytics enable, such as 'watch later' lists and targeted video suggestions, are some of the exact reasons why users might create an account in the first place." MTD at 9-10. Defendant also contends, without providing any information regarding the design and content of its website or app, that its "Privacy Policy clearly gives notice of and explains the scope of and reasons for the disclosures." MTD at 10. As to the former, this is a factual issue, and irrelevant: a user wanting "watch lists" or video recommendations does not mean the user finds acceptable disclosing their PII and video-viewing information to third parties to enable those features, allow TED to conduct targeted marketing, and drive TED's revenue. And as to the latter, the VPPA requires any disclosure of PII to be included "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B)(i). Defendant's Privacy Policy, therefore, is insufficient for purposes of this case.

*Finally*, Defendant makes a personal attack on Mr. Baker and his counsel, arguing "Plaintiffs' claim of concrete injury is also undermined by the fact that theirs is one of dozens of copycat suits brought in recent years by Plaintiffs' counsel, some of which include Plaintiff Baker." MTD at 10. Defendant cites no allegations to suggest this is a "copycat" case (nor could it), and does not contend Plaintiffs' counsel's representation of other clients goes to the merits. *See* Comment 13 to N.Y. Rules of Professional Conduct 3.3 ("A lawyer should not make unfair or

[4] That being said, Plaintiffs are not required to allege their information was disclosed for marketing purposes in order to satisfy standing. An individual has an interest in preventing "disclosure" of their personal information (*see Perry*, 854 F.3d at 1341), regardless of use.

derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system.”).

As to Plaintiff Baker, Defendant cites one case that involves completely different technology. *See generally Baker v. Bloomberg L.P.*, Case No. 1:22-cv-4988, ECF No. 1 (S.D.N.Y. June 14, 2022) (involving allegations that Bloomberg website disclosed Facebook ID and the URLs of videos to Facebook). None of this takes away from whether Plaintiff Baker was injured by Defendant’s disclosure of his PII (or affects the standing of other Plaintiffs). *Mendez v. Apple Inc.*, 2019 WL 2611168, at *4 (S.D.N.Y. Mar. 28, 2019) (“There is nothing inherently wrong with filing duplicative lawsuits against multiple defendants if the harms to be remedied do exist and are indeed identical.”). The authorities cited by Defendant involved ADA lawsuits with pleading issues, not “repeat plaintiff” issues. *Norkunas v. Wynn Resorts Holdings, LLC*, 2007 WL 2949569, at *4 (D. Nev. Oct. 10, 2007) (“The fact that Plaintiffs have been and/or are currently involved in other ADA lawsuits does not in itself automatically render their professed intent to return to Wynn Las Vegas disingenuous. The problem is that they have not submitted any evidence … demonstrating that their intent is not as Defendants portray.”); *Mendez*, 2019 WL 2611168, at *2 (finding “the purported injuries described lack all the requisite specificity”).

Simply put, Mr. Baker has done nothing wrong by seeking to vindicate his privacy rights against those who have violated them, including Defendant.

## II. PLAINTIFFS SUFFICIENTLY ALLEGE VIOLATIONS OF THE VPPA

### A. Plaintiffs’ Allegations Sufficiently Show A Subscriber Relationship With TED

Defendant argues that Plaintiffs do not qualify as “subscribers” under the VPPA. MTD at 11. That is wrong. As alleged in the Complaint, Plaintiffs and class members subscribed to Defendant’s video service by creating accounts. “While accounts “are free of charge …

individuals must provide Defendant with their first name, last name, and e-mail address in the sign-up process." Compl. ¶ 13. "Defendant allows users that create accounts to receive 'personalized recommendations,' 'sync videos across all [of a user's] devises,' '[d]ownload videos to watch offline,' and '[a]dd talks to your list to watch later,' among other benefits." *Id.* ¶ 14.

Although the Second Circuit has not addressed the definition of a subscriber under the VPPA, the First and Eleventh Circuits have. Plaintiffs qualify as subscribers under both standards.

*1. Plaintiffs Are Subscribers Under The First Circuit's Standard*

In *Yershov*, 820 F.3d at 489, the First Circuit held that "downloading a mobile device application" was sufficient to classify the plaintiff as a "subscriber." The court reasoned that "because we think that Congress cast such a broadly inclusive net in the brick-and-mortar world, we see no reason to construe its words as casting a less inclusive net in the electronic world when the language does not compel that we do so." *Id.* at 488. The court further noted that "Congress itself, in 2012, considered the impact of the VPPA on the electronic distribution of videos and … left untouched the definition of 'consumer' in the statute, which we believe supports an inference that Congress understood its originally-provided definition to provide at least as much protection in the digital age as it provided in 1988." *Id.* These rationales were well-reasoned. After all, the harm against which Congress sought to protect is no different regardless of whether a consumer pays for a subscription or subscribes to the content by installing the app on their cell phone.

Under this standard, Plaintiffs are certainly subscribers, as each of them downloaded the TED application on their cell phones. *See* Compl. ¶¶ 103, 109, 115.

*2. Plaintiffs Are Subscribers Under The Eleventh Circuit's Standard*

In *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015), the Eleventh Circuit found that "merely downloading [an] app" did not make the plaintiff a subscriber." Instead, the court held that '"subscriptions involve some or most of the following factors: payment,

registration, commitment, delivery, expressed association, and/or access to restricted content." *Id.* (internal punctuation omitted). An analysis of these factors favors Plaintiffs.

(i) Payment

Payment did not occur here in the financial sense. But that is not determinative. As the *Ellis* decision explained, the "term 'subscriber' is not preceded by the word 'paid' in § 2710(a)(1) of the VPPA, and there are numerous periodicals … and other services that a user can sign up for (i.e. subscribe to) and receive for free. Payment, therefore, is only one factor a court should consider when determining whether an individual is a 'subscriber' under the VPPA." *Id.*

Moreover, "payment" was present here in the form of personal information provided to Defendant, which is as useful as money in today's marketplace. *See Austin-Spearman v. AMC Network Enter. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 20156) ("Conventionally, 'subscription' entails an exchange between subscriber and provider whereby the subscriber imparts money <u>and/or personal information</u> in order to receive a future and recurrent benefit") (emphasis added). The personal information Plaintiffs provided to Defendant was as good as money because it used that information, along with Plaintiffs' video-viewing records, to raise "revenue from advertisements." Compl. ¶ 14; *see also id.* ¶ 107 ("Leanplum compiled Plaintiff Sutton's PII and Plaintiff Sutton's activity on the App, which Defendant uses for marketing, advertising, and analytics purposes"); ¶ 113 (same for Salman); ¶ 120 (same for Ramirez). Thus, this factor favors Plaintiffs.

(ii) Registration

Plaintiffs allege they registered accounts with Defendant. Compl. ¶ 103 ("Plaintiff Sutton created a TED account"); *id.* ¶ 109 (same for Salman); *id.* ¶ 115 (same for Ramirez). This differs from the facts of *Perry v. Cable News Network,* 854 F.3d 1336, 1342 (11th Cir. 2017), cited by Defendant, because the plaintiff there "did not sign up for or establish an account with CNN." That case is therefore inapposite and this factor favors Plaintiffs.

(iii) Commitment

Both sides in this case committed to abide by TED's "guidelines and policies." As TED's website notes, "[i]f you create an account, you are required to provide complete and accurate information. … All TED Sites must be used based on our guidelines and policies, and if TED determines in its sole discretion that you are not using TED Sites in the way it was intended, we have the right to deactivate your account at any time."[5] Users also have the ongoing commitment of allowing TED to store their personal information for the duration of the subscription.

Indeed, this information will be retained and subscribers' accounts will persist until they take affirmative steps to deactivate them. As TED's website notes, "[i]f you have created an account and do not wish to access TED Content, you may follow the user instructions applicable for the TED Site or platform and/or ask us to manually deactivate your account."[6] TED further advises that "[w]hen your account is deactivated, your user profile and all public activities (such as comments) will be hidden."[7] Thus, without deactivation, these commitments continue.

This is an important distinction between the facts here and those of cases cited by Defendant. Defendant argues that Plaintiffs fail to allege an "ongoing commitment or relationship" with it because "they can opt out of their account without consequences whenever they like and either never access its content again or choose to continue accessing the same content without logging in." MTD at 14. But the need for account holders to deactivate their accounts in order to terminate them and regain control over their data is highly material. In *Ellis*, the plaintiff never created any account whatsoever to begin with. The same was true in *Spearman*, where the

---

[5] https://www.ted.com/about/our-organization/our-policies-terms/ted-com-terms-of-use (last accessed 1/10/24).

[6] *Id.*

[7] https://www.ted.com/about/our-organization/our-policies-terms/privacy-policy (last accessed 1/10/24).

plaintiff did not "'sign up,' register for an account, establish a user ID or profile, download an app or program, or take any action to associate herself with AMC." 98 F. Supp. 3d at 669. Those cases are inapposite because they involved no registration to begin with. And Defendant's suggestion that something cannot be a "subscription" if it can be terminated lacks any support.

Thus, this factor also favors Plaintiffs.

(iv) Delivery

TED delivers video content to all account holders. Compl. ¶¶ 11-13. Thus, this factor favors Plaintiffs.

(v) Expressed Association

The "expressed association" factor similarly favors Plaintiffs in that they were specifically assigned "accounts" with TED. Indeed, they were each assigned User IDs: "A user ID is a unique string of numbers which Defendant assigns to an individual user after a user creates a TED account. The unique user IDs allow Defendant to identify and track an individual user." Compl. ¶ 43.

(vi) Access to Restricted Content

Account subscribers with TED also receive significant video-related benefits, including "personalized recommendations," and allowing them to "'sync videos across all [of a user's] devises,' '[d]ownload videos to watch offline,' and '[a]dd talks to your list to watch later,' among other benefits." *Id.* ¶ 14. Defendant argues that this does not constitute "restricted content." But common-sense dictates otherwise. Personalized recommendations and syncing are newly available technologies that were less prevalent years ago when *Ellis* was authored and were entirely non-existent when the VPPA was enacted. But they are hallmarks of any modern-day subscription service, whether it is Netflix, HBO, or Spotify. Moreover, the ability to download videos and play them offline *absolutely* constitutes restricted content. Just ask anyone in an airplane or underground on the subway.

In this regard, the facts of this case also differ from the cases cited by Defendant. In *Kuzenski v. Uproxx LLC*, 2023 WL 8251590, at *1 (C.D. Cal. Nov. 27, 2023), the plaintiffs argued that "subscribers receive benefits including a unique user profile with a custom avatar, the ability to interface and communicate with other subscribers, earn badges and rewards, and receive 'recurring emails from Defendant with links to articles and videos published to the Website." But unlike here, none of those benefits are specific to videos. Indeed, they have nothing to do with video-watching at all.

Similarly, in *Scripps Networks*, 2023 WL 3061858, at *6, the court found that the plaintiffs failed this factor because "the Complaint did not include facts that plausibly alleged that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience." But here, the benefits attendant to account creation certainly enhanced and affected subscribers' viewing experience.

Indeed, this concept holds true for every case cited by Defendant on this point. *See Gardener v. MeTV*, --- F. Supp. 3d ---, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) (plaintiffs were not subscribers where subscription was "unconnected to their ability to access video content" and they received "no special access to certain content"); *Golden v. NBCUniversal Media, LLC,* ---F. Supp. 3d ---, 2023 WL 5434378, at *9 (S.D.N.Y. Aug. 23, 2023) (subscription was insufficient under VPPA where it "did not provide … any video viewing benefits beyond those to any member of the public."); *Lamb v. Forbes Media LLC,* 2023 WL 6318033, at *13 (S.D.N.Y. Sep. 28, 2023) (subscription was insufficient under VPPA where plaintiff did not allege that it "enhanced or in any way affected her viewing experience").

Defendant's argument that this case should be dismissed based on the holdings of these decisions should be rejected. The Court is well within its discretion to follow the above-cited and

well-reasoned *Yershov* decision. And even courts within the Eleventh Circuit have not necessarily required any showing of enhanced video-viewing benefits to find the presence of valid subscriptions under the VPPA. *See Harris Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, at *3 (N.D. Ga. 2023) ("periodic newsletters and emails from Defendant" were sufficient benefits for subscription under VPPA); *Lebakken v. WebMD, LLC,* 640 F. Supp. 3d 1335, 1340 (N.D. Ga. 2022) (Plaintiff was subscriber where "she allege[d] that she exchanged her email address to receive the WebMD e-newsletter and that she also created her own WebMD account").

But even if the Court sides with the holdings of the cases cited in Defendant's brief, they simply do not apply here. As shown herein, the video-viewing enhancements provided by account subscriptions with TED, and the exclusive access to downloaded content set it apart in terms of what it means to be a subscriber to a videotape service provider under the VPPA.

### B. Defendant's Disclosures Were Not Exempt From The VPPA

Defendant contends that the "disclosures were [] made incident to TED's ordinary course of business, … align[ed] with 'order fulfillment' and 'request processing.'" MTD at 15–17. Defendant is wrong.

#### *1. The Ordinary Course Of Business Exception Is An Affirmative Defense That Cannot Be Resolved At The Pleading Stage*

Defendant's argument is a complete nonstarter because the Court is not empowered to address it at the pleading stage. As a court in the Northern District of California recently explained, under the VPPA, a plaintiff "has no duty to foreclose an ordinary course of business defense in his complaint." *M.K. v Google LLC*, 2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) (citing Nayab v. Cap. One Bank (USA), N.A., 942 F.3d 480, 494-95 (9th Cir. 2019) ("The burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits.... The plaintiff need not negative the

exception to the statute. If the defendant wishes to rely upon the proviso, the burden is upon it to bring itself within the exception."), *Adams v. America's Test Kitchen, LP*, 2023 WL 4304675, at *8 (D. Mass. June 30, 2023) (plaintiff need not negate "consent" exception to VPPA liability at the pleading stage, as it is akin to an affirmative defense), and *Feldman v. Star Trib. Media Co. LLC*, 2023 WL 2388381, at *11 (D. Minn. Mar. 7, 2023) (same)).

### *2. Plaintiffs Explicitly Allege That Defendant Disclosed Their Personal Information For Purposes Of Its "Marketing, Advertising, And Analytics"*

Notwithstanding that Plaintiffs were not required to allege the non-applicability of the exception, Plaintiffs did so anyway. As Plaintiffs alleged in the Complaint, Defendant disclosed personally identifiable information to third parties in order to assist with "Defendant's marketing, advertising, and analytics." Compl. at ¶¶ 46, 49, 81, 86, 90, 93, 95, 107–108, 113–14, 120, 125. Numerous courts have found that these activities fall outside the ordinary course of business. *See Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (holding that "analytics" and "advertising" are purposes that "do not fall within the narrow categories statutorily defined as the 'ordinary course of business'"); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (finding the disclosure of personally identifiable information "for the purpose of … promotions[] and analytics … do[es] not appear to fall within the narrow categories of 'debt collection activities, order fulfillment, request processing, and transfer of ownership'"); *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *7 (N.D. Cal. Apr. 28, 2014) (observing that the defendant used a third-party's identifier to "track Hulu users' activities," and that "was not part of orders processing").

Defendant's attempt at placing TED's illegal disclosures under the ordinary course of business exception through Congress' use of the words "computer services" is a misinterpretation of the law. *See* MTD at 16. Defendant references the legislative history, specifically the portion

explaining that Congress intended the exception to cover "mailing houses, warehouses, *computer services*, and similar companies for marketing to their customers." MTD at 16 (emphasis in original); *see also* S. Rep. No. 100-599, at *14. Defendant claims Congress intended to exempt from VPPA regulation and allow such "computer services" and "similar companies" to conduct "marketing" to customers. MTD at 16.[8] But the VPPA separately *explicitly regulates* disclosures made for "marketing goods and services directly to the consumer." 18 U.S.C. § 2710(b)(2)(D)(ii).

That makes sense because the entities listed in the legislative history – "mailing houses," "warehouses," and "similar companies" – are passive repositories of information. It is true that with the continuous development of technology, the definition of 'computer services' today could be very broad. But the Court should not interpret "computer services" here so broadly "that it is inconsistent with its accompanying words, thus giving unintended breadth to Acts of Congress." *Yates v. U.S.*, 574 U.S. 528, 543 (2015). Accordingly, applying the noscitur a sociis canon of interpretation to give a word "more precise content by the neighboring words with which it is associated," it follows that "computer services,"—as used here in a single list with "mailing houses," "warehouses," and "similar companies,"—was also intended to fall into the category of passive information storage services, such as warehouses and mailing houses. *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 604 (2d Cir. 2021). The defining characteristic of these listed entities therefore is that they may act as passive information storage sites and automated distributors to

[8] Further, Defendant relies on distinguishable caselaw. *See* MTD at 15-17 (citing *Sterk v. Redbox Automated Retail*, 770 F.3d 618, 625 (7th Cir. 2014) (finding the exception applied just as much to a human customer services call center providing technical support as it did to a "computerized response" doing the same automated services) and *Rodriguez v. Sony Computer Entm't Am.*, 801 F.3d 1045, 1054 (9th Cir. 2015) (concluding the ordinary course of business exception applied when one entity disclosed information so that the other entity could "sustain the operations" of the first)).

receive customer records and learn where to send marketing materials. But they may not become involved with analyzing those records or targeting groups within those materials.

Further, Defendant argues in a last-ditch attempt that Plaintiffs have "not allege[d] that Leanplum, Mixpanel, and OpenWeb provided" services *to TED*. MTD at 18. But Plaintiffs did. *See* Compl. ¶ 90 ("Defendant used the Leanplum SDK's thorough marketing, advertising, and analytics toolset to lift its mobile application user engagement by 72%."); *id.* ¶ 92 ("Defendant's website clearly states that Defendant uses Mixpanel's technology 'to help manage TED offerings, track the use of the content we provide, understand how our audiences are using our TED offerings, and to better personalize them."); *id.* ¶ 94 ("To ensure that Defendant is fully maximizing OpenWeb's data collection and analysis tools, only logged-in TED.com account holders can add, reply to, or like comments."). And even if Plaintiffs had failed to so allege, Plaintiffs have satisfied their burden of showing the plausibility that "a sophisticated media foundation like Defendant, who includes several data collection and analysis APIs and advertising platforms into its App, as well as partners with a social engagement platform through its Website, … is choosing to intentionally provide that data to Leanplum, Mixpanel, and OpenWeb in order to obtain their analyzing, marketing, and advertising services." Compl. ¶ 95.

As to Defendant's final contention that "[o]nly the largest and most sophisticated companies can afford to develop and internalize technical functionality and data management functions; the rest must outsource," this grasp at public policy also falls short. MTD at 18. Defendant is permitted to engage third parties to conduct these functions, it simply must procure its users' prior consent "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" before doing so. 18 U.S.C. § 2710(b)(2)(B)(i). Such compliance is easy. *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019)

("It would also not be burdensome to design a website whereby consumers must click a box confirming their consent to disclosures involving video purchases and click a separate box confirming their consent to all other applicable policies and terms."). Defendant's decision not to take such steps does not render its activities within the "ordinary course of business" exception.

## III. THE VPPA COMPORTS WITH THE FIRST AMENDMENT

Defendant then argues that Plaintiff's VPPA claim is "unconstitutional as applied." *See* MTD at 19–23. That argument ignores the overwhelming caselaw holding otherwise.

### A. At Most, Intermediate Scrutiny Should Apply

Defendant begins by arguing that, as applied, Plaintiff's claim should be "subject to the rigor of strict scrutiny." *See* MTD at 26 (internal quotations omitted). At most, intermediate scrutiny is appropriate because Defendant's speech is commercial and concerns a private matter.

Defendant's disclosures constitute commercial speech. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 661 (1980). Plaintiffs plead precisely that, alleging Defendant disclosed personally identifiable information "for marketing, advertising, and analytics purposes." *see id.* ¶ 107. These efforts are commercial in nature, helping Defendant improve "engagement," *see id.* ¶ 76, retain "a larger user base," *see id.* ¶ 79, and "target users," *see id.* ¶ 62, all of which increase "revenue from advertisements." *Id.* ¶ 14. Because these activities relate solely to Defendant's economic interest, "Defendant's speech is commercial in nature." *See Boelter*, 192 F. Supp. 3d at 445 (applying intermediate scrutiny in a case against Defendant involving a state analog to the VPPA and a nearly identical set of facts); *see also ACA Connects – Am.'s Communications Ass'n v. Frey*, 471 F. Supp. 3d 318 (D. Me. 2020) (applying intermediate scrutiny to a state law restricting the ability "to use, disclose, sell, and provide access to customers' personal information").

As commercial speech, "the default test" is the "intermediate-scrutiny approach." *See Mass. Ass'n of Priv. Career Schools v. Healey*, 159 F. Supp. 3d 173, 189 (D. Mass. 2016). But the degree of scrutiny can change depending on "the nature both of the expression and of the governmental interests served by its regulation." *See Central Hudson Gas & Elec. Corp.*, 447 U.S. at 563. Here, Defendant's speech only concerns a private matter—the videos that Plaintiffs watched—so the rational-basis test should apply. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) ("[S]peech on matters of purely private concern is of less First Amendment concern."); *see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[W]here matters of purely private significance are at issue, First Amendment protections are often less rigorous."); *Stover v. Fingerhut Direct Marketing, Inc.*, 709 F. Supp. 2d 473, 479 (S.D.W. Va. 2009) (finding under analogous circumstances that the defendant's speech was "entitled to only a modicum of First Amendment protection").

Defendant disagrees that the disclosures are "commercial," asserting that "the free, publicly available videos available on TED's website are not alleged to be connected to any purchase or sale, nor are TED's alleged disclosures motivated by a desire for financial gain." MTD at 21. As stated above, however, Defendant's disclosures are intended to "increase[] revenue from relevant advertising," a purpose that is undoubtedly commercial. *See Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1034 (N.D. Cal. 2023) ("[V]iewing the context of the disclosure as a whole, this Court is satisfied that Patreon's alleged speech at issue is commercial—as is most similar speech governed by the VPPA in the context of corporate data collection and analysis."). Although Defendant "is a charitable organization," *see* Compl. ¶ 130, that fact "cannot control whether promotion of [its] services is commercial speech." *See Aitkin v. Communications Workers of America*, 496 F. Supp. 2d 653, 663 (E.D. Va. 2007); *cf. National Artists Management Co., Inc. v. Weaving*, 769 F. Supp.

1224, 1232 (S.D.N.Y. 1991) ("[W]e read 'commercial' to describe advertising or promotion for business purposes, whether conducted by for-profit or non-profit organizations."). At most, therefore, intermediate scrutiny is appropriate.

**B. The VPPA Satisfies Intermediate Scrutiny**

Under intermediate scrutiny, courts must determine whether: "(1) the speech restriction concerns lawful activity; (2) [Congress's] asserted interest is substantial; (3) the prohibition directly advances that interest; and (4) the prohibition is no more extensive than necessary to serve that interest." *See Vugo, Inc. v. City of New York*, 931 F.3d 42, 44 (2d Cir. 2019). Neither party disputes that the disclosures "concern lawful activity," so the analysis begins with the second prong.

*1. Congress's Asserted Interest is Substantial*

Defendant contends that "the government does not have a substantial or compelling interest in preventing the confidential, non-public disclosures alleged here." MTD at 27. That argument runs head-first into well-established caselaw. Congress passed the VPPA to "preserve personal privacy," *see* S. Rep. 100–599, at *1, an interest that is unquestionably substantial. *See Carey v. Brown*, 447 U.S. 455, 471 (1980) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."); *Boelter*, 192 F. Supp. 3d at 447 (holding "the protection of consumer privacy" is "a substantial state interest"); *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 599 (S.D.N.Y. 2016) ("Michigan's interest in protecting consumer privacy is a substantial one."); *TransUnion Corp. v. FTC*, 245 F.3d 809, 818 (D.C. Cir. 2001) (holding the "interest [in] protecting the privacy of consumer credit information … is substantial"); *cf. Frisby v. Schultz*, 487 U.S. 474, 484 (1988) ("[A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions.").

Not only does the VPPA "protect[] privacy interests," *see Eichenberger*, 876 F.3d at 983, it also protects "intellectual freedom." *See* S. Rep. 100-599, at *4. As the Senate report noted, "[p]rotecting an individual's choice of books and films is a … pillar of intellectual freedom under the first amendment." *Id.* This interest is substantial, safeguarding "the right to receive information and ideas." *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866–67 (1982). Accordingly, because the VPPA protects privacy and intellectual freedom, Congress's asserted interests are substantial.

Defendant's counterarguments lack merit. Without any citation to caselaw or statutory text, Defendant warns that "[t]he VPPA's application would prohibit companies like TED from disclosing certain customer data to outside service providers," like "data managers and warehouses." MTD at 22. But the VPPA excludes disclosures "incident to the ordinary course of business," *see* 18 U.S.C. 2710(b)(E), meaning "debt collection activities, order fulfillment, request processing, and the transfer of ownership." *Id.* § (a)(2). As the Senate Report makes clear, that includes "mailing houses, warehouses, computer services, and similar companies for marketing to their customers." S. Rep. 100-599, at *12. So even if Defendant's argument was relevant, Congress addressed that concern directly.

*2. The VPPA Directly Advances Privacy And Intellectual Freedom*

The next prong asks whether the VPPA "directly advances" the asserted interest in privacy and intellectual freedom. *Cent. Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 556 (1980). Defendant declines to address this prong, *see* MTD at 22–25, and that omission makes sense. On its face, the VPPA exclusively applies to "video tape service providers," thereby regulating the only individuals—outside of the consumers themselves—who have access to the information the VPPA seeks to keep private. As such, by

restricting "video tape service providers" from disclosing that information, the statute directly advances the goal of protecting privacy and safeguarding intellectual freedom.

#### 3. *Congress Narrowly Tailored the VPPA to Protect Privacy and Intellectual Freedom*

The final prong requires courts to consider whether the regulation "is not more extensive than necessary" to serve the governmental interest. *See Central Hudson*, 447 U.S. at 566. Defendant argues that, as applied, the VPPA would cover "the limited, non-pecuniary, confidential disclosures alleged here," which would "have a substantial chilling effect on thousands of other organizations." MTD at 24. All of those characterizations conflict with Plaintiffs' allegations.

Far from being "limited," Defendant discloses personally identifiable information to three different companies. *See, e.g.*, Compl. ¶ 95 ("Defendant is choosing to intentionally provide that data to Leanplum, Mixpanel, and OpenWeb in order to obtain their analyzing, marketing, and advertising services."). And far from being "non-pecuniary," Defendant's disclosures "relate[] to the economic interest of the speaker and its audience." *See Volokh v. James*, 656 F. Supp. 3d 431, 443 (S.D.N.Y. 2023) (internal quotations omitted); *see also* Compl. ¶ 63 (stating Defendant contracts with a third party to turn personally identifiable information "into insights, and insights into sustainable revenue"); *id.* ¶ 93 (alleging Defendant discloses personally identifiable information to a third party to "drive revenue"). Defendant lastly describes the disclosures as "confidential," implying that the third parties cannot redistribute the information, but nothing in the pleadings supports that inference, so it should be rejected out of hand. *See, e.g.*, *HIS Acquisition XC, Inc. v. Kings Harbor Care Center*, 1999 WL 223152, at *2 (S.D.N.Y. Apr. 16, 1999) (noting that, "on a motion to dismiss, the Court is only entitled to review the 'four corners' of the complaint").

As Defendant recognizes, cases "concern[ing] disclosures for advertising purposes" are "consistent with most conceptions of the VPPA's reach." *See* MTD at 23. Once Defendant's mischaracterizations are removed, that is exactly what Plaintiffs' allegations establish. Accordingly, just like the "vast majority" of "VPPA cases," *see* MTD at 22, applying the statute to Defendant's conduct would still leave it "sufficiently narrowly drawn." *See Boelter*, 210 F. Supp. 3d at 602; *Stark*, 656 F. Supp. 3d at 1037 ("[T]he VPPA would not be invalid if it only regulated speech like Patreon's alleged disclosures to Meta."). The VPPA therefore survives intermediate scrutiny with ease.

**C. The Canon Of Constitutional Avoidance Is Inapplicable**

Defendant invokes the canon of constitutional avoidance, arguing that "[t]he VPPA's application to the facts … would be unprecedented." MTD at 25. Not only is that argument incorrect, but it is also too undeveloped to warrant consideration. "The constitutional avoidance canon is a traditional canon of statutory interpretation." *United States v. Hardin*, 2020 WL 1922594, at *27 (S.D.N.Y. Apr. 21, 2020). "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). But the canon "applies only when there are serious concerns about the statute's constitutionality." *See United States v. Awadallah*, 349 F.3d 42, 55 (2d Cir. 2003) (internal quotations omitted). And as the Supreme Court has recognized, the canon cannot be used as "a method of adjudicating constitutional questions by other means." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). What is more, the canon "has no application where the statutory language at issue is unambiguous." *See United States v. Scott*, 919 F. Supp. 2d 423, 430 (S.D.N.Y. 2013). "[E]ven where there are grave constitutional concerns,

unambiguous statutory language remains definitive." *See In re Methyl Tertiary Butyl Ehter (MTBE) Prod. Liab. Litig.*, 674 F. Supp. 2d 494, 501 (S.D.N.Y. 2009).

Defendant refrains from identifying what language should receive a different construction, instead offering an open invitation to construe the statute "in a way that obviates TED's constitutional concerns." *See* MTD at 25. On that basis alone, the canon is inapplicable because Defendant has failed to identify another construction that would be "fairly possible." *United States v. Security Indus. Bank*, 459 U.S. 70, 78 (1982); *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 239 (2010) ("In applying that tool, we will consider only those constructions of a statute that are fairly possible.") (internal quotations omitted).

Notwithstanding that, Defendant presumably seeks an interpretation prohibiting the VPPA from reaching "disclosures not motivated by financial gain." *See* MTD at 23. But as discussed, that characterization is fallacious, so there is no constitutional concern. And more fundamentally, Defendant declines to articulate where, exactly, the statute should be interpreted to avoid that concern. Defendant could have pointed to the term "video tape service provider," which the VPPA defines as any person "engaged in the business" of delivering pre-recorded videos. *See* 18 U.S.C. § 2710(a)(4). But tellingly, Defendant never even attempts to argue that TED falls outside of that definition. *See generally* MTD. By failing to articulate where the statute could be interpreted to correct the perceived infirmity, Defendant's argument is too undeveloped and conclusory to consider. *See, e.g.*, *Roman v. City of Mount Vernon*, 2023 WL 8719968, at *14 (S.D.N.Y. Dec. 18, 2023) ("[T]he Court will deem an argument waived, where a party's argument is notably underdeveloped."). As such, it should be rejected swiftly.

Dated: January 10, 2024 Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _/s/ Yitzchak Kopel_
Yitzchak Kopel

Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou (*Admission Forthcoming*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiffs*