**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KIMBERLY SUTTON, ZAINAB SALMAN, DAVID RAMIREZ, and TYLER BAKER, individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

TED FOUNDATION INC.,

Defendant.

INDEX NO. 1:23-cv-09219-DEH

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6) AND THE FIRST AMENDMENT**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

LEGAL STANDARD ..... 4

THE VIDEO PRIVACY PROTECTION ACT ..... 5

ARGUMENT ..... 6

I. Plaintiffs Lack Standing To Bring Certain Of Their VPPA Claims. ..... 6

a. The FAC Contains Fatal Factual Inaccuracies Concerning Plaintiff Salman's Account Status and Video Viewing History. ..... 6

b. The FAC Fails To Plausibly Allege A Disclosure To OpenWeb, Which Is The Sole Factual Basis For Plaintiff Baker's Standing And For Count II. ..... 8

c. Plaintiffs Have Not Stated A Claim Under The VPPA. ..... 9

d. Plaintiffs Fail To Allege A "Subscriber" Relationship With TED Sufficient To Render Them "Consumers" Under The VPPA. ..... 10

e. Plaintiffs Fail To Allege That TED's Use Of The Software At Issue Is Not Authorized By The VPPA's "Ordinary Course Of Business" Exception. ..... 14

II. The VPPA Violates The First Amendment As Applied To This Case. ..... 18

a. The First Amendment Imposes Heightened Scrutiny On Content-Based Restrictions On Non-Commercial Speech Like The VPPA. ..... 19

b. This Case Concerns Non-Commercial Speech, And Strict Scrutiny Applies. ..... 20

c. Application Of The VPPA Here Is Unconstitutional Because It Expands The VPPA Beyond What Is Necessary To Further Any Underlying Government Interest And Renders It Unduly Overbroad. ..... 22

d. The Canon Of Constitutional Avoidance Requires The Court To Construe The VPPA In A Manner That Avoids These First Amendment Concerns. ..... 25

CONCLUSION ..... 25

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*330 Creative LLC v. Elenis*,
600 U.S. 570 (2023)....................22

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011)....................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................5, 17

*Aurecchione v. Schoolman Transp. Sys.*,
426 F.3d 635 (2d Cir. 2005)....................5

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015)....................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................5

*Boelter v. Hearst Comm'ns*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016)....................21

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)....................20

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)....................20, 24

*Carroll v. Chick-Fil-A*,
No. 23-cv-314 (N.D. Cal.), ECF No. 49....................24

*Cent. Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n of N.Y.*,
447 U.S. 557 (1980)....................20

*Conn. Bar Ass'n v. United States*,
620 F.3d 81 (2d Cir. 2010)....................20

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988)....................25

*Edwards v. Learfield Commc'ns*,
697 F. Supp. 3d 1297 (N.D. Fla. 2023)....................13

*Ellis v. Cartoon Network*,
803 F.3d 1251 (11th Cir. 2015)....................11, 12, 13

*Farrell v. Burke*,
449 F.3d 470 (2d Cir. 2006)....................20

*Field Day v. County of Suffolk*,
463 F.3d 167 (2d Cir. 2006)....................18

*Gardener v. MeTV*,
681 F. Supp. 3d 864 (N.D. Ill. 2023)....................12, 13

*Gordon & Breach Sci. Pubs. v. Am. Inst. Of Physics*,
859 F. Supp. 1521 (S.D.N.Y. 1994)....................21, 24

*Gorran v. Atkins Nutritionals*,
279 F. App'x 40 (2d Cir. 2008)....................20

*Hernandez v. Container Store*,
No. 2:23-cv-05067-HDV-RAO, 2024 WL 72657 (C.D. Cal. Jan. 3, 2024)....................18

*Holland v. JPMorgan Chase Bank*,
No. 19 Civ. 00233 (PAE), 2019 WL 4054834 (S.D.N.Y. Aug. 28, 2019)....................8

*IMDB.com v. Becerra*,
962 F.3d 1111 (9th Cir. 2020)....................19, 23

*IMS Health, Inc. v. Sorrell*,
630 F.3d 263 (2d Cir. 2010)....................19

*Jusino v. Fed'n of Cath. Teachers*,
54 F.4th 95 (2d Cir. 2022)....................25

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021)....................18

*Krouner v. Am. Heritage Fund*,
No. 94 CIV. 7213(WK), 1997 WL 452021 (S.D.N.Y. Aug. 6, 1997)....................9

*Kuzenski v. Uproxx LLC*,
No. 2:23-cv-00945-WLH-AGR, 2023 WL 8251590 (C.D. Cal. Nov. 27, 2023)....................12

*Lamb v. Forbes Media*,
22-cv-06319-ALC, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023)....................7

*Lewis v. Casey*,
518 U.S. 343 (1996)....................9

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023)....................9, 14

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007)....................5

*Morrison v. Nat'l Austl. Bank Ltd.*,
547 F.3d 167 (2d Cir. 2008)....................................................................................4

*J.S. ex rel. N.S. v. Attica Cent. Schs.*,
386 F.3d 107 (2d Cir. 2004)....................................................................................5

*Pharm. Checker.com v. Nat'l Ass'n. of Bds. of Pharm.*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021)....................................................................20, 21

*Rancourt v. Meredith Corp.*,
No. 22-cv-10696-ADB, 2024 WL 381344 (D. Mass. Feb. 1, 2024) ................................16, 17

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015)..............................................................................................19

*Riley v. Nat'l Fed'n of the Blind*,
487 U.S. 781 (1988)..............................................................................................21

*Rodriguez v. Sony Comput. Ent. Am.*,
801 F.3d 1045 (9th Cir. 2015) ..............................................................................15, 16

*Salazar v. National Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ..........................................................................1, 10, 11, 12

*Sewell v. Bernardin*,
795 F.3d 337 (2d Cir. 2015)..................................................................................14

*Solomon v. Flipps Media*,
22-cv-5508 (JMA) (JMW), 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023)...........................14

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011)..............................................................................................19

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)................................................................................................6

*Stark v. Patreon, Inc.,*
656 F. Supp. 3d 1018 (N.D. Cal. 2023) ..............................................................18, 19, 21, 23

*Stark v. Patreon, Inc.*,
No. 22-cv-3131 (N.D. Cal. Dec. 5. 2022), ECF No. 49-1 ...............................................15, 21

*Sterk v. Best Buy Stores*,
No. 11 C 1894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012).......................................7, 15, 17

*Sterk v. Redbox Automated Retail*,
770 F.3d 618 (7th Cir. 2014) ..............................................................................15, 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6

*Yershov v. Gannett Satellite Info. Network*,
820 F.3d 482 (1st Cir. 2016) .......... 10, 11, 12

**Statutes & Other Authorities**

Deloitte Global Outsourcing Survey 2022 .......... 23

Federal Rule of Civil Procedure 12(b) .......... 4, 5, 8

S. REP. No. 100-599 (1988) .......... 15, 16

U.S. Constitution Article III .......... 6

Video Privacy Protection Act, 18 U.S.C. § 2710 .......... *passim*

## INTRODUCTION

Despite taking a second bite at the apple, Plaintiffs Kimberly Sutton, Zainab Salman, David Ramirez, and Tyler Baker still have not plausibly alleged that Defendant TED Foundation Inc. ("TED") has violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. To begin, the First Amended Complaint (ECF No. 50, "FAC") repeats facts that TED previously established were inaccurate and that Plaintiffs (first in their response brief and now in the FAC) make no effort to corroborate. Plaintiff Salman and Plaintiff Baker lack standing to bring their claims, and Count II should be dismissed. Plaintiffs also again fail to allege "subscriber" status under the VPPA. No case supports their assertion that TED's Terms of Use create an "ongoing commitment" between the parties, nor does the Second Circuit's recent decision in *Salazar v. National Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024), change the outcome of the subscriber analysis here.

Other pleading deficiencies from the original complaint also persist. As briefed previously, the vast majority of VPPA claims in recent years have targeted companies' sharing of data with Meta and Google to increase advertising revenue and monetize such data for profit. Plaintiffs' decision to target a non-profit organization that relies on third-party software programs to enable and moderate its online programming marks a dramatic shift from traditional VPPA legal theory because it targets the outsourcing of information technology functions, *not* advertising or data monetization. If Plaintiffs' theories against TED are accepted, it will be disastrous for small businesses and non-profits that depend on outsourced IT software to compete in the digital age. Congress did not intend the VPPA to be abused in this way.

Plaintiffs' failure to appreciate the differences between this case and those before it manifests in two ways. First, Plaintiffs do not—because they cannot—plausibly allege that TED's use of the software at issue falls outside the VPPA's exclusion for disclosures "incident to the ordinary course of business." Indeed, the FAC's only *substantive* allegations make clear that TED

uses Leanplum, Mixpanel, and OpenWeb to improve website functionality and the customer experience—paragons of how "ordinary course of business" is defined in the VPPA and its legislative history and interpreted by courts. And second, the VPPA is a content-based restriction on speech that, as applied to the non-commercial speech at issue here, is subject to strict scrutiny and cannot pass muster under the First Amendment. Even if intermediate scrutiny applies, Plaintiffs' proffered reading of the VPPA is far broader than is necessary to further any substantial interest, and it would have a chilling effect on lawful speech in violation of the First Amendment. But the Court need not reach this question, because the canon of constitutional avoidance requires that the VPPA's provisions be construed in a manner that avoids such a result.

For these reasons, and because Plaintiffs cannot cure these fatal deficiencies, TED respectfully requests that the First Amended Complaint be dismissed with prejudice.

## BACKGROUND

TED Foundation Inc. is a New York-based 501(c)(3) organization that aims to discover, foster, and promote "ideas worth spreading" in order to spark imagination, spur local and global community building, and catalyze impact. It is the curator and host of "TED Talks" and related online and in-person programming that allow leading visionaries and innovators to share their scientific, cultural, humanitarian, and academic endeavors with a global audience. To date, there have been over 3,500 curated TED Talks, which have been translated into over 100 languages and viewed over 30 billion times since TED launched online in 2006. TED expanded these efforts in 2009 by creating TEDx, a licensure of TED's format to communities around the world, and again in 2012 by creating TED-Ed animated lessons and clubs that celebrate the ideas of educators and students. TED's work also extends beyond conferences and video series, encompassing a variety

of global initiatives like the Audacious Project, which has catalyzed more than $3 billion for charities and projects that seek to make the world more beautiful, sustainable, and just.[1]

Consistent with TED's mission, TED Talks are available to the public for free at TED.com (the "Website") and on TED's Android and iOS applications (the "Apps"). FAC ¶ 4. Plaintiffs here allege that TED "knowingly and intentionally discloses its users' personally identifiable information . . . to unrelated third parties" on its Website and Apps in violation of the VPPA. *Id.* ¶ 5. Plaintiffs' claims stem from the fact that the Website and Apps offer visitors the option to create an account. *Id.* ¶ 15. TED account holders are not alleged to—and do not—gain access to different or altered video content, but they can create a "watch later" list, sync their account across devices, watch videos offline, receive TED Talks suggestions, and engage with "comments" on the Website. *Id.* ¶¶ 15, 104B. There are no fees associated with creating and maintaining a TED account, and a TED account is not necessary to view the videos on the Website or Apps. *Id.* ¶ 14-15. To create a TED account, a user provides her name and email address, *id.* ¶ 16, and acknowledges acceptance of TED's Privacy Policy, *see id.* ¶¶ 103 n.69, 116-17 nn.84-86.

Like many organizations of its size, TED relies on third-party software programs to help it provide and moderate its online programming. Plaintiffs allege that the Website and Apps integrate software from three such programs—Leanplum, Mixpanel, and OpenWeb—that offer "built-in tools and analytics [that] allow it to collect and analyze user data." *See id.* ¶¶ 46-47, 49-54, 106-07. Using images captured from a dynamic analysis of the Website, Plaintiffs allege that TED disclosed their names, email addresses, video views, and/or a user ID to these software systems. *Id.* ¶¶ 107B-10B, 113B-17B, 120-25.[2] Invoking TED and third-party press materials, Plaintiffs

[1] *See generally* "About" and "Programs & Initiatives," TED.com, www.ted.com/about/our-organization, and www.ted.com/about/programs-initiatives (last visited Nov. 14, 2024).
[2] The FAC repeats the numbering of paragraphs 103 to 119. For ease of reference, TED has appended a "B" to paragraph numbers belonging in the second batch.

allege that TED uses the data stored in Leanplum and Mixpanel to "understand[] how different mobile app users engage with different content," tailor "messaging campaigns to more effectively drive an increase in views," "monitor growth, engagement, and retention," "personaliz[e] talk recommendations for any user," and "safeguard[] customer data." *Id.* ¶¶ 99, 102, 114-15, 117. Quoting TED's Privacy Policy, Plaintiffs further allege that these programs "help manage TED offerings, track the use of the content we provide, understand how our audiences are using our TED offerings, and to better personalize them," and "to help us update and maintain our website." *Id.* ¶ 116. Plaintiffs allege that TED uses OpenWeb to host and moderate the comments feature of its Website. *Id.* ¶ 118.

TED moved to dismiss the original complaint on December 13, 2023. ECF No. 19. The parties briefed that motion, *see* ECF Nos. 28, 32, and exchanged limited early discovery on March 14 and March 19, 2024. *See* ECF No. 27. On September 12, 2024, the Court granted TED's motion to dismiss on the grounds that Plaintiffs failed to adequately allege their "subscriber" status under the VPPA. ECF No. 48 ("MTD Order") at 9-11. The Court did not reach TED's alternative arguments under the VPPA's "ordinary course of business" exception and the First Amendment. *Id.* at 12 n.5-6. The Court granted Plaintiffs leave to amend their allegations to "add factual detail . . . to fortify Plaintiffs' claims that they are subscribers as defined by the VPPA" and also requested that any amended complaint "ensure the factual accuracy" of statements about the named Plaintiffs. *Id.* at 12. On October 14, 2024, Plaintiffs filed the FAC, which among other things amends the factual bases for each Plaintiff's claim, *see* ECF No. 50, ¶¶ 103, 109, 115-16, 121-22, and adds allegations about Plaintiffs' alleged ongoing commitment to TED, *see id.* ¶¶ 14-37.

## **<u>LEGAL STANDARD</u>**

Under Federal Rule of Civil Procedure 12(b)(1), "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party

asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys.*, 426 F.3d 635, 638 (2d Cir. 2005). A court deciding a fact-based 12(b)(1) challenge "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [] may not rely on conclusory or hearsay statements[.]" *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

A court deciding a motion under Rule 12(b)(6) must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff must allege facts that show "more than a sheer possibility that a defendant has acted unlawfully[,]" and allegations "'merely consistent with' a defendant's liability, [] 'stop[] short of the line between possibility and plausibility[.]'" *Id.*

## THE VIDEO PRIVACY PROTECTION ACT

Passed in 1988 after a newspaper obtained and published a list of Supreme Court nominee Robert Bork's video rental history, the VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b). The VPPA then lists several exclusions, including for disclosures made "incident to the ordinary course of business of the video tape service provider[.]" *Id.* § 2710(b)(2)(E). The statute defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider," *id.* § 2710(a)(1), and defines "ordinary course of business" as including "debt collection activities, order fulfillment, request processing, and the transfer of ownership," *id.* § 2710(a)(2).

## ARGUMENT

### I. Plaintiffs Lack Standing To Bring Certain Of Their VPPA Claims.

Article III of the U.S. Constitution provides that federal courts only have jurisdiction over "cases" and "controversies." This requirement is satisfied only when a plaintiff alleges "an injury-in-fact, . . . fairly traceable to the challenged conduct of the defendant, and [] that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury-in-fact under the VPPA requires that Plaintiffs allege not just the facts concerning TED's alleged disclosures generally, but also those concerning Plaintiffs' own interactions with TED and TED's alleged collection and disclosure of their data. *See* 18 U.S.C. § 2710(a).[3] Despite being advised to "amend pleadings relevant to the Court's standing analysis, to ensure the factual accuracy of their allegations," MTD Order at 12, Plaintiffs have failed to do so. As set forth below, certain of Plaintiffs' claims should be dismissed for lack of Article III and statutory standing.

#### a. The FAC Contains Fatal Factual Inaccuracies Concerning Plaintiff Salman's Account Status and Video Viewing History.

Despite Plaintiffs' assurances that they could remedy their complaint through amendment, *see* ECF No. 28 at 3-4 n.2, factual inaccuracies and omissions highlighted in TED's first Motion to Dismiss persist, and are now fatal to at least two Plaintiffs' claims. As to Plaintiff Salman, the original complaint stated that she created a TED account "[i]n or about June 2013," and used that account to watch videos "[b]etween June 2013 and May 2022." ECF No. 1, ¶ 109. TED responded that it had no record of an account matching the email address provided for Ms. Salman. *See* ECF No. 20 at 7. Plaintiffs' response brief did not address Ms. Salman. The parties then exchanged

[3] The MTD Order rejected TED's threshold standing argument that Plaintiffs failed to plead actual injury and concrete harm under *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). *See* ECF No. 48 at 7-8. TED maintains that Plaintiffs lack standing where they do not allege the public disclosure of private information or the use of tracking for advertising purposes or for pecuniary gain, and reserves all rights with respect to its standing argument set forth at ECF No. 20 at 8-10.

early discovery, *see* ECF No. 27, including a screenshot produced by Plaintiffs on March 19, 2024, indicating that Ms. Salman did possess an account. The FAC now updates the factual basis for Plaintiff Salman's claim to state that she created a TED account "[i]n or about June 2021," and used that account to watch videos "[b]etween June 2021 and May 2022." FAC ¶ 109B.

Based on TED's records as set forth in the attached declaration,[4] Plaintiff Salman's email address was used to register for a TED account on March 18, 2024—one day before discovery from Ms. Salman was produced. *See* Second Merryman Decl. ¶ 9. Moreover, there is no record in Leanplum, MixPanel, or OpenWeb of *any* video views associated with that account. *Id.* ¶ 10. This information is materially contrary to the allegations in the FAC, and flies in the face of this Court's instruction to verify the accuracy of facts supporting each Plaintiff's standing. *See* MTD Order at 12. And more importantly, it is fatal to Ms. Salman's claim of video views using her account and any resulting disclosure of those video views under the VPPA.

In addition to lacking standing, the fact that Plaintiff Salman created her TED account (1) *after* hiring counsel to prosecute her VPPA claim, and (2) *after* filing a 44-page complaint describing the alleged disclosures and her lack of knowledge or agreement thereto, also means that her claims should be barred as a matter of law by the equitable doctrines of consent and waiver. At some time in 2023, Plaintiff Salman (through counsel) enlisted a research company to conduct a "dynamic analysis" of TED's Website and Apps, ECF No. 1, ¶ 15, and filed a complaint and

[4] In support of its 12(b)(1) arguments, TED submits the attached Second Declaration of Andrew Merryman. As this Court noted in dismissing the first complaint, *see* MTD Order at 6, on a fact-based 12(b)(1) motion a court can consider "evidence outside the pleadings" if that evidence places "jurisdictional facts in dispute[.]" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011); *see also Lamb v. Forbes Media*, 2023 WL 6318033, at *7 (S.D.N.Y. Sept. 28, 2023) (allowing evidence rebutting that plaintiff "requested or obtained specific video materials"); *Sterk v. Best Buy Stores*, 2012 WL 5197901, at *6 (N.D. Ill. Oct. 17, 2012) (dismissing VPPA claim for lack of standing where defendants "produced evidence calling Plaintiff's statutory standing into question" and plaintiff did not have "competent proof" rebutting that evidence). As set forth herein, Mr. Merryman flatly contradicts allegations upon which Plaintiffs rely to establish standing.

defended against a Rule 12(b)(1) motion challenging her account-holder status. She also repeatedly relied on and invoked notice of the alleged activity in TED's FAQs and Privacy Policy. *See id.* ¶¶ 79, 92-94. Plaintiff Salman should not be permitted to manufacture facts *post-filing* to establish standing (however unsuccessful), and cannot credibly allege that TED's use of the software at issue was "unbeknownst" to her and unauthorized. *See* FAC ¶¶ 5, 111B.

Plaintiffs have had repeated opportunities to remedy, rebut, and/or verify their allegations concerning Plaintiff Salman. Her claims should be dismissed with prejudice for lack of standing.

**b. The FAC Fails To Plausibly Allege A Disclosure To OpenWeb, Which Is The Sole Factual Basis For Plaintiff Baker's Standing And For Count II.**

As a second matter, the FAC alleges that Plaintiffs Sutton and Salman were account holders on TED's Android App whose personal information was disclosed to Leanplum and MixPanel, FAC ¶¶ 107B-08B, 113B-14B; that Plaintiff Ramirez was an account holder on TED's iOS App whose personal information was disclosed to Leanplum, *id.* ¶ 120; and that Plaintiff Baker was an account holder on TED's Website whose personal information was disclosed to OpenWeb, *id.* ¶ 125. The FAC makes clear that Plaintiff Baker is the sole plaintiff proceeding on behalf of the Website Class (Count II) and alleging a disclosure to (and *only* to) OpenWeb. *See id.* ¶¶ 81-97, 155-65. Yet the FAC does not allege that Plaintiff Baker used the comments feature of the Website—the only activity with which it alleges OpenWeb's involvement. *See* FAC ¶¶ 94, 122.[5]

Plaintiffs' claims concerning OpenWeb—which are the sole basis for Plaintiff Baker's standing and for Plaintiffs' ability to bring Count II—should be dismissed as both inadequately pled and as a factual impossibility. *See Holland v. JPMorgan Chase Bank*, 2019 WL 4054834, at

[5] The FAC does allege that Plaintiff *Sutton* "comment[ed] on TED videos through her TED account in the App," *id.* ¶ 104B, but as set forth in the Second Merryman Declaration, *id.* ¶ 6, TED's mobile applications do not have commenting functionality, nor is there any record of comments by Plaintiff Sutton. *Id.* ¶ 14, 15.

*6 (S.D.N.Y. Aug. 28, 2019) (dismissing TCPA claim for lack of standing based on evidence that defendant did not make calls to specific plaintiff). As stated in the FAC and confirmed in the attached declaration, TED uses OpenWeb only to enable and moderate comments on TED.com, and OpenWeb only records data if and when an account holder engages with comments. Second Merryman Decl. ¶ 6. There is no record of Plaintiff Baker—or *any* Plaintiff for that matter—engaging with the comments feature of TED.com, *id.* ¶¶ 12, 13, 14, 15, nor does TED have any data in OpenWeb concerning any of the Plaintiffs, *id.* ¶ 14, 15. And here the FAC does not err: it does not allege that any Plaintiff engaged with the Website in a manner that could have resulted in data being stored in OpenWeb.[6] Plaintiffs fail to adequately allege Plaintiff Baker's standing or any disclosure to OpenWeb, and Count II should be dismissed.

**c. Plaintiffs Have Not Stated A Claim Under The VPPA.**

"'To state a claim under § 2710(b), a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any consumer,' . . . (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by another part of the statute.'" MTD Order at 3 (quoting *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023)). As set forth below, Plaintiffs have not adequately alleged that they are "consumers" or that the VPPA's exclusion for disclosures made "incident to the ordinary course of business" does not apply.

[6] That Plaintiff Baker aims to represent a putative class does not bear on whether he has adequately pleaded an injury in fact. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class[.]'"); *Krouner v. Am. Heritage Fund*, 1997 WL 452021, at *2 (S.D.N.Y. Aug. 6, 1997) ("A court must assess standing to sue based upon the standing of the named plaintiff and not upon the standing of unidentified class members.").

**d. Plaintiffs Fail To Allege A "Subscriber" Relationship With TED Sufficient To Render Them "Consumers" Under The VPPA.**

Because Plaintiffs do not allege to have rented or purchased goods or services, their status as "consumers" hinges on whether they adequately allege that they are "subscriber[s]" of goods or services from TED. *See* 18 U.S.C. § 2710(a)(1). As set forth below, enrolling in a free account on the Website or Apps is insufficient to qualify Plaintiffs as "subscribers" under the VPPA.

The VPPA does not define "subscriber," but that term was the focus of a Second Circuit decision last month in *Salazar v. National Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024). In *Salazar*, the plaintiff signed up to receive an online email newsletter from NBA.com; provided his email address, IP address, and "cookies associated with his device" as part of the enrollment process; and thereafter periodically received a newsletter containing NBA-related updates. *Id.* at *536-38. Although the complaint did not allege that the plaintiff "watched or accessed NBA.com videos through the online newsletter," the Second Circuit noted that the plaintiff submitted that "he could amend his complaint to plausibly allege that 'the NBA's online newsletter gave subscribers 'exclusive content or enhanced access' to video content.'" *Id.* at *538.

The Second Circuit identified two questions probative of the plaintiff's "subscriber" status under the VPPA: first, was the NBA.com newsletter a "good or service," and second, was Salazar a "subscriber" of that good or service? The court answered both questions in the affirmative. First, the Second Circuit engaged in a lengthy analysis of the VPPA's text and history, ultimately holding that "goods or services" under the VPPA are not cabined to *audiovisual* goods or services. *Id.* at 544-51. The court did not expand further on what constitutes a "good" or "service," other than to conclude that "[t]he NBA's online newsletter" was a "qualifying good or service." *Id.* at *550. As to whether the plaintiff was a "subscriber" of that good or service, the Second Circuit agreed with two prior circuit courts—*Yershov v. Gannett Satellite Info. Network*, 820 F.3d 482 (1st Cir. 2016),

and *Ellis v. Cartoon Network*, 803 F.3d 1251 (11th Cir. 2015)[7]—that "someone doesn't have to spend money to be a VPPA 'subscriber.'" *Salazar*, 118 F.4th at 551. The court explained that other, non-monetary acts of association can give rise to a subscribership:

> It's also easy to imagine subscriptions that don't require monetary payment. Someone can, for example, subscribe to a YouTube channel by signing into a YouTube account (which requires no monetary payment) and clicking the "subscribe" icon on a content creator's channel. . . Subscribing causes YouTube to "automatically send . . . notifications about the highlights from that channel."

*Id.* at 552. The Second Circuit ultimately found that the provision of the plaintiffs' information "[i]n return for receiving periodic NBA-related updates . . . ma[de] the NBA's relationship with him distinct from its relationship with casual NBA.com video-watchers who had not signed up for the newsletter." *Id.* The court expressly noted in two separate footnotes that it was reserving judgment on—and "express[ed] no view on," *id.* at 550 n.11—whether "a NBA.com video watcher who does not sign up for the online newsletter" would constitute a "subscriber." *Id.* at 552 n.14.

Although *Salazar* does not squarely address the question presented in this case, the Second Circuit's YouTube hypothetical is illustrative of the critical distinction between the newsletter at issue there and Plaintiffs' website accounts here. Specifically, the court indicated that a YouTube user would become a "subscriber" as follows: first, "by signing into a YouTube account (which requires no monetary payment)," and second, by "clicking the 'subscribe' icon on a content creator's channel." *See id.* at 552. Doing so would "cause[] YouTube to 'automatically send . . . notifications about the highlights from that channel[,]'" thus creating a subscribership. *Id.* In other

---

[7] In *Ellis*—on which this Court's first MTD Order was largely based—the Eleventh Circuit held that the "common thread[]" of subscriber status "is that 'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." 803 F.3d at 1256. The court enumerated six factors indicative of a "subscriber" relationship: "payment, registration, commitment, delivery, [expressed association,] and/or access to restricted content." *Id.* (noting that "[s]ubscriptions involve some or [most]" of these factors). In *Yershov*, the Court likewise anchored its test to an identified connection between the plaintiff and the defendant's access to video material via the mobile application. *See* 820 F.3d at 489.

words, the Second Circuit did *not* say that the act of "signing into a YouTube account"—a process akin to registering for a TED account—created a subscribership. Rather, it was the second step—affirmatively associating with a specific product or service, in order to receive that product or service on an ongoing basis—that secured the subscribership. *See id.* In this way, the Second Circuit's analysis echoes that of prior courts that have required the alleged subscriber to have an "ongoing commitment or relationship" with the video services provider, and that have held that a subscribership typically involves the "delivery" of goods or services in connection with that relationship and some form of access to content that is not available to non-subscribers. *See Ellis*, 803 F.3d at 1256; *see also Kuzenski v. Uproxx LLC*, 2023 WL 8251590, at *4-5 (C.D. Cal. Nov. 27, 2023) (website account holders failed *Ellis* test; benefits like the ability to interact with other account holders and earn rewards did not "enhance and affect [plaintiff's] viewing of video materials[,]" but rather were akin to "social media type benefits"); *Gardener v. MeTV*, 681 F. Supp. 3d 864, 868-69 (N.D. Ill. 2023) (website account holders were not subscribers because "anyone can view videos on [defendant] MeTV's website, without the need for a login," and plaintiffs "were free to watch or not watch [MeTV's] videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site").

Here, Plaintiffs do not allege that they received any content or ongoing goods or services akin to a newsletter (as in *Salazar*) or app access (as in *Yershov*) as a result of creating accounts on the TED Website or Apps. Both the *Salazar* reasoning and five of the six *Ellis* factors therefore still counsel against finding that the FAC adequately alleges a subscribership:

- *Payment.* It is undisputed that no payment is required to open a TED account. Although the Court previously did not ascribe weight to this factor because it was "non-dispositive,' *see* MTD Order at 9, TED has never argued that payment is *required* to create a subscribership. Rather, whether payment is exchanged is one factor bearing on whether a

subscribership exists. And for the allegedly disclosed personal information to itself constitute a "payment" would be circular, would render "Payment" duplicative of the "Registration" factor, and would mean that "Payment" is satisfied in all VPPA cases.[8]

- *Ongoing commitment.* The FAC's attempt to manufacture an ongoing commitment by virtue of TED's alleged possession of anonymized data after accounts are deleted fails for two reasons. First, Plaintiffs can identify no case finding an ongoing commitment by virtue of the allegedly disclosed data itself. And second, as with the payment factor, to allow the allegedly disclosed data at issue to *be* the "ongoing commitment" would again be circular and self-fulfilling in all cases. Instead, courts considering this factor look to whether users can opt out of their account "without consequences whenever [they] like[]," and either "never access its content again" or choose to continue accessing the same content without logging in. *See Ellis*, 803 F.3d at 1257. That is certainly the case here.
- *Delivery.* Plaintiffs do not supplement their allegations as to "how the videos are delivered nor distinguish[ed] the access they receive as account holders from that available to any non-registrant." MTD Order at 10. As such, the analysis under this factor has not changed: Plaintiffs do not allege that their website accounts resulted in the "delivery" of any audiovisual or non-audiovisual goods or services.
- *Express association.* Plaintiffs do not supplement their allegations of express association, despite the Court's encouragement to do so. *See* MTD Order at 12. TED respectfully submits that the MTD Order errs in finding that this factor favors Plaintiffs because TED allegedly assigns "unique user IDs" to account holders. This factor considers whether the

[8] *See, e.g.*, *Gardener*, 681 F. Supp. 3d at 866, 869 (finding "[n]either set of plaintiffs paid for this privilege[]" or "exchanged anything of value," despite providing "at least" names and e-mail addresses); *Edwards v. Learfield Commc'ns*, 697 F. Supp. 3d 1297, 1306 (N.D. Fla. 2023) (providing "minimal personal information" bore on registration, not payment).

alleged *subscriber*—not the defendant—"take[s] any action to associate herself" with the video services provider. *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015). Here, Plaintiffs have not alleged taking any affirmative steps beyond registering for a Website or App account (i.e., the "Registration" factor).

- *Access to restricted content.* Plaintiffs do not supplement their allegations regarding exclusive or restricted content, and the Court previously rejected their arguments that the ability to download videos and other functions available to account holders constituted "special access to certain content" unavailable to non-account holders. *See* MTD Order at 10. As such, the analysis under this factor has not changed.

In sum, Plaintiffs' alleged enrollment in a free account that provides access to the same content available to the general public, and that does not impose payment, usage, or activity requirements or provide any ongoing delivery of goods or services, is insufficient to establish a subscribership. The FAC should be dismissed because Plaintiffs have not adequately alleged subscriber status.

**e. Plaintiffs Fail To Allege That TED's Use Of The Software At Issue Is Not Authorized By The VPPA's "Ordinary Course Of Business" Exception.**

Plaintiffs also fail to plausibly plead that TED's use of the software at issue was not "incident to the ordinary course of business[.]" 18 U.S.C. § 2710(b)(2)(E). A statutory defense like the ordinary course of business ("OCOB") exception is grounds for dismissal when facts establishing the defense are "clear from the face of the complaint, and matters of which the court may take judicial notice[.]'" *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015). Courts in this District have emphasized that VPPA plaintiffs *must* address § 2710(b)(2) in their pleadings. *E.g.*, MTD Order at 3 ("[T]o state a claim under § 2710(b)(1), a plaintiff must allege that . . . (4) the disclosure was not authorized by another part of the statute."); *Solomon v. Flipps Media*, 2023 WL 6390055, at *2 (E.D.N.Y. Sept. 30, 2023) (same); *Martin,* 657 F. Supp. 3d at 284 (same). Here,

Plaintiffs do not just plead the bare minimum; they clearly allege facts that make application of the OCOB exception apparent on the face of the FAC.

Whether disclosures fall within the OCOB exception "turns on the underlying purpose for which [the video services provider] provides the information to a third party." *Sterk v. Redbox Automated Retail*, 770 F.3d 618, 626 (7th Cir. 2014). The VPPA defines "ordinary course of business" disclosures as those made in connection with "debt collection activities, order fulfillment, request processing, and the transfer of ownership." 18 U.S.C. § 2710(a)(2). When enacting the VPPA, the Senate Judiciary Report explained that this OCOB exception "allows disclosure to permit video tape service providers to use mailing houses, warehouses, *computer services*, and similar companies for marketing to their customers. These practices are called 'order fulfillment' and 'request processing.'" S. REP. No. 100-599 at 14 (1988) (emphasis added).

Courts that have recently addressed the OCOB exception have observed that it "reflects Congress' awareness of the unremarkable fact that no business is an island, and that video tape service providers, like many other businesses, 'may use third parties in their business operations.'" *Rodriguez v. Sony Comput. Ent. Am.*, 801 F.3d 1045, 1054 (9th Cir. 2015) (quoting *Sterk*, 770 F.3d at 624); *see also* DOJ Mem. In Supp. of the Constitutionality of the VPPA ("Stark DOJ Br."), *Stark v. Patreon, Inc.*, No. 22-cv-3131 (N.D. Cal. Dec. 5. 2022), ECF No. 49-1, at 11 (the VPPA includes "reasonable, limited exceptions to account for . . . the practicalities of running a business"). In *Sterk*, the Seventh Circuit held that the exception allows disclosures attendant to "out-sourc[ing] certain 'back office' functions to various service providers[.]" 770 F.3d at 621. It found that, although when Congress enacted the VPPA it had in mind the sort of outsourcing done by brick-and-mortar stores, the exception also applies to electronic data disclosures—specifically those to a third party that assisted Redbox with customer service and marketing functions. *See id.* at 621, 624-26. *See also Rodriguez*, 801 F.3d at 1054-55 (disclosures intended to "sustain the

operations" of the company fell within exception); *Rancourt v. Meredith Corp.*, 2024 WL 381344, at *17 (D. Mass. Feb. 1, 2024) (exception applies to disclosures "designed to ensure the smooth operation of the business, such as customer support, internal data analytics, or cyber security[]").

For a company like TED with a significant online presence, "back-office functions" primarily involve maintaining and improving digital functionality and the user experience. While there is no question that such functions fall within the Senate Judiciary Report's enumerated exceptions for either "computer services" or "similar companies for marketing to [] customers," *see* S. Rep. No. 100-599, 4342-12, they also align with the VPPA's express statutory references to "order fulfillment" and "request processing." That is because, for a company like TED that does not sell or rent videos, the "request" and "order" at issue—both under the VPPA and as alleged in the FAC—*is* the playing of video content. *See Sterk*, 770 F.3d at 620 (customer service disclosures were incident to "request processing"); *Rodriguez*, 801 F.3d at 1054 (functions performed by the third parties "fall within the definition of 'order fulfillment' or 'request processing'"). Software that enables, maintains, and facilitates the manner in which TED videos are featured to users is *precisely* what Congress had in mind when including the OCOB exception.

The FAC is replete with source material showing that TED employed OpenWeb, Leanplum, and Mixpanel for purposes that fall squarely within the OCOB exception:

- **OpenWeb.** According to Plaintiffs, TED uses OpenWeb to provide the functionality for account holders to "add, reply to, or like comments." FAC ¶ 118. Plaintiffs quote TED's Comments FAQ page that makes this usage clear: "[c]omments on TED.com are hosted and moderated by OpenWeb, an innovative social engagement platform that uses both AI and human moderators to empower publishers like TED to shift discussions from social media back to their own online communities." *Id.*

- **Leanplum.** According to Plaintiffs, TED integrates Leanplum into its app to "personaliz[e] talk recommendations for any user, based on the individual viewer's interest and motivations." *Id.* ¶ 115. Plaintiffs quote TED's Director of Mobile and Platforms as saying that TED uses Leanplum to "understand[] how different mobile app users engage with different content," *id.* ¶ 99, and that Leanplum is used by TED's

editorial and product engagement team "to manage push and in-app messaging" and "make decisions on messaging strategies and switch gears when needed." *Id.* ¶ 100-01.

- **Mixpanel.** According to Plaintiffs, Mixpanel is a data analytics tool that TED uses to "analyze user metrics, view how users convert at each step, and monitor growth, engagement, and retention." *Id.* ¶ 102 (cleaned up). Plaintiffs also cite TED's Privacy Policy, which states that TED uses Mixpanel "to help manage TED offerings, track the use of the content we provide, understand how our audiences are using our TED offerings, and to better personalize them." *Id.* ¶¶ 103, 116-17. Plaintiffs further quote from TED's website that TED "may provide information to [such] partners to *help us update and maintain our website*." *Id.* Plaintiffs also allege that TED has "admitted" that it "leverages Mixpanel's ability to 'safeguard[] customer data.'" *Id.* ¶ 117.

The FAC speaks for itself, alleging that the software programs at issue enabled TED to maintain and enhance the functionality of its Website and Apps. It also makes clear that, unlike in almost all other VPPA cases, data stored in these programs is *for TED's own use*. *See Rancourt*, 2024 WL 381344, at *17 (OCOB exception applies "if the disclosure of PII is in furtherance of business management and operations that are intra-corporate and inner-facing, designed to ensure the smooth operation of the business"). Thus, the FAC does not adequately allege that TED's practices are not authorized by the OCOB exception, and in fact shows that the exception *does* apply.[9]

In previously opposing TED's argument under the OCOB exception, Plaintiffs asked the Court to disregard the *Twombly*/*Iqbal* plausibility standard and presume the truth of naked allegations concerning TED's usage and motives that are purely speculative and flatly contradicted by *all* of the FAC's substantive allegations about TED's usage of the three software programs. In contrast to its specificity about the foregoing uses, the FAC offers no factual support of any kind for its bare and conclusory allegations that TED uses Leanplum, Mixpanel, and OpenWeb to

[9] Although this is true for all three software programs, TED alternatively requests that the Court at a minimum dismiss Count II concerning OpenWeb, which as stated in the FAC, the "Comments FAQ" cited therein, *and* the attached declaration, TED uses to host and moderate comments on its Website. *See* Part I.b. That function aligns precisely with those performed by the third parties in *Sterk*. And for the same reasons stated in Part I.b, Plaintiffs also fail to state a claim under Count II because they do not plausibly plead a disclosure of any Plaintiff's data to OpenWeb.

engage in targeted advertising or monetize its viewers' data. Tellingly, although Plaintiffs devote much space to the uses to which companies *can* put Leanplum's and Mixpanel's technologies, *id.* ¶¶ 70, 71, 105, as well as OpenWeb's *optional* advertising feature, *id.* ¶¶ 83-89, 108-10, they do not allege that Leanplum, Mixpanel, or OpenWeb provided any such services ***to TED.*** In fact, despite the FAC's lengthy invocations to a TED case study, quotes from TED leadership, and TED policies and FAQs, *see id.* ¶¶ 99-119 and despite having access to TED's operative contracts through early discovery, the FAC does not identify any aspect of those documents that supports their allegations that TED used Leanplum, Mixpanel, and OpenWeb for advertising or increased profits. *Cf. Hernandez v. Container Store*, 2024 WL 72657, at *2 (C.D. Cal. Jan. 3, 2024) ("Plaintiff's references to Defendant's 'monetizing' the hosted 'video content' do not include allegations that Defendant sells such content or even receives remuneration from TikTok[.]").

Forcing TED into full discovery based on pure speculation and conjecture—and given the uses *acknowledged* in the FAC—would strike at the heart of IT and data management software that is both ubiquitous and *necessary* for small businesses to participate and compete in today's economy. Plaintiffs' claims should be dismissed for failure to plausibly allege that the alleged disclosures did not occur in the ordinary course of business.

## II. The VPPA Violates The First Amendment As Applied To This Case.

Although the Court need not reach the issue, application of the VPPA to TED's use of third-party software programs also does not pass muster under the First Amendment. The Court should dismiss Plaintiffs' VPPA claim either as unconstitutional as applied to TED[10] or because

[10] As-applied challenges ask "whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day v. County of Suffolk*, 463 F.3d 167, 174-75 (2d Cir. 2006). They are preferred to facial challenges so that courts can "decide constitutional attacks on the narrowest possible grounds[.]" *Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021), especially "in cases involving 'clashes between the First Amendment and privacy rights[.]' *Stark v. Patreon*, 656 F. Supp. 3d 1018, 1037 (N.D. Cal. 2023).

the canon of constitutional avoidance compels it to construe the VPPA's provisions in favor of TED to avoid the statute running afoul of weighty constitutional concerns.

**a. The First Amendment Imposes Heightened Scrutiny On Content-Based Restrictions On Non-Commercial Speech Like The VPPA.**

It is well settled that the disclosure prohibited by the VPPA—of information that "identifies a person as having requested or obtained specific video materials or services"—is speech entitled to First Amendment protection. Indeed, the Supreme Court made clear over a decade ago that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011) (restriction on pharmacies from selling data for marketing purposes violated First Amendment); *see also IMS Health, Inc. v. Sorrell*, 630 F.3d 263, 271-72 (2d Cir. 2010) ("The First Amendment protects even dry information[.]").

In evaluating whether a law violates the First Amendment, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Here, there is no question that the VPPA, which restricts the disclosure of specific information and only by specific speakers, is content-based and subject to heightened scrutiny. *See Stark*, 656 F. Supp. 3d at 1031 ("[T]he VPPA's regulation of video service providers disclosing consumers' personal information—as opposed to any other information—is content-based[.]"); *see also Sorrell*, 564 U.S. at 559 (law governing "records containing prescriber-identifiable information" was content-based); *IMDB.com v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (statute targeting "one type of speech: 'date of birth or age information' . . . [and] a single category of speakers" was content-based).

Courts also agree, however, that "commercial speech" receives reduced protection, even if content-based. The Supreme Court has articulated two definitions of commercial speech: first, that

it "does no more than propose a commercial transaction," *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)), and second, that it "relate[s] solely to the economic interests of the speaker and its audience," *id.* at 94 (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)). A regulation of commercial speech must "directly advance a substantial governmental interest and [be] no more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 573. The regulation also cannot be "unconstitutionally vague and its prohibitions too broad in their sweep, failing to distinguish between conduct that may be proscribed and conduct that must be permitted." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973). This final analysis "prevent[s] the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that *may* fall within the scope of a prohibition, even if they are not entirely sure whether it does." *Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006).

**b. This Case Concerns Non-Commercial Speech, And Strict Scrutiny Applies.**

The speech here does not fit either definition of commercial speech. To state the obvious, TED's use of the software at issue—and interactions with users more broadly—does not involve commercial transactions. Nor does it "relate solely to the economic interests of the speaker and its audience." *Conn. Bar Ass'n*, 620 F.3d at 94; *see also Gorran v. Atkins Nutritionals*, 279 F. App'x 40, 41 (2d Cir. 2008) (portion of website that sought "to communicate a particular view on health, diet, and nutrition" was noncommercial even though website also had commercial elements). Indeed, the FAC lists many uses not alleged to be spurred by economic gain. *See* Part II.b.

Even if there *were* indicia of commercial use, three factors bear on whether speech featuring both commercial and noncommercial elements receives reduced scrutiny: "(1) it is an advertisement; (2) it refers to a specific product or service; and (3) the speaker has an economic motivation[.]" *Pharm. Checker.com v. Nat'l Ass'n. of Bds. of Pharm.*, 530 F. Supp. 3d 301, 355

(S.D.N.Y. 2021). The speech here was not advertising and did not involve products or services for sale; it "simply provide[d] information" and did not "propose a commercial transaction." *Id.*

Under the third factor, the fact that TED is a non-profit organization with an educational mission undermines the plausibility of allegations that its speech here related *solely* to its financial interests. Although the VPPA is certainly not *per se* unconstitutional as applied to non-profits, courts regularly accord deference and/or heightened protection to otherwise commercial speech by non-profit groups. *E.g.*, *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1988) (non-profit's charitable fundraising efforts were "inextricably intertwined with otherwise fully protected speech"); *PharmacyChecker.com*, 530 F. Supp. 3d at 354 ("That a nonprofit 'stood to benefit from publishing [its statements]—even that they intended to benefit—is insufficient by itself to turn the [statements] into commercial speech.'"); *Gordon & Breach Sci. Pubs. v. Am. Inst. Of Physics*, 859 F. Supp. 1521, 1541 (S.D.N.Y. 1994) (collecting Supreme Court cases) ("Non-profit organizations must be free to participate fully in the marketplace of ideas without fear of sanctions, even if such participation redounds to their financial benefit. To hold otherwise would be to squelch the expression of facts and opinions which might not otherwise find ready expression through commercial media.").[11] At the very least, Plaintiffs must come forward with more to establish the plausibility of TED's allegedly commercial motive, which they have not done.

In this case, the free, publicly available videos available on TED's website are not alleged

[11] By contrast, the facts here are a far cry from the two cases that have found that speech regulated by the VPPA and a related state law was commercial. *See Boelter v. Hearst Comm'ns*, 192 F. Supp. 3d 427, 445 (S.D.N.Y. 2016) (speech disclosed individuals "who purchase [certain] products"; "relays an individual's economic decisions, elucidates an individual's economic preferences, and facilitates the proposal of new commercial transactions"; and results in "profit from the collection and sale of data"); *Stark*, 656 F. Supp. 3d at 1033-34 ("There is no indication that either party to this transfer of information had any non-economic motivation," and disclosure was aimed "to more effectively sell or otherwise monetize their products[.]"). In fact, in *Stark*, the court stressed that applying the VPPA in a "non-economic motivation" context would implicate non-commercial speech, and would be subject to "the rigor of strict scrutiny." *Id*. at 1036-37.

to be connected to any purchase or sale, nor is TED's use of the software motivated solely by a desire for financial gain. Instead, its use of these programs chiefly concerns and is aimed at enabling TED's digital "marketplace of ideas" and proliferation of messages of the utmost public concern. *See 330 Creative LLC v. Elenis*, 600 U.S. 570, 584-85 (2023) ("[I]f there is any fixed star in our constitutional constellation, it is the principle that the government may not interfere with an uninhibited marketplace of ideas."). As discussed in Part II.b, the FAC and all materials cited therein make clear that the use of data was intended to improve the customer experience and website functionality and to assist in TED's promulgation of "ideas worth spreading." Strict scrutiny therefore applies to TED's as-applied challenge, but as set forth below, the FAC does not pass muster regardless of which level of scrutiny applies.

**c. Application Of The VPPA Here Is Unconstitutional Because It Expands The VPPA Beyond What Is Necessary To Further Any Underlying Government Interest And Renders It Unduly Overbroad.**

Although the over 200 VPPA cases filed in recent years against every manner of website owner suggest that the statute may be facially overbroad, and litigants' and courts' increasingly diverging interpretations of its language suggest that it may be unduly vague, *no* reading of the VPPA can render it constitutional as applied to the case at hand. And while the VPPA should be reviewed under strict scrutiny, the VPPA does not survive even if intermediate scrutiny applies.

As an initial matter, the government does not have a substantial or compelling interest in preventing the confidential, non-public data management alleged here. First, TED's use of the software is not plausibly alleged to have been made for anyone other than TED and for any reason other than assisting TED in managing and maintaining its website. And second, as applied here, the VPPA's prohibitions *undermine* Congress's overarching intent to prevent the public disclosure of viewing history. Consider, for example, that the most commonly outsourced corporate functions

are IT, data management, and cybersecurity.[12] Rather than keeping customer data on internal systems with varying degrees of sophistication, companies regularly elect to contract with data managers and warehouses to ensure the security of customer data while remaining in compliance with various preservation and retention obligations. The VPPA's application here would prohibit companies like TED from "disclosing" data to such outside providers, meaning that it would likely remain on internal systems and arguably be *more* likely to be compromised.

Whatever the merit of Congress's interest in protecting privacy when enacting the VPPA, broadening its scope to reach the alleged activity here is by no means "sufficiently narrowly drawn" to protect that interest. Of the recent onslaught of VPPA cases, the vast majority concern disclosures for advertising purposes, with over 90% involving data shared with Meta or Google. This is consistent with most conceptions of the VPPA's reach. *See, e.g.*, *Stark*, 656 F. Supp. 3d at 1034 ("Patreon's alleged speech at issue is commercial—as is most similar speech governed by the VPPA in the context of corporate data collection and analysis"); Stark DOJ Br. at 16 (noting that "the VPPA's disclosure prohibitions are targeted at the commercial entities"). Courts and the DOJ have also contrasted such commercial uses from noncommercial uses like those here, recognizing that restrictions on the latter are unlikely to pass muster. *See, e.g.*, *Stark*, 656 F. Supp. 3d at 1037 (commercial transaction like a video rental "does not remove [later] noncommercial speech from the rigor of strict scrutiny[]"); *IMDb.com*, 962 F.3d at 1122 (data restriction on "free, publicly available" website that "d[id] not propose a commercial transaction" violated First Amendment); Stark DOJ Br. at 8 ("any hypothetical non-commercial application of the statute is trivial in comparison to the statute's *legitimate* scope") (emphasis added).

Many VPPA plaintiffs share this view, arguing in response to overbreadth challenges that

---

[12] *See* Deloitte Global Outsourcing Survey 2022, at 7, 10, https://www2.deloitte.com/us/en/pages/operations/articles/global-outsourcing-survey.html.

"website owners/operators with no commercial interest (such as a non-profit entity) are clearly beyond the scope of the VPPA."[13] Indeed, until Plaintiffs' suit against TED, the threat that a plaintiff would bring claims based on data management practices not motivated by financial gain was largely speculative. *See* Stark DOJ Br. at 11 (noting "the VPPA's restrictions have overwhelmingly been applied to disclosures of private information for financial gain").

Application of the VPPA here will contravene these principles and have repercussions and a profound chilling effect far beyond the pale of Congress's intent. First, it will open the floodgates of litigation against small and non-profit businesses who outsource various IT and other corporate functions. Only companies that achieve the scale and technical know-how required to internalize data-related functions will feel secure in their ability to retain data. Moreover, if outsourcing data management is under fire—and if baseless allegations concerning the motivations therefore can be sufficient to send a case to discovery and result in hundreds of thousands of dollars in litigation costs—individuals and businesses like TED will have their speech chilled and their operational costs skyrocket. The expressive content on such platforms, which is *essential* to a functioning democracy, will be chilled by extension. *See Gordon*, 859 F. Supp. at 1543 ("[G]ain[ing] access to court-sanctioned discovery" absent "a prima facie showing that speech which appears fully protected is in fact undeserving of full First Amendment protection . . . could cast a substantial chill on the 'robust exchange of ideas.'"). Finally, the VPPA as applied here will "cause others not before the court to refrain from constitutionally protected speech." *Broadrick*, 413 U.S. at 612. If found to support the VPPA's application here, terms like "subscriber" and "ordinary course of business" are fatally misleading and/or indistinct to put companies on notice of who and what the

[13] *See Carroll v. Chick-Fil-A*, No. 23-cv-314 (N.D. Cal.), ECF No. 49 at 7. The plaintiffs have made identical arguments about the VPPA's inapplicability to non-profit entities in over a dozen cases, including against Ashley Global Retail, Buzzfeed, Denny's, Feld Entertainment, General Mills, Hershey, J.M. Smuckers, J.P. Boden, Jostens, Luxy, Tapestry, and Sound United.

VPPA proscribes. *See id*. Video content is pervasive online, and the VPPA's application to the non-pecuniary, closed-loop, and confidential software usage here would have a substantial chilling effect on thousands of other organizations' and content creators' ability to function.

**d. The Canon Of Constitutional Avoidance Requires The Court To Construe The VPPA In A Manner That Avoids These First Amendment Concerns.**

It is a "cardinal principle . . . beyond debate" that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988); *see also Jusino v. Fed'n of Cath. Teachers*, 54 F.4th 95, 101 (2d Cir. 2022) (recognizing "the longstanding principle that acts of Congress 'ought not be construed to violate the Constitution if any other possible construction remains available'") (citation omitted).

The VPPA's application to the facts alleged in the FAC would be unprecedented and would expand the statute's reach further than ever before. In essence, Plaintiffs would have the Court not only disregard the canon of constitutional avoidance, but take the opposite approach and construe the VPPA in the manner *most* likely to cause First Amendment concerns. Rather than confronting TED's as-applied First Amendment challenge, the Court can and should avoid such complications altogether by construing the still-unsettled "subscriber" question or the OCOB exception in a way that obviates TED's constitutional concerns. Because the VPPA cannot be applied as Plaintiffs urge without unduly restricting lawful speech, the Court should decline to give the VPPA an overbroad reading and choose instead to preserve its proper scope.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss Plaintiffs' First Amended Complaint (ECF No. 50) with prejudice.

Dated: November 15, 2024

Respectfully submitted,

By: *_/s/ Carter C. Simpson_*

Carter C. Simpson (*pro hac vice*)
Ryan P. Phair (*pro hac vice*)
Emma J. Hutchison (*pro hac vice*)
**PAUL HASTINGS LLP**
2050 M Street, N.W.
Washington, DC 20036
cartersimpson@paulhastings.com
ryanphair@paulhastings.com
emmahutchison@paulhastings.com
Telephone: 1(202) 551-1753
Facsimile: 1(202) 551-0253

*Attorneys for Defendant TED Foundation Inc.*

## CERTIFICATE OF SERVICE

I, Emma J. Hutchison, hereby certify under penalty of law that on November 15, 2024, I caused a copy of the foregoing to be served electronically on all counsel of record via ECF.

*/s/ Emma J. Hutchison*
Emma J. Hutchison