**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KIMBERLY SUTTON, ZAINAB SALMAN, DAVID RAMIREZ, and TYLER BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TED FOUNDATION INC.,<br><br>Defendant. | Case No. 1:23-cv-09219-DEH<br><br>Hon. Dale E. Ho |

# PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Dated: December 3, 2024

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**PAGE**


INTRODUCTION ..... 1

ARGUMENT ..... 3

I. ALL PLAINTIFFS HAVE STANDING TO BRING THEIR VPPA CLAIMS ..... 3

A. As Early Discovery Showed, Plaintiff Salman Has Standing To Pursue Her VPPA Claim ..... 4

B. Plaintiff Baker Has Standing Because His PII And Video-Viewing Information Was Disclosed To OpenWeb ..... 5

II. PLAINTIFFS SUFFICIENTLY ALLEGE VIOLATIONS OF THE VPPA ..... 6

A. Pursuant To *Salazar*, Plaintiffs Have Sufficiently Alleged They Are Consumers Of Defendant ..... 6

1. To The Extent Still Required, Plaintiffs' Allegations Satisfy The *Ellis* Factors ..... 7

2. Defendant's Counterarguments Are Unavailing ..... 11

B. Defendant's Disclosures Were Not Made In The Ordinary Course Of Business ..... 14

1. Marketing, Advertising, And Analytics Do Not Fall Within The Ordinary Course Of Business ..... 14

2. Defendant's Counterarguments Are Unpersuasive ..... 17

III. AS EVERY COURT TO ADDRESS THE ISSUE HAS HELD, THE VPPA COMPORTS WITH THE FIRST AMENDMENT ..... 19

A. Intermediate Scrutiny Applies Because Defendant's "Speech" Is Commercial ..... 20

B. The VPPA Satisfies Intermediate Scrutiny ..... 22

C. The Canon Of Constitutional Avoidance Is Inapplicable ..... 25

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ade v. Viki, Inc.*,
2024 WL 1880153 (N.D. Cal. Mar. 28, 2024) ........ 15, 17

*Boelter v. Advance Magazine Publishers Inc.*,
210 F. Supp. 3d 579 (S.D.N.Y. 2016) ........ 20, 23, 25

*Boelter v. Hearst Commc'ns, Inc.*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016) ........ 24

*Boelter v. Hearst Commc'ns, Inc.*,
269 F. Supp. 3d 172 (S.D.N.Y. 2017) ........ 19, 23

*Burdette v. FuboTV Inc.*,
2024 WL 2831466 (N.D. Ill. June 4, 2024) ........ 15

*Canadian St. Regis Band of Mohawk Indians v. New York*,
146 F. Supp. 2d 170 (N.D.N.Y. 2001) ........ 5

*Cappello v. Walmart Inc.*,
2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) ........ 2, 19, 23

*Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980) ........ 20

*Clark v. Martinez*,
543 U.S. 371 (2005) ........ 25

*Collins v. Toledo Blade*,
720 F. Supp. 3d 543 (N.D. Ohio 2024) ........ 16

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ........ 21

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ........ 7, 8

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) ........ 9

*Gordon and Breach Science Publishers S.A. v. Am. Institute of Physics*,
859 F. Supp. 1521 (S.D.N.Y. 1994) ........ 21, 22

*Harris v. Public Broadcasting Serv.*,
662 F. Supp. 3d 1327 (N.D. Ga. 2023) ........ 13

*Homaidan v. Sallie Mae, Inc.*,
3 F.4th 595 (2d Cir. 2021) ........ 16

*IMDb.com, Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ........ 24

*In re Hulu Priv. Litig.*,
2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ........ 15

*In re Hulu Privacy Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ........ 19

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) ........ 9, 12, 13, 17

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) ........ 2, 19

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) ........ 15

*M.K. v Google LLC*,
2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) ........ 14

*Mendoza v. Manymar Corp.*,
2023 WL 3043634 (S.D. Fla. Apr. 21, 2023) ........ 5

*Michael Grecco Prods., Inc. v. RADesign, Inc.*,
112 F.4th 144 (2d Cir. 2024) ........ 14

*Morrison v. Amway Corp.*,
323 F.3d 920 (11th Cir. 2003) ........ 5

*Nayab v. Cap. One Bank (USA), N.A.*,
942 F.3d 480 (9th Cir. 2019) ........ 14

*Petty v. Goord*,
2007 WL 724648 (S.D.N.Y. Mar. 5, 2007) ........ 4

*PharmacyChecker.com, LLC v. Nat. Ass'n of Boards of Pharm.*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021) ........ 20

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024) ........ 15, 16

*Richards v. Warner Music Group*,
2024 WL 4307994 (S.D.N.Y. Sept. 26, 2024)........................................................... 17

*Riley v. Nat. Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988)........................................................................................................ 21

*Rodriguez v. Sony Computer Ent. Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) ........................................................................................ 17

*Salazar v. National Basketball Association*,
118 F.4th 533 (2d Cir. 2024) ...................................................................................... passim

*Saunders v. Hearst Television, Inc.*,
711 F. Supp. 3d 24 (D. Mass. 2024) ....................................................... 15, 18, 19, 20

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) ........................................................................................ 23

*Shah v. Fandom, Inc.*,
--- F. Supp. 3d ---, 2024 WL 4539577 (N.D. Cal. Oct. 21, 2024) .................................. 25

*Stark v. Patreon, Inc.*,
656 F. Supp. 3d 1018 (N.D. Cal. 2023) ....................................................... 19, 20, 22

*Sterk v. Redbox Automated Retail, LLC*,
2013 WL 4451223 (N.D. Ill. Aug. 16, 2013) ................................................................ 17

*Sterk v. Redbox Automated Retail, LLC*,
770 F.3d 618 (7th Cir. 2014) .......................................................................................... 17

*Sutton v. TED Foundation, Inc.*,
2024 WL 4167342 (S.D.N.Y. Sept. 12, 2024)........................................................... passim

*Trans Union Corp. v. F.T.C.*,
267 F.3d 1138 (D.C. Cir. 2001)..................................................................................... 24

*Yates v. United States*,
574 U.S. 528 (2015)........................................................................................................ 16

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016)................................................................................. 7, 9, 12, 13

**STATUTES**

18 U.S.C. § 2710.......................................................................................................... passim

**OTHER AUTHORITIES**

S. Rep. 100-599 (1988)...................................................................................................... 21

# INTRODUCTION

On September 12, 2024, the Court issued an Order (ECF No. 48) dismissing Plaintiffs' VPPA claims for failure to allege Plaintiffs were "consumers" of Defendant. *See Sutton v. TED Foundation, Inc.*, 2024 WL 4167342, at *5-6 (S.D.N.Y. Sept. 12, 2024). That ruling is no longer good law. On October 15, 2024, the Second Circuit issued a decision in *Salazar v. National Basketball Association*, 118 F.4th 533, 552 (2d Cir. 2024), finding the plaintiff's exchange of personally identifiable information ("PII") in return for access to the defendant's free newsletter rendered him a "subscriber" under the VPPA. Pursuant to *Salazar*, the Court *must* find Plaintiffs are "consumers" of Defendant, because Plaintiffs allege they (i) "subscribed" to the TED app and website (the "TED Video Service") by creating accounts (or "subscribed to the TED accounts themselves"); (ii) exchanged their PII to create those accounts; and (iii) received benefits only available to TED account holders in return. FAC ¶¶ 15-18, 37 103, 109, 115, 121. That is enough.

Defendant's remaining arguments fair no better. Defendant again tries to sandbag Plaintiffs with a declaration attesting that Plaintiffs Salman and Baker do not have a VPPA claim. Defendant's declaration is undermined by the information Plaintiffs provided in early discovery and the results of Plaintiffs' dynamic analysis, and Defendant's continued refusal to meet and confer with Plaintiffs about these alleged arguments is a waste of the Court's time. Defendant also contends its disclosures to third parties fall within the "ordinary course of business" exception to the VPPA, even though courts have near universally held that disclosures for marketing, advertising, and analytics—which is Defendant's purpose here—do not fall under the narrow exception. And Defendant contends applying the VPPA to it would violate the First Amendment, even though courts have also universally held that the VPPA's regulation of commercial speech such as Defendant's does not violate the First Amendment.

One last point bears emphasis. Defendant spends much of its brief seeking the Court's pity that its business activities may be impacted if the Court sustains Plaintiffs' VPPA claim. This is dramatic. As far as the VPPA is concerned, Defendant is free to disclose all of the PII to all of the third parties for any purpose it wants, *so long as it procures its users' prior consent*. 18 U.S.C. § 2710(b)(2)(B)(i). Getting consent is easy to do. *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) ("It would also not be burdensome to design a website whereby consumers must click a box confirming their consent to disclosures involving video purchases and click a separate box confirming their consent to all other applicable policies and terms."); *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023) ("The acquisition of consent when visiting websites … is a regular occurrence and hardly particularly 'technologically impractical.'"). But Defendant does not want to get consent because it generates an enormous amount of advertising revenue by disclosing PII to third parties (*see* FAC ¶¶ 14, 32-34), yet is likely afraid of losing consumers (and therefore, a revenue stream) if it discloses those practices and clearly asks for consumer consent.[1] And this is not a situation where Defendant discloses even arguably "anonymized data" (MTD at 13), as Defendant disclosed its users' *full names*, e-mail addresses, and the titles of the videos they watched to the third parties. FAC ¶¶ 43, 82. So, Defendant seeks to have its cake and eat it too, disclosing the most explicit PII possible to generate advertising revenue while failing to properly inform its users or get their VPPA-compliant consent.

Thus, Defendant's predicament is of its own making, and its desire to make money is no

---

[1] *See, e.g.*, Marcus Moretti and Michael Naughton, *Why Privacy Policies Are So Inscrutable*, THE ATLANTIC (Sept. 5, 2014), https://www.theatlantic.com/technology/archive/2014/09/why-privacy-policies-are-so-inscrutable/379615/ (noting "[a]s more people learn how much of their personal information is in the hands of strangers with algorithms, they become concerned," and that if website or app developers were to "tell people every single way they're collecting information and using it, then most users will share less information, which would mean less money for them.").

excuse for its failure to comply with the law.

## ARGUMENT

### I. ALL PLAINTIFFS HAVE STANDING TO BRING THEIR VPPA CLAIMS

Prior to filing the initial Motion to Dismiss, Plaintiffs provided Defendant with the e-mail addresses they believed were associated with their TED accounts "so [Defendant] could retrieve records with the expectation that Defendant would report back in the event that the records revealed inconsistencies with [Plaintiffs'] recollections." ECF No. 28 at 3 n.2. Instead, Defendant sandbagged Plaintiffs with a declaration in its initial Motion to Dismiss, attesting that several Plaintiffs never had TED accounts, or did not have TED accounts during the VPPA's two-year statute of limitations period. ECF No. 20 at 6-8. Early discovery revealed Defendant's investigation was not "diligent." *Id.* at 7. For instance, Defendant previously claimed Plaintiff Ramirez had "not viewed a video using his account since 2021." *Id.* at 7. But early discovery showed that Plaintiff Ramirez created TED accounts with several different e-mails, at least one of which he used to view pre-recorded videos as recently as October 2023. FAC ¶¶ 115-116. Plaintiffs could have easily clarified this had Defendant simply met and conferred with Plaintiffs about its findings rather than trying to score points and wasting the Court's time.[2]

Failing to learn from its hastiness, Defendant *again* moves to dismiss individual Plaintiffs' claims for lack of standing, citing "factual inaccuracies and omissions" in the FAC. MTD at 6. This time, however, Defendant ignores factual evidence produced to it that undercuts its investigation. Accordingly, Defendant's standing arguments should be denied.[3]

---

[2] Given Defendant does not move to dismiss Plaintiff Ramirez's claims for lack of standing, Plaintiff Ramirez's allegations are clearly correct (as are Plaintiff Sutton's).

[3] Defendant also asserts "[t]he MTD Order rejected TED's threshold standing argument" and that "TED maintains that Plaintiffs lack standing." MTD at 6 n.3. Defendant's argument is foreclosed by *Salazar*. *Salazar*, 118 F.4th at 544 ("[The plaintiff's] alleged injury in fact is particularized and

### A. As Early Discovery Showed, Plaintiff Salman Has Standing To Pursue Her VPPA Claim

Plaintiff Salman alleges she created a TED account "[i]n or about June 2021," and that "[b]etween June 2021 and May 2022, Plaintiff Salman used her TED account on the TED App to watch videos on her Android phone." FAC ¶ 109. Defendant argues these allegations are incorrect because "[b]ased on TED's records as set forth in the attached declaration, Plaintiff Salman's email address was used to register for a TED account on March 18, 2024" and "there is no record … of any video views associated with [Plaintiff Salman's] account." MTD at 7. The early discovery produced to Defendant says otherwise.

*First*, early discovery showed that Plaintiff Salman watched at least seven pre-recorded videos while signed into her TED account. Zhou Decl. Ex. 1 at SALMAN_000002-000003. Pursuant to Plaintiffs' counsel's investigation, this means that Plaintiff Salman's PII and video-viewing history would have been disclosed to LeanPlum and MixPanel. *See, e.g.*, FAC ¶¶ 43, 113-114. *Second*, early discovery showed that Plaintiff Salman reset her TED account password on March 18, 2024, the exact date Defendant says she created an account. Zhou Decl. Ex. 1 at SALMAN_000005. The fact that Plaintiff Salman reset her password on the same day Defendant claims she created an account cannot be a mere coincidence. Indeed, being able to reset one's password means one must already have an account. Thus, the evidence supports both that Plaintiff Salman had an account prior to engaging counsel and that she watched videos through her account.

At the very least, there is a factual dispute that, if the Court were to resolve it at this stage (and it should not) would convert the MTD into one for summary judgment. *Petty v. Goord*, 2007 WL 724648, at *5 (S.D.N.Y. Mar. 5, 2007) (converting Rule 12(b)(1) motion into a summary

---

actual—his personal viewing information was disclosed without his consent to a third party … Accordingly, Salazar has alleged a sufficient harm to confer Article III standing.").

judgment motion where "both Petty and the defendants have submitted materials outside of the pleadings to the Court"); *see also Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (holding "[i]f a jurisdictional challenge does implicate the merits of the underlying claim then[] … the defendant is forced to proceed under Rule 12(b)(6) [] or Rule 56 [] both of which place great restrictions on the district court's discretion") (cleaned up). And such a motion would be highly prejudicial to Plaintiffs at this juncture, as they have had no ability to depose Mr. Merryman—who *twice* submitted a declaration under penalty of perjury based on incomplete facts—about Defendant's recordkeeping practices and his investigation.

Given this, the Court should not decide Defendant's challenge to Plaintiff Salman's standing at this juncture, given "sufficient affidavit and other necessary documentary evidence necessary to decide such a [] factual issue is not before [the Court] at this time." *Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F. Supp. 2d 170, 183 n.12 (N.D.N.Y. 2001); *see also Mendoza v. Manymar Corp.*, 2023 WL 3043634, at *1 (S.D. Fla. Apr. 21, 2023) ("The Court will not decide a motion for summary judgment on such an undeveloped record—especially where the record already contains competing facts … at such an early stage in the case.").

### B. Plaintiff Baker Has Standing Because His PII And Video-Viewing Information Was Disclosed To OpenWeb

Defendant argues Plaintiff Baker's claim should be dismissed because "OpenWeb only records data if and when an account holder engages with comments" and "[t]here is no record of Plaintiff Baker … engaging with the comments feature of TED.com." MTD at 9. This argument is easily disposed of. The VPPA prohibits the *disclosure* of one's PII and video-viewing information. 18 U.S.C. § 2710(b)(1). And the dynamic analysis shows that Website users' PII and video-viewing information is disclosed to OpenWeb when a user views a video, even when a user does not comment on the video. FAC ¶¶ 82, 92-93. Whether or not OpenWeb stored Plaintiff

Baker's PII and video-viewing information is irrelevant to whether Plaintiff Baker has standing, as Plaintiff Baker plausibly alleges his PII and video-viewing information was disclosed to OpenWeb. FAC ¶ 125; *see also Sutton*, 2024 WL 4167342, at *3 ("Plaintiffs may rely on the allegations in their pleading to establish standing, as the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing.") (cleaned up). Indeed, the fact Plaintiff Baker's PII and video-viewing information was disclosed to OpenWeb, despite not commenting on a video, cements why Defendant's disclosures to OpenWeb (and the other third parties) cannot fall within the ordinary course of business exception (*i.e.*, the disclosure was clearly not necessary or related to commenting). Argument § II.B.1, *infra*.

## II. PLAINTIFFS SUFFICIENTLY ALLEGE VIOLATIONS OF THE VPPA

### A. Pursuant To *Salazar*, Plaintiffs Have Sufficiently Alleged They Are Consumers Of Defendant

Second Circuit precedent now conclusively establishes that Plaintiffs are "consumers" of Defendant. In *Salazar*, 118 F.4th at 536-37, the Second Circuit examined whether a plaintiff was a "consumer" or "subscriber" under the VPPA where he "signed up for an online email newsletter offered by [the] [d]efendant" and "visited the NBA's website … where he watched videos" that were "free." The Second Circuit held the plaintiff was. Principally, and contrary to the Court's prior opinion (*Sutton*, 2024 WL 4167342, at *5), the Second Circuit found the plaintiff provided consideration in the form of his PII, which he exchanged with the defendant for benefits:

> although Salazar does not allege that he paid the NBA money, he does allege that he provided the NBA with his personal information when he signed up for the newsletter. In return for receiving periodic NBA-related updates, Salazar exchanged, at a minimum, (1) his email address, (2) his IP address, and (3) cookies associated with his device.

> …
>
> That information is not insignificant. By receiving it, the NBA learned how to directly reach out to Salazar. It discovered where his device was. It gained access to additional information stored in any cookies on his device. These tools increased the NBA's potential to urge Salazar to visit NBA.com and watch videos on it, making the NBA's relationship with him distinct from its relationship with casual NBA.com video-watchers who had not signed up for the newsletter. Accepting these allegations as true and drawing all reasonable inferences in Salazar's favor, as we must at the pleadings stage, Salazar plausibly alleged that he gave the NBA valuable personal information in exchange for access to the online newsletter.

*Salazar*, 118 F.4th at 552. Likewise, the Second Circuit cited with approval the First Circuit's decision in *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016), which found the plaintiff was a "subscriber" because he provided "consideration in the form of" his "personal information, such as his Android ID and his mobile device's GPS location at the time he viewed a video." *See also Salazar*, 118 F.4th at 552-53 (citing *Yershov*).

Here, Plaintiffs allege they subscribed to the TED Video Service (a "service" offered by Defendant) by creating TED accounts, or that the TED account itself was a "good or service" offered by Defendant to which Plaintiffs subscribed. FAC ¶¶ 15, 37 103, 109, 115, 121. Plaintiffs also allege they provided their PII to Defendant (but not third parties) when they created accounts, in exchange for receiving benefits exclusive to TED account holders. *Id.* ¶¶ 15-18. These allegations fit neatly within the scope of *Salazar*. Thus, the Court *must* find Plaintiffs are "consumers" under the Second Circuit's new and binding guidance.

*1. To The Extent Still Required, Plaintiffs' Allegations Satisfy The Ellis Factors*

In *Salazar*, the Second Circuit did not explicitly adopt the factors laid out in *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015), to determine whether the plaintiff was a "consumer." Thus, Plaintiffs dispute an analysis of these factors is required. It is now enough that

Plaintiffs provided their PII to Defendant when they created TED accounts and received benefits associated with their accounts in return. *Salazar*, 803 F.4th at 552. Nonetheless, Plaintiffs evaluate these factors because the Second Circuit cited approvingly to *Ellis*. *Id.* at 551. And under the Second Circuit's decision in *Salazar*, these factors now tip in Plaintiffs' favor.[4]

***Payment.*** This factor is now satisfied under *Salazar*. Plaintiffs allege that they created TED accounts, which inured various benefits not available to those without TED accounts, including but not limited to "the option to like or save talks to watch later," the ability to "receive talk Recommendations" and "write your own endorsements for talks," and the ability to "sync videos across all of a user's devices, and download videos to watch offline." FAC ¶ 15; *see also id.* ¶¶ 103, 109, 115, 121.[5] To create their TED accounts, however, Plaintiffs were required to "provide their e-mail address to Defendant," and "[i]t is only through this account creation that Defendant receives its users' e-mail addresses, which it then discloses to the third parties." *Id.* ¶ 16. "Users are also permitted to create TED account profiles, which include users' names," and which Defendant therefore acquires and discloses. *Id.* ¶ 17.

The Second Circuit now recognizes the exchange of PII to be a form of "payment"—or that PII is something of value—and Plaintiffs back this up with copious allegations regarding how "Defendant discloses PII to the third parties for marketing, advertising, and data analytics purposes, which are all significant revenue-generating activities for Defendant." *Id.* ¶ 32; *see also*

---

[4] To be clear, each factor individually could be a ground to find "some type of commitment, relationship, or association … between a person and an entity." *Salazar*, 118 F.4th at 551 (quoting *Ellis*, 803 F.3d at 1256). This is because the Eleventh Circuit noted "[s]ubscriptions involve *some or* most" of the factors. *Ellis*, 803 F.3d at 1256 (emphasis added; other alterations omitted). And "some" means "at least one." SOME, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/some.

[5] Crucially, the VPPA does not require the benefits Plaintiffs received for creating an account to be video-related. *Salazar*, 118 F.4th at 550 ("The phrase 'goods or services' in the VPPA's definition of 'consumer' is not cabined to only audiovisual 'goods or services.'").

*id.* ¶¶ 33-36; *Salazar*, 118 F.4th at 552 ("Salazar plausibly alleged that he gave the NBA valuable personal information in exchange for access to the online newsletter … That information is not insignificant."); *Yershov*, 820 F.3d at 489 (reasoning the plaintiff provided "consideration in the form of" his "personal information").

***Registration.*** As the Court previously found, this factor is satisfied because Plaintiffs "have TED accounts." *Sutton*, 2024 WL 4167342, at *5. Defendant does not dispute this factor is satisfied. MTD at 12-14.

***Commitment.*** This factor is now satisfied under *Salazar*. There was no indication in *Salazar* that the plaintiff could not delete his newsletter subscription "without consequences whenever he likes, and never access its content again." *Sutton*, 2024 WL 4167342, at *5. Nonetheless, the Second Circuit still found the plaintiff was a "subscriber":

> By receiving [plaintiff's PII], the NBA learned how to directly reach out to Salazar. It discovered where his device was. It gained access to additional information stored in any cookies on his device. These tools increased the NBA's potential to urge Salazar to visit NBA.com and watch videos on it, making the NBA's relationship with him distinct from its relationship with casual NBA.com video-watchers who had not signed up for the newsletter.

*Salazar*, 118 F.4th at 552

Plaintiffs' allegations here are even stronger. It is enough under *Salazar* that Plaintiffs created TED accounts and received account-related benefits in exchange for their PII, which Defendant used for marketing, advertising, and analytics. *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) ("Jackson plausibly alleges that she is a subscriber under the VPPA … [S]he created a Fandom account; became a registered user; provided Fandom with her PII, including her name and email address; and then used Fandom to watch videos.") (cleaned up); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 721-22 (N.D. Cal. 2023) (plaintiff was

a subscriber where he "provided defendant with his personal information, establishing ongoing commitment") (cleaned up).

In addition, however, Plaintiffs allege that once their PII was provided to Defendant and disclosed to the third parties, this was permanent and irrevocable, as Defendant maintains no data retention policy and does not say the third parties delete user information upon deletion of TED accounts. FAC ¶¶ 20-23. This exposes Plaintiffs to a whole host of privacy implications based on Defendant's (and the third parties') indefinite storage of their PII, including violating a separate prong of the VPPA. *Id.* ¶¶ 24-30; *see also* 18 U.S.C. § 2710(e). Accordingly, "creating a TED account is not free of commitment"—it is a permanent and irrevocable exchange of PII. *Id.* ¶ 31.[6]

***Delivery.*** Previously, the Court found this factor was not satisfied because "Plaintiffs state neither how the videos are delivered nor distinguish the access they receive as account holders from that available to any non-registrant." *Sutton*, 2024 WL 4167342, at *5. However, the Second Circuit found the plaintiff was a subscriber even though there was no "exclusive content or enhanced access to audiovisual services through the newsletter," and he viewed videos that were "generally accessible on the NBA.com website." *Salazar*, 118 F.4th at 544. And here, Plaintiffs' creation of TED accounts—which entitled exchanging PII that Defendant used for marketing, advertising, and analytics—makes Defendant's "relationship with [them] distinct from its relationship with casual" TED Video Service viewers who viewed videos without creating an account. *Salazar*, 118 F.4th at 552. Accordingly, this factor is now satisfied.

[6] Defendant says no court has found "an ongoing commitment by virtue of the allegedly disclosed data itself." MTD at 13. Defendant cites no authority rejecting Plaintiffs' allegations either. Regardless, Defendant misrepresents Plaintiffs' allegations on this factor, which concern Defendant's (and the third parties') indefinite *storage* of the PII once disclosed.

***Expressed Association.*** Previously, the Court found this factor was satisfied because "Defendant assigned Plaintiffs unique user IDs that allow Defendant to identify and track an individual user." *Sutton*, 2024 WL 4167342, at *6 (cleaned up). This remains true. FAC ¶¶ 18, 37, 67-70. Defendant urges the Court rethink this factor (MTD at 14), but *Salazar* forecloses this argument. *See Salazar*, 118 F.4th at 552 ("By receiving [plaintiff's PII], the NBA … discovered where [plaintiff's] device was."). In addition, Plaintiffs have strengthened these allegations by providing details about how their PII is permanently and irrevocably stored by Defendant and the third parties. FAC ¶¶ 20-23.

***Access to Restricted Content.*** Previously, the Court found this factor was not satisfied because "there is no allegation that a user must log in to watch any video, and Plaintiffs do not allege that the video content they accessed was exclusive to a subscribership." *Sutton*, 2024 WL 4167342, at *6. But that was true in *Salazar* as well, yet the Second Circuit found the plaintiff was a subscriber. Thus, this factor is not dispositive as to whether Plaintiffs are subscribers here. In any event, Plaintiffs did get access to "restricted content"—the account-exclusive benefits that Plaintiffs received in exchange for their PII (FAC ¶ 15)—just as the plaintiff in *Salazar* received access to the newsletter in exchange for his PII. *Salazar*, 118 F.4th at 552 ("Salazar plausibly alleged that he gave the NBA valuable personal information in exchange for access to the online newsletter").

*2. Defendant's Counterarguments Are Unavailing*

Despite spending three pages of briefing trying to sidestep *Salazar*, Defendant misses the core holding of that decision: the plaintiff's provision of PII in exchange for receiving the newsletter was what made him a "subscriber," just as Plaintiffs' provision of PII in exchange for creating TED accounts and accessing the associated benefits make Plaintiffs subscribers here.

*Salazar*, 118 F.4th at 552. Defendant argues it is "circular" "for the allegedly disclosed personal information to itself constitute a 'payment,'" yet that is the exact holding of the First and now Second Circuits.[7] *Salazar*, 118 F.4th at 552 ("Salazar plausibly alleged that he gave the NBA valuable personal information in exchange for access to the online newsletter."); *Yershov*, 820 F.3d at 489 (finding the plaintiff provided "consideration in the form of" his "personal information"); *see also Jackson*, 2023 WL 4670285, at *4. Regardless, providing PII *to Defendant* in exchange for a good or service makes Plaintiffs subscribers, whereas it is Defendant's disclosure of the PII *to third parties* that gives rise to the VPPA violation. Thus, the two are distinct.

Defendant also cites a hypothetical from *Salazar* that someone would become a subscriber of a particular YouTube *channel* by "clicking the 'subscribe' icon on a content creator's channel." *Salazar*, 118 F.4th at 552. Defendant contends "the second step—affirmatively associating with a specific product or service, in order to receive that product or service on an ongoing basis," makes someone a subscriber. MTD at 12. Conversely, Defendant argues "signing into a YouTube account—a process akin to registering for a TED account," does not. MTD at 12.

Defendant ignores that this hypothetical addressed how someone would "subscribe to a YouTube *channel*." *Salazar*, 118 F.4th at 552 (emphasis added). The Second Circuit did not say this two-step process was necessary for someone to subscribe to YouTube *itself*. Instead, as indicated above, the Second Circuit's reasoning is that by providing PII when creating an account (which is a "good or service") in exchange for some benefit, users become subscribers and are thus

[7] Defendant also contends this holding "would render 'Payment' duplicative of the 'Registration' factor, and would mean that 'Payment' is satisfied in all VPPA cases." MTD at 13. The Second Circuit did not adopt the *Ellis* factors, however; it simply held the plaintiff was a subscriber where he provided his PII in exchange for the newsletter. *Salazar*, 118 F.4th at 552. Further, the factors are not duplicative because, for instance, a user may not need to provide his or her PII to a business to create an account. In addition, there could be instances where a user provides information to create an account, but that information does not constitute PII under the VPPA.

distinguished from "casual [website] video-watchers who" do not. *Id*. And, creating a TED account indicates a desire to "affirmatively associat[e] with a specific product or service"—the TED Video Service (or the account itself). *See also Jackson*, 2023 WL 4670285, at *4.

Defendant's arguments also ignore the legislative policy behind the VPPA. As the Second Circuit held, "[t]he VPPA is no dinosaur statute … Our modern means of consuming content may be different, but the VPPA's privacy protections remain as robust today as they were in 1988." *Salazar*, 118 F.4th at 553. To wit, in today's day and age, many video tape service providers—including Defendant—choose not to charge their users a subscription fee, instead funding their ventures through advertising revenue that is powered by the PII these companies collect from account holders and disclose to third parties. FAC ¶¶ 14, 32-33.

So, "[i]t appears evident that subscription to a paid streaming service (like Netflix) … would render [someone] a 'consumer' under the VPPA." *Harris v. Public Broadcasting Serv.*, 662 F. Supp. 3d 1327, 1332 n.1 (N.D. Ga. 2023). But according to Defendant, such consumers lose their VPPA protections if Netflix decides to adopt an ad-supported model like the one Defendant uses here (*i.e.*, consumers create free Netflix accounts and receive benefits in exchange for their PII). That cannot be—and, per *Salazar*, is not—the law:

> Suppose a customer in 1988 obtained several videos from a new commercial supplier at no charge, or with money back. We can discern no reason why Congress would have wanted different disclosure rules to apply to those transactions than to ones where a monetary payment is made

*Salazar*, 118 F.4th at 552 (quoting *Yershov*, 820 F.3d at 488); *see also Harris*, 662 F. Supp. 3d at 1332 n.1 ("If payment is not required, then a free registration otherwise consistent with registration for those services would likely suffice."); *Jackson*, 2023 WL 4670285, at *4 ("Jackson … created a Fandom account; became a registered user; provided Fandom with her PII … and then used

Fandom to watch videos.") (cleaned up). Under *Salazar*, therefore, consumers do not leave their VPPA protections at the door when they create an account and therefore subscribe to a free online video service. And Defendant cannot avoid the VPPA because it chooses to charge consumers in data rather than dollars.

### B. Defendant's Disclosures Were Not Made In The Ordinary Course Of Business

#### *1. Marketing, Advertising, And Analytics Do Not Fall Within The Ordinary Course Of Business*

The ordinary course of business is an affirmative defense that Plaintiffs are not required to plead around. *See M.K. v Google LLC*, 2023 WL 4937287, at *6 n.4 (N.D. Cal. Aug. 1, 2023) (holding a plaintiff "has no duty to foreclose an ordinary course of business defense in his complaint"); *see also Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 494-95 n.4 (9th Cir. 2019) ("The burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits … If the defendant wishes to rely upon the proviso, the burden is upon it to bring itself within the exception."); *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 149-50 (2d Cir. 2024) (reversing and remanding the district court's holding that an affirmative defense barred the plaintiff's claim) (cleaned up).

Notwithstanding this, Plaintiffs laboriously allege that Defendant disclosed their PII to third parties for marketing, advertising, and analytics. *See, e.g.*, FAC ¶¶ 16-19, 22-23, 32-36, 45-47, 50-51, 53-54, 73, 75, 80, 81, 84-89, 98, 100-01, 102-03, 105, 106-110, 114-15, 117, 119 (alleging, among other things, "Defendant discloses PII to the third parties for marketing, advertising, and data analytics purposes, which are all significant revenue-generating activities for Defendant. This is because [c]ompanies can purchase advertising space on … sites [like

Defendant's] in an effort to reach consumers they might otherwise miss.") (cleaned up). The Department of Justice also understood this was what Plaintiffs alleged. ECF No. 44 at 7.

Numerous courts have found marketing, advertising, and analytics fall outside the ordinary course of business. *See, e.g.*, *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024) ("The alleged uses of the information here – marketing, advertising, and analytics – do not fall within the exception's narrow list of permissible uses.") (cleaned up); *Rancourt v. Meredith Corp.*, 2024 WL 381344, at *17 (D. Mass. Feb. 1, 2024) (holding that disclosures of "App user data as part of its targeted advertising campaign which is intended to drive revenue … [and] better target ads does not constitute an intra-corporate disclosure or a disclosure in support of management operations."); *Burdette v. FuboTV Inc.*, 2024 WL 2831466, at *5 (N.D. Ill. June 4, 2024) ("As targeted marketing and advertising analytics have only ballooned in complexity and pervasiveness … 'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities."); *Ade v. Viki, Inc.*, 2024 WL 1880153, at *3 (N.D. Cal. Mar. 28, 2024) ("The complaint alleges that Viki uses the Pixel to track visitor actions on its website and to better target their products and services on Facebook to interested consumers, thereby increasing its profits … The Court cannot find as a matter of law based on the allegations of the complaint that the purpose of this data-sharing arrangement falls within the ordinary course of business exception."); *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (finding disclosures "to measure analytics and increase advertising revenue … do not fall into the narrow categories statutorily defined as the 'ordinary course of business'"); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012) ("Market research and web analytics are not in the ordinary course of Hulu's business of delivering video content to consumers.").[8]

---

[8] Defendant contends *Rancourt* supports its argument on this topic. MTD at 16. It does not. *Rancourt* noted that "once user information is disclosed to Twilio through the Segment API, Twilio

Indeed, the VPPA *explicitly regulates* disclosures made for "marketing goods and services directly to the consumer," if the disclosure only includes "the subject matter of such materials"—which here, it does not. 18 U.S.C. § 2710(b)(2)(D)(ii). "If Congress intended to include 'marketing' … where it discussed the 'ordinary course of business,' then it would have done so, and perhaps would not have also addressed 'marketing' in its own subsection." *Collins v. Toledo Blade*, 720 F. Supp. 3d 543, 554-55 (N.D. Ohio 2024). And while the legislative history refers to "mailing houses," "warehouses," and "similar companies," this makes sense because such companies are passive repositories of information and automated distributors to receive customer records. But they may not become involved with analyzing those records or targeting groups with those materials, which is what Plaintiffs allege the third parties do here.

Further, and given the foregoing, the Court should not interpret "computer services" in the legislative history so broadly "that it is inconsistent with its accompanying words, thus giving unintended breadth to Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015). Accordingly, applying the *noscitur a sociis* canon of interpretation to give a word "more precise content by the neighboring words with which it is associated," it follows that "computer services,"—as used here in a single list with "mailing houses," "warehouses," and "similar companies"—was intended to fall into the category of passive information storage services (*e.g.*, cloud storage companies), *not* marketing or advertising services. *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 604 (2d Cir. 2021).

---

compiles and transmits that information to other third parties that Meredith utilizes for targeted advertising." *Rancourt*, 2024 WL 381344, at *17 (cleaned up). *Rancourt* found this activity fell outside the ordinary course of business. *Id*. Similarly, Plaintiffs allege the information disclosed to the third parties here is then subsequently used for targeted advertising and monetization, which necessarily entails further disclosure. FAC ¶¶ 47, 85-89, 98, 101, 103, 105, 108-109.

### 2. *Defendant's Counterarguments Are Unpersuasive*

Against this smattering of authority, Defendant cites *zero cases* holding marketing or advertising, or analytics in service of these functions, fall within the ordinary course of business.[9] Instead, Defendant tries to recharacterize its disclosures as "maintaining and improving digital functionality and the user experience." MTD at 16. To reinforce its point, Defendant cherry-picks a mere ten allegations from the FAC. *Id.* at 16-17. This, of course, construes Plaintiffs' allegations against them and raises a factual dispute not ripe for resolution at this juncture. *Richards v. Warner Music Group*, 2024 WL 4307994, at *2 (S.D.N.Y. Sept. 26, 2024) (Ho, J.) ("[A] court must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor.") (cleaned up); *Ade*, 2024 WL 1880153, at *3 ("The scope of the ordinary course of business exception and whether Viki's use of the Pixel falls within the exception are issues better addressed on a fuller record at summary judgment."); *Jackson*, 2023 WL 4670285, at *5 ("To the extent Fandom challenges Jackson's factual allegations regarding the purpose of Fandom's data-sharing practices, that factual issue is not appropriate for resolution on a motion to dismiss.").

Notwithstanding this, Defendant's attempt to euphemize marketing and advertising as "improving digital functionality and the user experience" does not change what these activities actually are, and even "improving digital functionality and the user experience" do not fall within the narrow categories of "only debt collection activities, order fulfillment, request processing, and

---

[9] Defendant cites *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618 (7th Cir. 2014), but that case involved disclosures to a third party for "customer support services" or "to respond to customer service requests." *Sterk v. Redbox Automated Retail, LLC*, 2013 WL 4451223, at *4 (N.D. Ill. Aug. 16, 2013). Defendant also cites *Rodriguez v. Sony Computer Ent. Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015), but that case involved "intra-corporate disclosures" between two Sony entities, not the disclosure of information to an unrelated third party as alleged here.

the transfer of ownership." 18 U.S.C. § 2710(a)(2). Further, even if Defendant's cited activities *could* qualify for the ordinary course of business exception (and they do not), it cannot possibly be necessary (and thus, not in the ordinary course of business) for Defendant to disclose its users' full names, unhashed e-mail addresses, and video titles (FAC ¶¶ 43, 82)—as opposed to some less invasive form of information—to "improv[e] digital functionality and the user experience."

In addition, Defendant argues these disclosures cannot possibly violate the VPPA because they are for "TED's own use." MTD at 17 (emphasis removed). That is irrelevant. Courts have consistently held that disclosing PII to third parties gives rise to a VPPA violation, notwithstanding any benefit the defendant may have derived. *Salazar*, 118 F.4th at 542 ("Salazar's core allegation is that his personally identifiable information was exposed to an unauthorized third party. And Salazar … asserts that it was disclosed as a result of an arrangement between the NBA and Meta pursuant to which the NBA deliberately uses the Facebook Pixel.") (cleaned up); *see also Saunders*, 711 F. Supp. 3d at 31 ("[T]he FAC is rife with allegations that Hearst knew that it was collecting data from users that identified personalized information about them because, in exchange for the data, Braze and Google provided Hearst with analytics allowing it to provide advertisements tailored to specific users."). And if the "benefit" to Defendant is enriching itself by disclosing PII to third parties to generate advertising revenue (which it is, FAC ¶¶ 32-34), that is exactly what the VPPA prohibits.

Finally, Defendant waxes poetic that prohibiting the disclosures here "would strike at the heart of IT and data management software that is both ubiquitous and necessary for small businesses to participate and compete in today's economy," as "[o]nly companies that achieve the scale and technical know-how required to internalize data-related functions will feel secure in their ability to retain data." MTD at 18 (cleaned up). Defendant is no "small business," the disclosures

here are not for "IT and data management software," and none of the disclosures were "necessary." *See In re Hulu Privacy Litig.*, 2014 WL 1724344, at *7 (N.D. Cal. Apr. 28, 2014). Regardless, Defendant is permitted to make these disclosures to third parties for whatever purpose it wants, so long as it procures its users' prior consent "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" before doing so. 18 U.S.C. § 2710(b)(2)(B)(i). Such compliance is easy. *Cappello*, 2019 WL 11687705, at *2 ("It would also not be burdensome to design a website whereby consumers must click a box confirming their consent to disclosures involving video purchases and click a separate box confirming their consent to all other applicable policies and terms."); *see also Javier*, 649 F. Supp. 3d at 900 ("The acquisition of consent when visiting websites (for the collection of cookies, for example) is a regular occurrence and hardly particularly 'technologically impractical.'"). Defendant's decision not to take such steps does not render its activities within the "ordinary course of business" exception.[10]

## III. AS EVERY COURT TO ADDRESS THE ISSUE HAS HELD, THE VPPA COMPORTS WITH THE FIRST AMENDMENT

Defendant argues the "application of the VPPA to TED's use of third-party software programs [] does not pass muster under the First Amendment." MTD at 18. No court has ever agreed with TED, and the only courts to address challenges to the constitutionality of the VPPA have squarely rejected them. *See Saunders*, 711 F. Supp. 3d at 32-33; *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1026-1039 (N.D. Cal. 2023); *see also Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 196-98 (S.D.N.Y. 2017) ("*Boelter I*") (rejecting First Amendment challenge to state

---

[10] Defendant also chides Plaintiffs for not citing to its miniscule early discovery production in support of Plaintiffs' allegations. MTD at 18. Such factual arguments would be improper at the pleadings stage. Regardless, Plaintiffs can include statements from Defendant's contracts on amendment if the Court deems it necessary.

analog of the VPPA); *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 596-603 (S.D.N.Y. 2016) ("*Boelter II*") (same). This Court should do the same.

### A. Intermediate Scrutiny Applies Because Defendant's "Speech" Is Commercial

Defendant argues that "strict scrutiny applies" because "[t]he speech here does not fit [the] definition of commercial speech." MTD at 20. This is wrong. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). Here, Plaintiffs allege Defendant disclosed their PII and video-viewing information to third parties for the purposes of "marketing, advertising, and analytics." FAC ¶¶ 98-110. These activities are commercial, as Defendant made these disclosures to "monetize[] its extensive 'free' video viewership, in part, with revenue from advertisements" and to promote its platform. FAC ¶ 14; *see also, e.g.*, *id.* ¶¶ 32-34, 87, 89, 100, 102, 114; *Saunders*, 711 F. Supp. 3d at 33, 33 n.8 (holding "disclosure of PII to third parties is commercial speech" because it was "solely motivated by the desire for profit, which is a force less likely to be deterred than others") (cleaned up); *Stark*, 656 F. Supp. 3d at 1034 (disclosure of PII to third party was commercial speech, "as is most similar speech governed by the VPPA in the context of corporate data collection and analysis"); *PharmacyChecker.com, LLC v. Nat. Ass'n of Boards of Pharm.*, 530 F. Supp. 3d 301, 355 (S.D.N.Y. 2021) (finding commercial speech where the plaintiff "alleged that NABP's statements were made for the purpose of influencing consumers to buy defendant's goods or services") (cleaned up).

Indeed, Defendant admits these disclosures were for its "own use" or business (MTD at 17), further warranting intermediate scrutiny. *Saunders*, 711 F. Supp. 3d at 33 n.8 ("[S]peech that is 'solely in the individual interest of the speaker and its specific business audience' and does not implicate matters of public concern is subject to 'many of the same concerns that argue in favor of

reduced constitutional protection' for commercial speech.") (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-62, 762 n.8 (1985)). Further, the disclosures here pertain only to a private matter: the videos Plaintiffs watched on their mobile devices and computers. *See Dun & Bradstreet*, 472 U.S. at 759 ("[S]peech on matters of purely private concern is of less First Amendment concern."); *see also* S. Rep. 100-599, at 6-7 (1988) (noting the "right to privacy" encompasses the right to control where "information goes," as that information is "a window into our loves, likes, and dislikes").

Defendant's status as a nonprofit is of no import. The activities here concern advertising revenue derived from disclosing consumer PII without consent, unlike the "charitable solicitations" in *Riley v. Nat. Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988), where people willingly and voluntarily donate money. *See also id.* at 799 (noting "[d]onors are [] undoubtedly aware that solicitations incur costs, to which part of their donation might apply"). Likewise, Plaintiffs are not seeking to prohibit Defendant from hosting or displaying videos on its service, and the content of the videos themselves are naturally protected speech. *Gordon and Breach Science Publishers S.A. v. Am. Institute of Physics*, 859 F. Supp. 1521, 1523, 1542, 1544 (S.D.N.Y. 1994) (publication of articles in "physics journals," "letter to the editor," and press release "constitute protected speech"). Instead, Plaintiffs' claims involve Defendant's disclosure of its users' PII and video-viewing information to third parties to monetize its content through advertising revenue based on that PII. Argument § II.B.1, *supra*. Such disclosures "constitute commercial advertising or promotion." *Gordon and Breach Science Publishers S.A.*, 859 F. Supp. at 1544-45 (cleaned up) ("preprints at a librarians' conference" and continued dissemination of survey results through mailings and "quotes to the media" were "explicitly promotional in nature" and were thus commercial speech).

Defendant also claims, "the free, publicly available videos available on TED's website are not alleged to be connected to any purchase or sale, nor is TED's use of the software motivated solely by a desire for financial gain." MTD at 22. Again, Defendant is free to post whatever videos it wants on its TED Video Service. However, it is commercial speech for Defendant to disclose (without consent) the PII of TED account holders who view those videos to third parties to monetize user PII through advertising revenue. *Gordon and Breach Science Publishers S.A.*, 859 F. Supp. at 1544 ("While we have held that non-profit organizations must be free to publish on any topic … the same does not apply to subsequent … promotional uses of that speech."). And Plaintiffs have more than alleged that this monetization is the purpose of Defendant's disclosures. Argument § II.B.1, *supra*; *see also, e.g.*, FAC ¶¶ 16-19, 22-23, 32-36, 45-47, 50-51, 53-54, 73, 75, 80, 81, 84-89, 98, 100-01, 102-03, 105, 106-110, 114-15, 117, 119.

**B. The VPPA Satisfies Intermediate Scrutiny**

Defendant argues "the VPPA does not survive even if intermediate scrutiny applies [which it does]." MTD at 22. Again, no court has ever agreed with Defendant's argument. This Court should not be the first.

*First*, Defendant claims, "the government does not have a substantial or compelling interest in preventing the confidential, non-public data management alleged here." MTD at 22. As explained *ad nauseum* in this brief and as alleged in the FAC, Defendant's activities do not involve "data management"; they involve disclosures to monetize information through marketing, advertising, and analytics. Argument § II.B.1, *supra*; *see also Stark*, 656 F. Supp. 3d at 1034 (speech was commercial where the "disclosure of Plaintiffs' commercial interactions with Patreon" was "motivated by the commercial interests of both Patreon and Meta to more effectively sell or otherwise monetize their products"). Further, Defendant's disclosure of PII to third parties

takes the disclosures out of the realm of being "confidential" and "non-public." *Salazar*, 118 F.4th at 542 (finding defendant's disclosure of PII to a third party software provider "closely related to the public disclosure of private facts"). Even putting this aside, Congress's "stated interest in protecting consumer privacy from nonconsensual disclosure to third parties—and particularly in this case, where Defendant traded and sold Plaintiff[s'] personal information for its own gain—is a substantial government interest." *Boelter I*, 269 F. Supp. 3d at 197 (addressing state analog of the VPPA). Thus, "[t]he V[P]PA, even construed to encompass non-public disclosures to third parties, serves a substantial state interest." *Id*.

*Second*, Defendant claims "[t]he VPPA's application here would prohibit companies like TED from disclosing data to [] outside providers, meaning it would likely remain on internal systems and arguably be more likely to be compromised." MTD at 23 (cleaned up). Defendant likewise contends "[a]pplication of the VPPA here will … [have] a profound chilling effect" on speech via litigation. *Id.* at 24. This is hyperbole, and a false one at that. The conduct being regulated here is Defendant's disclosure of PII, not its posting of video content.

Moreover, whether or not it should, Defendant can disclose PII to third parties and avoid litigation—whether it is for marketing and advertising (which Defendant does here) or IT and cybersecurity—so long as Defendant obtains the prior consent of its users in a VPPA-compliant manner. 18 U.S.C. § 2710(b)(2)(B); *see also Boelter II*, 210 F. Supp. 3d at 602 (state-analog of the VPPA "permits disclosure for any reason with the customer's permission"). "This is not hard to accomplish, as the enormous volume of commerce on the Internet attests." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016); *see also Cappello*, 2019 WL 11687705, at *2 ("It would also not be burdensome to design a website whereby consumers must click a box confirming their consent to disclosures involving video purchases and click a separate box

confirming their consent to all other applicable policies and terms."). The problem for Defendant is it has a financial interest in *not* informing consumers of the extent to which Defendant collects, discloses, and monetizes their information. Introduction, *supra*. But Defendant's reluctance to obtain sufficient consent from its users does not mean the sky will fall if the Court agrees with Plaintiffs (and it should), nor that the VPPA runs afoul of the First Amendment (it does not).

*Third*, Defendant's citation to *IMDb.com, Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020), is inapposite. *IMDb* is a non-VPPA case where the defendant "post[ed] [] information on its website free of charge for the public to review." *Id.* at 1125. "The content is encyclopedic, not transactional." *Id.* at 1122. The Ninth Circuit distinguished the facts before it from a situation like the allegations here, where "the 'speech' at issue—the sale of data—was itself an inherently private exchange between private parties" that was commercial in nature and satisfied the First Amendment. *Id.* at 1124-25 (citing *Trans Union Corp. v. F.T.C.*, 267 F.3d 1138 (D.C. Cir. 2001)); *see also Trans Union Corp.*, 267 F.3d at 1141 (statute survived First Amendment scrutiny where disclosed information included "names of private individuals").

*Finally*, Defendant believes expanding the VPPA to its conduct here "is by no means sufficiently narrowly drawn to protect [the privacy] interest." MTD at 23 (cleaned up). On the contrary, the VPPA is narrowly drawn because "[t]he law limits the dissemination of precisely the kind of information with which the state is concerned, and targets those most likely to disseminate it." *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 449 (S.D.N.Y. 2016). At the same time, the VPPA "is not absolute," as it includes several exceptions (like consent from the consumer). *Id.* Further, as the Second Circuit recognized, the VPPA's privacy protections were *intended* to apply to "[o]ur modern means of consuming content." *Salazar*, 118 F.4th at 553. "To the extent that [Defendant] believes the statute may impose too many burdens when applied to the

realities of modern technologies [and it does not] … the question of whether the statute's scope should be narrowed ultimately rests with the Legislature, not the courts." *Shah v. Fandom, Inc.*, --- F. Supp. 3d ---, 2024 WL 4539577, at *6 (N.D. Cal. Oct. 21, 2024).

**C. The Canon Of Constitutional Avoidance Is Inapplicable**

Defendant claims the canon of constitutional avoidance requires the court to "constru[e] the still-unsettled 'subscriber question or the OCOB exception' in a way that obviates TED's constitutional concerns." MTD at 25. But the VPPA is not susceptible to Defendant's proffered constructions (Argument §§ II.A-B, *supra*), and "[t]he canon of constitutional avoidance comes into play *only when*, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). Regardless, the VPPA survives First Amendment scrutiny so this canon does not even come into play.

On the other hand, declining to apply the VPPA to Defendant's marketing and advertising-based disclosures would enable non-profits to generate advertising revenue from disclosing PII for these purposes but prevent for-profit corporations from doing the same. This would rewrite the VPPA "to target the message of particular speakers." *Boelter II*, 210 F. Supp. 3d at 601. Thus, the canon of constitutional avoidance actually requires siding with Plaintiffs.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion should be denied.

Dated: December 3, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

Yitzchak Kopel
Max S. Roberts
Victoria X. Zhou
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

*Attorneys for Plaintiffs*