UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIMBERLY SUTTON, et al.,

                                    Plaintiffs,

                    v.

TED FOUNDATION, INC.,

                                    Defendant.

23 Civ. 9219 (DEH)

**OPINION
AND ORDER**

DALE E. HO, United States District Judge:

Plaintiffs bring this putative class action alleging that Defendant TED Foundation, Inc. ("TED" or "Defendant") violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. *See generally* Compl., ECF No. 1; First Am. Compl. ("FAC"), ECF No. 50.  By prior Order, this Court dismissed the original complaint for failure to state a claim, but granted Plaintiffs leave to amend.  *See* Op. and Order dated September 12, 2024, ECF No. 48 (the "First MtD Order"). Defendant moves to dismiss the FAC, arguing that at least some Plaintiffs do not have standing under Rule 12(b)(1) and that the FAC fails to state a claim under Rule 12(b)(6).[1]  *See generally* Def.'s Mem. of L. in Supp. of Mot. to Dismiss ("Def.'s Br."), ECF No. 58.  For the reasons discussed herein, Defendant's motion is **DENIED**.

## BACKGROUND

### I.    Factual Background

"In reviewing a facial attack to the court's jurisdiction, we draw all facts—which we assume to be true unless contradicted by more specific allegations or documentary evidence—

---

[1] All references to Rules are to the Federal Rules of Civil Procedure.

from the complaint and from the exhibits attached thereto." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).[2] "In assessing the plausibility of the claim, [the Court] must accept factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 137 (2d Cir. 2022).

Defendant TED Foundation, Inc. is a non-profit organization that produces pre-recorded videos accessible to the public via browser on its website TED.com and via the TED application on Android and Apple mobile devices. FAC ¶ 4. TED allows users to create accounts, which are free of charge, to receive personalized recommendations, sync videos across all of a user's devices, download videos to watch offline, and add talks to [the user's] list to watch later, among other benefits. *Id.* ¶¶ 15-18. To create an account, TED users must provide their names and email addresses. *Id.* ¶ 16.

TED shares users' personally identifiable information (names, email addresses, videos viewed, and user IDs) with third-party service providers Leanplum, Mixpanel, and OpenWeb. *See id.* ¶¶ 5, 38-105. It uses Leanplum's built-in tools and analytics to "collect and analyze user data" and "understand[] how different mobile app users engage with different content," with the ultimate goal of increasing Defendant's user base by "target[ing] different users with different marketing and advertising strategies." *See id.* ¶¶ 46, 98-99. It uses Mixpanel to "analyze user metrics, view how users convert at each step, and monitor growth, engagement, and retention," *id.* ¶ 102, with the goal of using that data to "ultimately retain[] a larger user base," *id.* ¶ 103. Finally, TED transmits its users' personal data to OpenWeb to analyze users' information, "deliver[] personalized and targeted content to users," and "generate[] insights that lead to increased

---

[2] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

monetization and other business outcomes." *Id.* ¶¶ 106-08.  TED receives revenue in part from advertisements to users.  *Id.* ¶ 14.

Across the Android and iOS apps, as well as the website, TED shares a user's name, email address, and other identifying information with Leanplum, Mixpanel, or OpenWeb whenever a user watches a video.  FAC ¶¶ 56-80, 90-97.  Plaintiffs allege that, with this personal information, TED discloses video-viewing information in the form of the video name, video ID, and video topics for each specific video watched.  *Id.* § V, ¶¶ 103-08, 115-125.  An example of the screenshots of computer code demonstrating the exact information transmitted is shown below:



Disclosure of User ID to Leanplum



FAC ¶¶ 68, 72.

Two of the named Plaintiffs—Kimberly Sutton and David Ramirez[3]—are individuals who created a TED account and downloaded the TED App to watch TED videos on their phones.  *See*

---

[3] Plaintiff Zainab Salman voluntarily dismissed her claims on December 19, 2025.  ECF No. 88.

*id.* § V, ¶¶ 103, 115-116.  One Plaintiff—Tyler Baker—is an individual who accessed and created a free TED account to watch videos on the website.  *See id.* ¶ 121.

## II.    Statutory Background

The VPPA was enacted in 1988, after a newspaper published a profile based on Supreme Court nominee Judge Robert Bork's video rental history.  *See Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 96 (S.D.N.Y. 2023) (citing S. Rep. No. 100-599, at 5 (1988)).  It "creates a private right of action for plaintiffs to sue persons who disclose information about their video-watching habits." *Salazar v. Nat'l Basketball Ass'n*, 685 F. Supp. 3d 232, 239 (S.D.N.Y. 2023). The VPPA states that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]"  18 U.S.C. § 2710(b)(1).  "To state a claim under § 2710(b), a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any consumer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by another part of the statute." *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023) (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)).

The Act defines the following terms relevant here:

(1) "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider; . . .


(3) "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and

(4) "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]

18 U.S.C. § 2710(a).  "In 2013, Congress amended the pre-Internet VPPA to 'reflect the realities

of the 21st century,' but it did not alter any of the VPPA's substantive definitions."  *Golden v.*

*NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023) (quoting 158 CONG. REC.

H6849-01 (daily ed. Dec. 18, 2012) (statement of Rep. Bob Goodlatte)).

## DISCUSSION

### I.    Standing

#### A.  Legal Standard

"A district court properly dismisses an action under [Rule] 12(b)(1) for lack of subject

matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it[.]"

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-17 (2d Cir. 2015).  To

satisfy the constitutional requirements of Article III standing, a plaintiff must have "(1) suffered

an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that

is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330,

338 (2016), *as revised* (May 24, 2016).  "[A] plaintiff has class standing if he plausibly alleges (1)

that he personally has suffered some actual injury as a result of the putatively illegal conduct of

the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged

to have caused injury to other members of the putative class by the same defendants."  *NECA–*

*IBEW Health & Welfare Fund v. Goldman Sachs & Co*., 693 F.3d 145, 162 (2d Cir. 2012).

"As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating

that they have standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021).  "Congress

may create causes of action for plaintiffs to sue defendants who violate . . . legal prohibitions or

obligations.  But under Article III, an injury in law is not an injury in fact."  *Id.* at 427.  Thus,

"[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may

sue that private defendant over that violation in federal court."  *Id.* (emphasis in original).  "Central

to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts[.]" *Id.* at 417 (quoting *Spokeo*, 578 U.S. at 341).  Such harms include "various intangible harms" such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425.

### B.  Application

The Court previously held that Plaintiffs have standing for their VPPA claims.  *See* First MtD Order at 4-8.  "The Complaint pleads a concrete, particularized injury to a legally protected interest of [Plaintiffs']: the disclosure of [their] video viewing history [and other personal information] to [third parties]." *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 281 (S.D.N.Y. 2024).

In its Motion to Dismiss, however, TED argues that Plaintiff Baker—the only plaintiff in this case to assert a claim related to disclosures to OpenWeb, as set forth in Count II of the FAC— lacks standing to bring that particular claim.  Specifically, TED argues that Baker's information was never exposed to OpenWeb, which according to TED, receives user data only when a user engages in comments on the TED website.  *See* Def.'s Br. at 9.  And TED claims that "[t]here is no record of Plaintiff Baker—or any Plaintiff for that matter—engaging with the comments feature of TED.com, . . . nor does TED have any data in OpenWeb concerning any of the Plaintiffs . . . ." *See id*. (citing Decl. of Andrew Merryman in Supp. ¶¶ 12-15, ECF No. 73 ("Merryman Decl.").  Because Plaintiff's OpenWeb claims are based solely on Baker's use of the TED website, Defendant contends that Baker's lack of standing defeats the entire claim. *See id.* at 8.

The Court cannot grant TED's motion to dismiss this claim, however, because there is a dispute of fact regarding how OpenWeb functions for website users.  While TED contends that OpenWeb records data only if and when an account holder engages with comments, Plaintiffs disagree, claiming their dynamic analysis shows that "[w]ebsite users' PII and video-viewing

6

information is disclosed to OpenWeb when a user views a video, even when a user does not comment on the video." Mem. of L. in Opp'n to Mot. to Dismiss ("Pls.' Br.) at 5, ECF No. 63 (citing FAC ¶¶ 82, 92-93.).

Defendants are correct that the Court may go outside of the pleadings to consider extrinsic evidence in deciding this motion. *See Lamb v. Forbes Media LLC*, No. 22 Civ. 6319, 2023 WL 6318033, at *8 (S.D.N.Y. Sept. 28, 2023) ("The Court agrees with Defendant that its extrinsic evidence is material insofar that it contradicts Plaintiffs' allegations that they ever requested or obtained specific video materials," which contradiction, in turn, "creates a jurisdictional dispute because there is no concrete harm without disclosure of private information"); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (stating that the district court "properly considered evidence outside the pleadings" where there were "jurisdictional facts in dispute"). But Defendant's proffered evidence that Baker did not engage in user comments on the TED website does not undermine Plaintiffs' plausible allegations that Baker's video viewing information was disclosed to OpenWeb regardless of whether he commented on a video. Accordingly, Plaintiffs may "rely on the allegations in their pleading" to establish standing, as "the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *See Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). Nor does the Court consider it proper at this stage to convert the Motion to one for summary judgment. *See Petty v. Goord*, No. 00 Civ. 803, 2007 WL 724648, at *5 (S.D.N.Y. Mar. 5, 2007) (converting Rule 12(b)(1) motion into a summary judgment motion where "both Petty and the defendants have submitted materials outside of the pleadings to the Court").

To the extent further discovery shows Plaintiffs' allegations regarding the disclosure of viewing information to OpenWeb to be misleading or inaccurate, the Court can properly address

that issue on summary judgment. *See Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (holding that, because the "jurisdictional challenge does implicate the merits of the underlying claim then[] … the defendant is forced to proceed under Rule 12(b)(6) [] or Rule 56.").For the reasons stated above, Defendant's Motion to Dismiss under 12(b)(1) is **DENIED**.

## II.    Failure to State a VPPA Claim

To state a claim under the VPPA, "a plaintiff must plausibly allege that (1) a video tape service provider (2) knowingly disclosed to any person (3) personally identifiable information concerning her use of the service." *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 44 (2d Cir. 2025). By its terms, the Act protects from disclosure the personally identifiable information only of "consumer[s]," 18 U.S.C. § 2710(b)(1), which, as noted above, it defines as including "subscriber[s] of goods of services from a video tape service provider," 18 U.S.C. § 2710(a).

This Court previously granted Defendant's Motion to Dismiss, concluding, that "Plaintiffs' claims fail as a matter of law because the Complaint falls short of pleading that Plaintiffs were 'consumer[s]' within the meaning of the VPPA." *See* First MtD Order at 8 (citing 8 U.S.C. § 2710(a)(1)).  At the time the Court rendered its decision, the Second Circuit had not weighed in on several important issues, including the question of whether providing personal data could constitute payment for purposes of determining whether a plaintiff is a "subscriber" under the VPPA.  Nor had the Circuit defined "personally identifiable information" for purposes of determining whether a particular disclosure of information violates the VPPA.  Now, with the benefit of a more thoroughly developed framework in this area, the Court concludes that Plaintiffs have adequately alleged that they are consumers within the meaning of the VPPA.  The Court also concludes that Plaintiffs have adequately alleged that an ordinary person "with little or no extra

effort" would be able to link the disclosed pixel[4] to the titles of the videos viewed by Plaintiffs. *See Solomon*, 136 F.4th at 54.  Accordingly, Defendant's Motion to Dismiss under 12(b)(6) is **DENIED**.

### A.  Legal Standard on 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. New York Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. However, the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

### B.  Recent Second Circuit Guidance on the VPPA

Since the Court previously addressed this issue, numerous Courts have considered similar allegations of VPPA violations.  Importantly, this includes the Second Circuit at least three times: *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024), *cert. denied sub nom. NBA v.*

---

[4] A "pixel" is "a piece of code embedded on a website someone visits.  As its name suggests, a tracking pixel tracks users as they navigate the website, reporting back to the pixel's owner.  The information tracked depends on the tracking pixel's configuration." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 537 (2d Cir. 2024).

*Salazar*, No. 24-994, 2025 WL 3506972 (U.S. Dec. 8, 2025); *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025); and *Hughes v. Nat'l Football League*, No. 24 Civ. 2656, 2025 WL 1720295, at *3 (2d Cir. June 20, 2025) (summary order).  The Court begins by recounting the current legal framework.

The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).  The VPPA does not define the term "subscriber," *see generally* 18 U.S.C. § 2710.  The Complaint alleges that Plaintiffs Sutton and Ramirez are subscribers because they registered, committed, and expressed association with the TED App.  *See* FAC ¶ 37.  Similarly, Plaintiff Baker is alleged to have subscribed to TED by registering, committing, and expressing association with TED's Website.  *Id.* ¶ 160.  All named Plaintiffs have provided their names and email addresses to TED.  *Id.* ¶¶ 147, 149, 161.  All have viewed pre-recorded content on TED's website and/or mobile app.  *Id.* § V, ¶¶ 103, 116, 121.

In *Salazar*, the Second Circuit faced similar allegations of an unpaid subscriber relationship.  There, the plaintiff had signed up for the NBA newsletter.  "In return for receiving periodic NBA-related updates, Salazar exchanged, at a minimum, (1) his email address, (2) his IP address, and (3) cookies associated with his device."  *Salazar*, 118 F.4th at 552.  The Circuit concluded that "Salazar plausibly alleged that he gave the NBA valuable personal information in exchange for access to the online newsletter," which was "sufficient at the pleadings stage to satisfy the requirement that Salazar allege that he became a 'subscriber of' the NBA's online newsletter."  *Id.* at 552-53.

*Salazar* appeared to open the door to many new VPPA claims, but that door largely slammed shut quickly in *Solomon*.  There, the plaintiff alleged that the defendant's website transmitted her Facebook ID and the titles and URLs of the videos she viewed on the defendant's website to Facebook through a similar, but slightly different pixel than that before the Court here.

136 F.4th at 43.   The Circuit, in affirming the dismissal of the plaintiff's claim, held that "personally identifiable information" under the VPPA "encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." *Id*. at 52.   Thus, a VPPA claim can only survive a motion to dismiss if "the Complaint plausibly allege[d] that [the defendant]'s disclosure of [the plaintiff]'s [Facebook ID] and video titles 'would, with little or no extra effort, permit an ordinary recipient to identify [the plaintiff's] video-watching habits.'" *Id*. at 54 (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016)).   Given the opacity of the computer code transmitted to Facebook in the case, the Circuit found that it was "implausible that an ordinary person would look at the [code]" and understand it to contain a video's title or the viewer's Facebook ID.   *Id*.   The Circuit concluded that, in such circumstances, no personally identifiable information had been disclosed, and thus no violation of the VPPA had occurred.

Subsequently, the Second Circuit considered another pixel-related VPPA claim and, relying on the reasoning of *Solomon*, affirmed the district court's dismissal of the plaintiff's complaint.   *Hughes*, 2025 WL 1720295.   In so doing, the Court clarified that *Solomon* "focused on whether an ordinary person would be able to understand the actual underlying code communication itself, regardless of how the code is later manipulated or used by Facebook." *Id*. at *3.   The Court further proclaimed that "*Solomon* effectively shut the door for Pixel-based VPPA claims."   *Id*. at *2.

### C.  Application

There are three issues as to the VPPA's applicability to this case: (1) whether Plaintiffs are protected as "subscribers" under the statute under the Second Circuit's decision in *Salazar*; (2) whether TED's disclosures violate the VPPA because they are of the sort that an "ordinary person" can discern with "little or no extra effort" under the Circuit's decision in *Solomon*; and (3) whether

TED's disclosures are within the "ordinary course of business," and thus subject to a statutory exemption from liability under the VPPA.  The Court addresses each issue in turn.

### 1.  Subscriber Relationship

The Court first addresses Defendant's argument that Plaintiffs have failed to allege that they are consumers (or, more specifically, "subscribers") under the VPPA.  Plaintiffs assert that *Salazar* provides enough support for their claims to survive this Motion to Dismiss.  And the Court—mostly—agrees.[5]  While true that the Second Circuit explicitly concluded that the types of information provided by the Plaintiffs here constitute a form of payment that could support the finding of a subscriber relationship, this case is somewhat different.  In *Salazar*, the plaintiff signed up for a subscribers-only newsletter with exclusive content.  *See* 118 F.4th at 536; *see also Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 254 (S.D.N.Y. 2025) (concluding that provision of personal information in exchange for *exclusive* content satisfies *Salazar*).  That is not the case here, where the Plaintiffs do not obtain any particular content from TED, but rather receive personalized recommendations and can sync videos across all of a user's devices, download videos to watch offline, and add talks to the user's list to watch later, among other benefits.  FAC ¶¶ 15.  And so the Court must address a question explicitly "le[ft] … for another day" by the *Salazar*: whether these sorts of alleged non-content benefits are sufficient to render Plaintiffs "subscribers" under the VPPA.  *See Salazar*, 118 F.4th at 552 n.14.  That is, do these benefits constitute "goods

---

[5] TED cites several contrary rulings, including the Sixth Circuit's decision in *Salazar v. Paramount Glob.*, 133 F.4th 642 (6th Cir. 2025), where the court held that a newsletter subscriber did not qualify as a "consumer" under the VPPA.  But the Second Circuit's decision in *Salazar*, holding that a subscriber relationship can be formed in absence of a monetary payment is controlling on this Court.

or services from a video tape service provider" that Plaintiffs have obtained in exchange for their personal information.[6]

Having reviewed the many decisions concerning similar allegations, the Court concludes that Plaintiffs have adequately alleged that they are consumers under the VPPA. In exchange for their personal information, TED account holders receive various benefits available only to them. While the Second Circuit has not yet directly addressed whether these sorts of "goods or services" fall within the VPPA, this Court joins the many other district courts that have taken an expansive view of the sorts of offerings that can establish a subscriber relationship and thus trigger the statute's protections. *See Joseph v. IGN Ent., Inc.*, No. 24 Civ. 11579, 2025 WL 2597913, at *3 (D. Mass. July 10, 2025) (finding that, in exchange for PII, access new offers such as ability to enter contests made someone a consumer under the VPPA); *Mata v. Zillow Grp., Inc.*, No. 24 Civ. 1095, 2024 WL 5161955, at *4 (S.D. Cal. Dec. 18, 2024) (finding that viewing videos after registering for an account is sufficient for a subscriber relationship, even where Plaintiff did not allege any specific additional benefits related to signing up for an account).

---

[6] TED argues that, in order to determine whether Plaintiffs are subscribers within the meaning of the VPPA, a court must apply the factors set forth by the Eleventh Circuit in *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) (the "*Ellis* factors"). *See* Def.'s Br. at 11. The Court acknowledges that it walked through each of the *Ellis* factors in its prior opinion. *See* First MtD Order at 8-12. But in light of the Second Circuit's decision *Salazar*, which found a subscriber relationship without expressly walking through each of the *Ellis* factors, the Court concludes that doing so is unnecessary in this Circuit. As explained above, under the facts of this case, the Court concludes that Plaintiffs have adequately alleged subscriber status under *Salazar*. In any event, while the *Ellis* factors may remain relevant to assessing subscriber status, *Ellis* itself did not hold that any single factor (or any particular number of them) is strictly necessary to finding that a plaintiff is a subscriber within the meaning of the VPPA. And here, even if the Court were to apply the *Ellis* factors, it would reach the same conclusion based on *Salazar*'s holding that providing personal data may constitute a form of payment under the VPPA, combined with the presence of certain other *Ellis* factors described in the Court's prior opinion. *See id.*

As the Seventh Circuit noted, "[n]othing in the Act says that the goods or services must be video tapes or streams." *Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022, 1025 (7th Cir. 2025). As the Court went on,

> The Act is aimed principally at information about videos; public disclosure of his rentals is what happened to Judge Bork. And what happened to Judge Bork has some overlap with what plaintiffs allege; after all, the Meta pixel encodes the name of each video that they stream from the website. But as far as the statute is concerned, this connection lies in the definition of "video tape service provider" rather than the definition of "consumer". Any purchase or subscription from a "video tape service provider" satisfies the definition of "consumer", even if the thing purchased is clothing or the thing subscribed to is a newsletter. So the Second Circuit recently held. *Salazar*, 118 F.4th at 546–50. We agree.

*Id*.  Applied here, the Court concludes that the "thing[s] subscribed to" in this case are the several benefits offered by TED to those who give up their personal identifying information, including "personalized recommendations" and the ability to "sync videos across all of a user's devices, download videos to watch offline, and add talks to [the user's] list to watch later." *See id.*; FAC ¶¶ 104, 110, 117, 122.  It seems clear that, if users had paid cash for these services, they would be considered "subscribers."  As explained above, Plaintiffs here instead "purchased" these features with their data.  *See Salazar*, 118 F.4th at 552-53.  Accordingly, Plaintiffs have adequately alleged that they are consumers under the VPPA.

### 2. Disclosure of Personally Identifiable Information

As the Second Circuit acknowledged, *Solomon* and *Hughes* "effectively shut the door for Pixel-based VPPA claims." *Hughes*, 2025 WL 1720295, at *2.  Where complicated computer code and hash values are transmitted to a third party, courts in this District have uniformly found that a VPPA claim cannot survive.[7]  For example, in *Simon* v. *Scripps Networks, LLC*, a court in this

---

[7] See  *Salazar v. Nat'l Basketball Ass'n*, 22 Civ. 7935, 2025 WL 2830939, at *5 (S.D.N.Y. Oct. 6, 2025) ("Because an ordinary person would not plausibly be able to identify Plaintiff's

District found that the transmission of the data shown below—which could, with appropriate expertise, be used to identify a user and their viewing history—failed to establish a claim under the VPPA. 24 Civ. 8175, 2025 WL 3167915, at *6-8 (S.D.N.Y. Nov. 13, 2025).



Figure 10

*Simon*, 24 Civ. 8175, ECF No. 22, Second Amended Complaint, ¶ 24.  The Court concluded that the lack of "clear[ ] label[s]" supported an inference that an "ordinary person" could not "identify the personal information conveyed by that code."  *Simon*, 2025 WL 3167915, at *6–7.  The Court

---

video-watching habits as a result of the Pixel transmissions, Plaintiff has not plausibly alleged that the NBA disclosed personally identifiable information in violation of the VPPA."); *Joiner v. NHL Enters., Inc.*, 23 Civ. 2083, 2025 WL 3126106, at *1–2 (S.D.N.Y. Sept. 29, 2025) (dismissing pixel-based VPPA claim after adopting in part report and recommendation that relied on *Solomon*); *Taino v. Bow Tie Cinemas, LLC*, 23 Civ. 5371, 2025 WL 2652730, at *8 (S.D.N.Y. Sept. 16, 2025) (*Solomon* was "fatal" to "Plaintiff's allegations ... that Defendant sent Plaintiff's Facebook ID and the name of the movie they were purchasing tickets for ... to Facebook"); *Golden v. NBCUniversal Media, LLC*, 22 Civ. 9858, 2025 WL 2530689, at *7 (S.D.N.Y. Sept. 3, 2025) ("[D]isclosures comprehensible only to Facebook or other sophisticated actors are not PII. That forecloses [the plaintiff]'s claim."); *Nixon v. Pond5, Inc.*, 24 Civ. 5823, 2025 WL 2030303, at *5 (S.D.N.Y. July 21, 2025) (granting motion to dismiss because "the Second Circuit has now twice rejected" plaintiffs' theory that their Facebook IDs "can be identified from the c_user cookie and can thus be used to identify their individual video-watching habits.").

However, Courts outside this Circuit have concluded differently.  *Goodman v. Hillsdale Coll.*, 25 Civ. 417, 2025 WL 2941542, at *9 (W.D. Mich. Oct. 17, 2025) ("The VPPA is not primarily aimed at bystanders who might intercept a disclosure; rather, it is meant to prevent an *intended recipient* from receiving a disclosure. The information in the screenshot above is plainly sufficient for Meta to determine a person's Facebook ID, or else Meta would arrange for the Pixel to transmit the information in some other form"); *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015) ("No one would deny that I would violate the VPPA by passing someone an encrypted list of [a person]'s video rentals—if my recipient and I both understood that we would use a mutually intelligible code.").

then held that the Complaint failed to allege how an ordinary person "with little or no extra effort" would be able to discern that the pixel transmission contained Simon's Facebook ID, browser identifier, or the titles of the videos viewed by her. *Id*.

However, as Plaintiffs noted at oral argument, the Facebook Pixel is not at issue here. Rather, TED uses Leanplum, MixPanel, and OpenWeb. And instead of sharing strings of letters and numbers that, only with the application of technical expertise, could be used to reveal a person's viewing history, Plaintiff alleges that TED shares easily identifiable information on specific users linked to a specific video viewed. For example, Plaintiff alleges that TED shares to Leanplum a user's email, name, and userID number in an easily readable format.



Disclosure of User ID to Leanplum

FAC ¶ 68. Plaintiff further alleges that TED also shares the video ID number and "Title" of the video watched by a user, identifying the user by their userID number.



FAC ¶ 72. This is a far cry from the incomprehensible strings of characters that the Circuit and other courts in this district have found not to be comprehensible by an ordinary user.[8] As alleged

_____

[8] The parties agreed at oral argument that, if TED anonymized these transmissions in a way that made the data not immediately comprehensible to an ordinary person, *Solomon* would likely preclude this claim, so long as an ordinary person would be unable to decode the transmission with little or no extra effort. But such a mode of disclosure would seem to contravene the VPPA's

by Plaintiffs, these sorts of disclosures are of such a nature that an ordinary person, with little or no extra effort could identify a user's video viewing history—i.e., by simply matching the userID number in the record with a person's name and email address, to the record with the title of the video viewed by the user with that same userID number.

The Court therefore concludes that Plaintiffs have adequately alleged that TED shares personally identifiable information linked to video viewing history in a manner comprehensible to an ordinary user when it shares a user's name and a video title with Leanplum, Mixpanel, and OpenWeb.

### 3. Ordinary Course of Business

While Plaintiffs have adequately pleaded knowing disclosure of personally identifiable information, Defendant argues that they are exempt from liability because any disclosures occurred in the ordinary course of business. The VPPA carves out liability where "the disclosure is incident to the ordinary course of business of the video tape service provider." 18 U.S.C. § 2710(b)(2)(E). "The term 'ordinary course of business' is 'narrowly defined' in the statute," *Daniel v. Cantrell*, 375 F.3d 377, 382 (6th Cir. 2004) (quoting S. Rep. No. 100-599, at 14) (1988). "[T]he term 'ordinary course of business' means only debt collection activities, order fulfillment, request processing, and the transfer of ownership." 18 U.S.C. § 2710(a)(2).

---

purpose of preventing the disclosure of a subscriber's viewing history. For example, if then-Judge Bork's viewing history had been disclosed in an encrypted manner, with a key given only to Congress, that disclosure would not necessarily be readable by an ordinary person. However, that would still seem to be the sort of unauthorized disclosure of a person's video viewing history that the VPPA was enacted to prevent. *See In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015) ("No one would deny that I would violate the VPPA by passing someone an encrypted list of [a person]'s video rentals—if my recipient and I both understood that we would use a mutually intelligible code."). *Solomon*, however, which binds this Court, seems to suggest otherwise, because a transmission encrypted along these lines would not be something that an "ordinary person" could understand with "little or no extra effort." In any event, that precise question is not presented today, and the Court need not address it.

Reviewing the FAC, the Court concludes that Plaintiffs have adequately pleaded that the ordinary course of business exception does not apply. *See Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023) ("To state a claim under § 2710(b), a plaintiff must allege that . . . (4) the disclosure was not authorized by another part of the statute."); *Lamb v. Forbes Media LLC*, No. 22 Civ. 6319, 2023 WL 6318033, at *5 (S.D.N.Y. Sept. 28, 2024) (same).  The FAC alleges that Defendants use Leanplum, Mixpanel, and OpenWeb for marketing, advertising and analytics. *See, e.g.*, FAC ¶¶ 14, 88, 101, 105.  To this Court's knowledge, no court has found that disclosure for these purposes falls within an exception to the VPPA. *See, e.g.*, *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024) ("The alleged uses of the information here – marketing, advertising, and analytics – do not fall within the exception's narrow list of permissible uses."); *Rancourt v. Meredith Corp.*, No. 22 Civ. 10696, 2024 WL 381344, at *17 (D. Mass. Feb. 1, 2024) (holding that disclosures of "App user data as part of its targeted advertising campaign which is intended to drive revenue … [and] better target ads does not constitute an intra-corporate disclosure or a disclosure in support of management operations."); *Burdette v. FuboTV Inc.*, No. 23 Civ. 10351, 2024 WL 2831466, at *5 (N.D. Ill. June 4, 2024) ("As targeted marketing and advertising analytics have only ballooned in complexity and pervasiveness . . .'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities."); *Ade v. Viki, Inc.*, No. 23 Civ. 2161, 2024 WL 1880153, at *3 (N.D. Cal. Mar. 28, 2024) ("The complaint alleges that Viki uses the Pixel to track visitor actions on its website and to better target their products and services on Facebook to interested consumers, thereby increasing its profits … The Court cannot find as a matter of law based on the allegations of the complaint that the purpose of this data-sharing arrangement falls within the ordinary course of business exception.").  The Court similarly finds that the sharing of Plaintiffs' video viewing history for the marketing purposes alleged here is not in the ordinary course of business within the meaning of the VPPA.

Further, despite Defendant's contention otherwise, the Court sees no reason to find that Plaintiffs allegations that the data is shared for marketing and analytics purposes are implausible. Plaintiffs allege in detail the marketing capabilities of Leaplum, Mixpanel, and OpenWeb. *See, e.g.*, FAC ¶¶ 16-19, 22-23, 32-36, 45-47, 50-51, 53-54, 73, 75, 80, 81, 84-89, 98, 100-01, 102-03, 105, 106-110, 114-15, 117, 119 (alleging, among other things, "Defendant discloses PII to the third parties for marketing, advertising, and data analytics purposes, which are all significant revenue-generating activities for Defendant. This is because [c]ompanies can purchase advertising space on … sites [like Defendant's] in an effort to reach consumers they might otherwise miss."). TED's counter-assertion that disclosures of information to Leanplum, Mixpanel, and OpenWeb "[are] not plausibly alleged to have been made for . . . any reason other than assisting TED in managing and maintaining its website," Def's Br. at 22, is unavailing at this stage in the litigation. Plaintiffs allege in detail how TED discloses PII (including video-viewing history) to third parties that "help[] publishers engage readers and target them with ads," and how the relevant software can be used for such purposes. *See* FAC ¶¶ 38–119. While Defendant raises a factual dispute regarding Plaintiffs' allegations, that does not render them implausible for purposes of a motion to dismiss, and the Court deems it improper to address those disagreements at this stage. *Ade*, 2024 WL 1880153, at *3 ("The scope of the ordinary course of business exception and whether Viki's use of the Pixel falls within the exception are issues better addressed on a fuller record at summary judgment."); *Jackson v. Fandom, Inc.*, 22 Civ. 4423, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023) ("To the extent Fandom challenges Jackson's factual allegations regarding the purpose of Fandom's data-sharing practices, that factual issue is not appropriate for resolution on a motion to dismiss.").

### III.    Constitutionality of the VPPA

Having found that the VPPA applies to TED's alleged disclosures of Plaintiffs video viewing history, the Court now turns to Defendant's contention that the VPPA is unconstitutional as applied in this context.

#### A.  Commercial Speech

##### 1.  Legal Standard

"[A]s a general matter, [the] government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011).  "However, this principle, like other First Amendment principles, is not absolute." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).  Some "categories of speech are subject to a less-exacting standard of judicial scrutiny." *Volokh v. James*, 148 F.4th 71, 85 (2d Cir. 2025).  One such category is commercial speech, which "enjoys a limited measure of protection . . . and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression." *Bd. of Trs. v. Fox*, 492 U.S. 469, 477 (1989).  "However, commercial speech that is not false or deceptive and does not concern unlawful activities may be regulated only if it survives intermediate scrutiny." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 374 (2d Cir. 2025).

"The core notion of commercial speech is that which does no more than propose a commercial transaction." *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 274 (2d Cir. 2010).  "Outside this so-called 'core' lie various forms of speech that combine commercial and noncommercial elements." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998).  "Whether these types of mixed communications are considered commercial speech is based upon a number of factors, including whether the speech is an advertisement, whether the speech references a specific product, and whether the speaker has an economic motive."  *Nat'l Inst. of*

*Fam. & Life Advocs*, 160 F.4th at 374; *see also Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) ("Even a communication combining commercial and noncommercial elements, if it is an advertisement, makes reference to a specific product, and the speaker has an economic motivation for the communication, is properly characterized as commercial speech."). Ultimately, "a court's lodestars in distinguishing commercial from noncommercial speech must be the nature of the speech taken as a whole[.]" *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010). "In other words, context matters, and, as a result, our inquiry is fact intensive." *Nat'l Inst. of Fam. & Life Advocs*, 160 F.4th at 374; *see also Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) ("[The] commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.").

## 2. Application

Plaintiffs allege that TED discloses users' video viewing information for marketing and analytics purposes. The complaint explains in detail how, by disclosing this data, TED can increase the revenue it generates through selling advertisements on its website. FAC ¶ 32. With more refined information about a user's interests, TED can better target said user with advertisements for products they are more likely to buy. FAC ¶ 84, 87-88, 117. This makes an advertisement on TED's website more valuable to an advertiser, bringing in more revenue for TED.

TED disputes these allegations. Rather than for marketing purposes, TED asserts that the disclosure of video viewing information to the various analytics sites is for enhancing the "user experience" and "back office functions" having nothing to do with any revenue-seeking motive. Def's Br. at 16. In their view, disclosing personal information goes to the core of TED's protected speech rights to optimize the way in which users interact with their site and facilitates spreading TED's message by increasing user engagement. *See id*.

While the Court agrees that, if ultimately accurate, TED's characterization of the driving purpose for disclosing user video viewing information would pose serious constitutional questions, the ultimate "inquiry" behind the alleged motivation for disclosures of this nature "is fact intensive." *Nat'l Inst. of Fam. & Life Advocs*, 160 F.4th at 374.  At this stage in the litigation, the Court is tasked with addressing the allegations in Plaintiffs' well-pleaded complaint. *See Sacerdote*, 9 F.4th at 106.  Plaintiffs thoroughly and plausibly allege the revenue-generating purpose of disclosing user's video-viewing history, which the Court assumes to be true for purposes of adjudicating this Motion.  The Court leaves for another day whether Plaintiffs allegations may ultimately be inaccurate.

Turning to the alleged marketing purpose for the disclosures here, the Court finds that Plaintiffs' allegations of economic motive weigh strongly in favor finding this to be commercial speech.  While TED is a nonprofit, selling advertisements to bring in revenue is a core business function with a purely economic motive.  Numerous district courts have held similarly.  *See, e.g.*, *Saunders*, 711 F. Supp. 3d at 33, 33 n.8 (holding "disclosure of PII to third parties is commercial speech" because it was "solely motivated by the desire for profit, which is a force less likely to be deterred than others");  *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1034 (N.D. Cal. 2023) (disclosure of PII to third party was commercial speech, "as is most similar speech governed by the VPPA in the context of corporate data collection and analysis"); *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 355 (S.D.N.Y. 2021) (finding commercial speech where the plaintiff "alleged that NABP's statements were made for the purpose of influencing consumers to buy defendant's goods or services").  Even if revenue generated through the sale of targeted advertising ultimately benefits the nonprofit's mission, a nonprofit is not exempt from any regulations that may govern how an entity generates revenue solely because of its nonprofit status.  Where, as alleged here, a nonprofit acts with what appears to be a purely

economic motive, in a manner that does not suggest any intent to spread a message, such speech is properly treated as commercial for purposes of a First Amendment challenge. *Compare with Nat'l Inst. of Fam. & Life Advocs*, 160 F.4th at 375-76 (finding speech to be non-commercial where speaker did not act with profit motive and sought to spread a specific message).

### B.  Intermediate Scrutiny

Having concluded for purposes of this Motion that TED's disclosures constitute commercial speech, the Court must subject the VPPA's prohibition on said disclosures to intermediate scrutiny.  Commercial speech may be regulated if the government: (1) "assert[s] a substantial interest in support of its regulation"; (2) "demonstrate[s] that the restriction on commercial speech directly and materially advances that interest"; and (3) the regulation is "narrowly drawn." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995).

Every Court to have addressed the constitutionality of the VPPA has found it to pass muster under intermediate scrutiny.  *See, e.g., Saunders*, 711 F. Supp. 3d at 33 ("[T]he court is aware of no cases in any circuit – and Hearst cites none – holding that the VPPA violates the First Amendment.").  To begin, there is no dispute that there is a substantial government interest in protecting user privacy.  Congress's stated intent in enacting the VPPA was to "preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." S. Rep. No. 100-599, at 1 (1988). "The Supreme Court has repeatedly recognized the sanctity of personal privacy." *Saunders*, 711 F. Supp. 3d at 33 (citing *Frisby v. Schultz*, 487 U.S. 474, 483-485 (1988)).

Furthermore, as applied, the VPPA is closely drawn to advance the protection of user privacy without overly burdening TED's speech rights.  To begin, the law applies only to video service providers and restricts their disclosure only of an individual's video viewing history.  Thus, "[t]he law limits the dissemination of precisely the kind of information with which the state is

23

concerned, and targets those most likely to disseminate it." *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 449 (S.D.N.Y. 2016).

Finally, working around the VPPA is only minimally burdensome for entities subject to its restrictions. As Plaintiffs concede, the VPPA prohibits disclosure of video-viewing history only without a user's consent. If TED added a checkbox during account creation that required approval of TED's sharing of video-viewing history, the VPPA would no longer bar those disclosures. Pls.' Br. at 19; *see also Cappello v. Walmart Inc.*, 18 Civ. 6678, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) ("It would also not be burdensome to design a website whereby consumers must click a box confirming their consent to disclosures involving video purchases and click a separate box confirming their consent to all other applicable policies and terms."). As interpreted by *Solomon*, the VPPA is further cabined to preventing only disclosures in which an ordinary person can readily identify a user's video-viewing history without any extra effort or technical expertise. *See* 136 F.4th at 51-53. Thus, certain efforts to anonymize any disclosed data may satisfy the statute while also advancing Congress' interest in protecting user privacy.

*          *          *

The Court thus concludes that, based on Plaintiffs' allegations in the FAC, the VPPA as-applied satisfies intermediate scrutiny.

**CONCLUSION**

For the reasons discussed herein, the Court **DENIES** Defendant's motion to dismiss under Rule 12(b)(1) and Rule 12(b)(6).  The Parties are hereby **ORDERED** to file a proposed case management plan within 14 days of this Order.

The Clerk of Court is respectfully requested to terminate ECF No. 57.


SO ORDERED.

Dated: January 27, 2026

New York, New York


_____

DALE E. HO

United States District Judge